David A. Nelson (Ill. Bar No. 6209623; *pro hac vice*)
davenelson@quinnemanuel.com
QUINN EMANUEL URQUHART & SULLIVAN, LLP
500 West Madison St., Suite 2450
Chicago, IL 60661
Telephone: (312) 705-7400
Facsimile: (312) 705-7401

Karen P. Hewitt (State Bar No. 145309)
kphewitt@jonesday.com
Randall E. Kay (State Bar No. 149369)
rekay@jonesday.com
JONES DAY
4655 Executive Drive, Suite 1500
San Diego, CA 92121.3134
Telephone: (858) 314-1200
Facsimile: (844) 345-3178

Evan R. Chesler (N.Y. Bar No. 1475722; *pro hac vice*)
echesler@cravath.com
CRAVATH, SWAINE & MOORE LLP
825 Eighth Avenue
New York, NY 10019
Telephone: (212) 474-1000
Facsimile: (212) 474-3700

[Additional counsel identified on signature pages]

*Attorneys for Counterclaim-Defendants*
QUALCOMM INCORPORATED
QUALCOMM TECHNOLOGIES, INC.

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| QUALCOMM INCORPORATED, | Case No. 3:17-CV-01375-DMS-MDD |
| Plaintiff, | **COUNTERCLAIM-DEFENDANTS QUALCOMM INC.'S AND QUALCOMM TECHNOLOGIES, INC.'S OPENING CLAIM CONSTRUCTION BRIEF** |
| v. | |
| APPLE INCORPORATED, | |
| Defendant. | |
| AND RELATED COUNTERCLAIM. | |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................... 1

LEGAL STANDARD ............................................................................... 1

ARGUMENT ............................................................................................ 2

I.    The Campbell Patents............................................................................ 2

    A.    "integrated circuit" ('905 Patent, '559 Patent, and '534 Patent) .......... 2

    B.    "received on a first / second input to the integrated circuit" ('905
       Patent) and "receiving power from at least one first / second
       input to the integrated circuit" ('559 Patent) ......................................... 5

    C.    "during use" ('905 Patent, '559 Patent, and '534 Patent)..................... 6

        1.    The Claim Language........................................................................ 6

        2.    The Specification and Prosecution History ................................. 8

II.   The Youngs Patents ............................................................................... 9

    A.    "core" and "area" ('453 Patent) ............................................................ 10

        1.    The Scope of Claim 1 of the '453 Patent Is Uncertain.............. 10

        2.    The Intrinsic Record Makes Claim 1 Less Clear...................... 11

        3.    Apple's Constructions Do Not Resolve the Problem................ 12

    B.    "wherein in a normal operation mode . . . the core voltage is a
       first value that is sufficient to maintain the state information of
       the instruction-processing circuitry" [Apple] or "sufficient to
       maintain the state information of the instruction-processing
       circuitry" [Qualcomm] ('453 Patent).................................................... 13

    C.    "power area" ('940 Patent) .................................................................... 14

    D.    "real-time clock"('940 Patent) .............................................................. 15

III.  The de Cesare Patents........................................................................... 16

    A.    "performance domain" ('812 Patent, '216 Patent, and '196
       Patent) ..................................................................................................... 18

    B.    "power management unit" ('812 Patent, '216 Patent, and '196
       Patent) ..................................................................................................... 20

# TABLE OF CONTENTS
(continued)

Page

C. "establish a . . . performance state" ('812 Patent, '216 Patent, and '196 Patent) ........................................................................... 23

D. "a prior performance state at which the processor was operating prior to entering the sleep state" ('812 Patent) .................................... 24

# TABLE OF AUTHORITIES

**Page**

C<span style="font-variant:small-caps">ASES</span>

*Allen Eng'g Corp. v. Bartell Indus., Inc.*,
    299 F.3d 1336 (Fed. Cir. 2002) ............................................................................ 8

*Baldwin Graphic Sys., Inc. v. Siebert, Inc.*,
    512 F.3d 1338 (Fed. Cir. 2008) .......................................................................... 25

*Capital Security Systems, Inc. v. NCR Corporation*,
    2018 WL 1181197 (Fed. Cir. 2018) .................................................................. 12

*Comput. Docking Station Corp. v. Dell, Inc.*,
    519 F.3d 1366 (Fed. Cir. 2008) ................................................................ 4, 6, 21

*Decisioning.com, Inc. v. Federated Dep't Stores, Inc.*,
    527 F.3d 1300 (Fed. Cir. 2008) ............................................................................ 3

*Fenner Investments, Ltd. v. Cellco Partnership*,
    778 F.3d 1320 (Fed. Cir 2015) ...................................................................... 14, 21

*Interval Licensing LLC v AOL, Inc.*,
    766 F.3d 1364 (Fed. Cir. 2014) .......................................................................... 12

*K-2 Corp. v. Salomon S.A.*,
    191 F.3d 1356 (Fed. Cir. 1999) .......................................................................... 25

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
    134 S. Ct. 2120 (2014) .......................................................................... 1, 2, 7, 12

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
    521 F.3d 1351 (Fed. Cir. 2008) .......................................................................... 23

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) (en banc) ...................................................... 1, 25

*Rexnord Corp. v. Laitram Corp.*,
    274 F.3d 1336 (Fed. Cir. 2001) ........................................................... 13

*Saffran v. Johnson & Johnson*,
    712 F.3d 549 (Fed. Cir. 2013) ........................................................... 4, 6

*UltimatePointer, LLC v. Nintendo Co.*,
    816 F.3d 816 (Fed. Cir. 2016) ........................................................... 3

*Ventana Med. Sys., Inc. v. Biogenex Labs., Inc.*,
    473 F.3d 1173 (Fed. Cir. 2006) ........................................................... 22

QUALCOMM'S & QTI'S OPENING CLAIM CONSTRUCTION BRIEF

**TABLE OF EXHIBITS**

| | |
|---|---|
| Exhibit A | U.S. Patent No. 7,355,905 to Campbell et al. |
| Exhibit B | U.S. Patent No. 7,760,559 to Campbell et al. |
| Exhibit C | U.S. Patent No. 8,098,534 to Campbell et al. |
| Exhibit D | Declaration of Dr. Vijay Madisetti with Exhibits (July 20, 2018) |
| Exhibit E | U.S. Patent No. 7,383,453 to Youngs[1] |
| Exhibit F | U.S. Patent No. 8,433,940 to Youngs |
| Exhibit G | Declaration of Dr. Richard Belgard with Exhibits (July 20, 2018) |
| Exhibit H | November 14, 2007 Amendment in Response to Office Action during prosecution of the '453 patent |
| Exhibit I | October 17, 2012 Amendment in Response to Office Action during prosecution of the '940 patent |
| Exhibit J | U.S. Patent No. 8,271,812 to de Cesare et al. |
| Exhibit K | U.S. Patent No. 8,443,216 to de Cesare et al. |
| Exhibit L | U.S. Patent No. 8,656,196 to de Cesare et al. |
| Exhibit M | Declaration of Dr. Vincent Mooney with Exhibits (July 20, 2018) |
| Exhibit N | February 24, 2012 Office Action during prosecution of the '812 Patent |
| Exhibit O | May 16, 2012 Response to Office Action during prosecution of the '812 patent |
| Exhibit P | Excerpts from the August 3, 2018 Deposition of |

---

[1] To aid in the Court's review of the '453 Patent claims, Qualcomm has included a listing of claims as amended with Exhibit E.

| | Dr. Sherief Reda |
|---|---|
| Exhibit Q | Excerpts from the August 3, 2018 Deposition of Dr. Vincent Mooney |
| Exhibit R | U.S. Patent No. 7,120,061 to Daga |
| Exhibit S | Excerpts from prosecution history of U.S. Patent No. 7,355,905 to Campbell et al. |
| Exhibit T | Excerpts from Webster's New College Dictionary (2007) |

# TABLE OF ABBREVIATIONS

| | |
|---|---|
| '196 Patent | U.S. Patent No. 8,656,196 |
| '216 Patent | U.S. Patent No. 8,443,216 |
| '453 Patent | U.S. Patent No. 7,383,453 |
| '534 Patent | U.S. Patent No. 8,098,534 |
| '559 Patent | U.S. Patent No. 7,760,559 |
| '812 Patent | U.S. Patent No. 8,271,812 |
| '905 Patent | U.S. Patent No. 8,098,534 |
| '940 Patent | U.S. Patent No. 8,433,940 |
| Apple | Apple Inc. |
| Campbell Patents | U.S. Patent Nos. 7,355,905; 7,760,559; and 8,098,534 |
| de Cesare Patents | U.S. Patent Nos. 8,271,812; 8,443,216; and 8,656,196 |
| Qualcomm | Qualcomm Inc. and Qualcomm Technologies, Inc. |
| USPTO | United States Patent and Trademark Office |
| xx:yy-zz | When citing to a patent, "xx" refers to the column and "yy-zz" refers to the lines numbers.

When citing to a deposition transcript, "xx" refers to the page and "yy-zz" refers to the lines numbers. |
| Youngs Patents | U.S. Patent Nos. 7,383,453 and 8,433,940 |

## INTRODUCTION

Qualcomm's claim constructions track the meanings ascribed to the disputed terms by the applicants and, where appropriate, correctly identify the terms that fail to inform those skilled in the art about the scope of the inventions with reasonable certainty. Apple's constructions, on the other hand, conflict with the intrinsic record and should be rejected.

## LEGAL STANDARD

A claim term is construed to "have the meaning that the term would have to a person of ordinary skill in the art … at the time of the invention." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc). "The person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which [it] appears, but in the context of the entire patent, including the specification." *Id.* Courts look first to the intrinsic evidence, i.e., the claim language, specification, and prosecution history. *Id.* at 1314-17. Sometimes, "the specification may reveal a special definition given to a claim term by the patentee that differs from meaning that it would otherwise possess," or it "may reveal an intentional disclaimer of claim scope by the inventor." *Id.* at 1316. "[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.* at 1317. Courts may also consider extrinsic evidence (e.g., dictionaries and expert testimony), but such evidence must be "considered in the context of the intrinsic evidence." *Id.* at 1317, 1319.

Indefinite patent claims are invalid. *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2124 (2014). A patent claim is indefinite if the claim, when read in light of the specification and prosecution history, "fail[s] to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Id.* Thus, while acknowledging that absolute precision is unattainable, a patent "must be precise

1  enough to afford clear notice of what is claimed, thereby apprising the public of

2  what is still open to them." *Id.* at 2129 (internal quotation marks omitted).

3  **ARGUMENT**

4  **I.    The Campbell Patents**

5         The Campbell Patents pertain to an integrated circuit having a logic circuit

6  and a memory circuit.  "Power consumption in an integrated circuit is related to the

7  supply voltage provided to the integrated circuit." (Ex. A at 1:28-29.)  "Reducing

8  the supply voltage generally leads to reduced power consumption." (*Id.* at 1:36-37.)

9  But lowering the supply voltage too much makes reading and writing memory

10 unreliable. (*Id.* at 1:37-63.)  The Campbell Patents claim an "integrated circuit" that

11 is supplied by two different voltages, the first for the "logic circuit" and the second

12 for the "memory circuit." (*Id.* at Fig. 1, 2:53-58.)  This allows the logic circuit's

13 voltage to be lower than the memory circuit's voltage, reducing power consumption

14 while maintaining memory circuit stability. (*Id.* at 3:22-30.)

15        **A.    "integrated circuit" ('905 Patent, '559 Patent, and '534 Patent)**

| "integrated circuit" | |
|---|---|
| **Apple's Construction** | **Qualcomm's Construction** |
| "one or more circuit elements that are integrated onto a single semiconductor substrate" | "a chip made up of connected circuit elements" |

19        Qualcomm's construction is the meaning a person of skill in the art would

20 give "integrated circuit" in the context of the Campbell Patents' specification and

21 prosecution history.  The "integrated circuit" cannot be simply any arbitrary set of

22 "one or more circuit elements that are integrated onto a semiconductor substrate," as

23 Apple proposes.  Instead, the intrinsic evidence dictates that the "integrated circuit"

24 be "a chip made up of connected circuit elements," as Qualcomm proposes.

25        The claim language requires "input[s]" to the "integrated circuit."  Thus, the

26 "integrated circuit" must have a discernable boundary with inputs on which "a [first

27 / second] supply voltage [is] received," and from which "the [first / second] voltage

28 domain receiv[es] power." (Ex. A at claim 1; Ex. B at claim 1.)  Contrary to this

language, Apple proposes that any arbitrary collection of "one or more circuit elements that are integrated onto a single semiconductor substrate" can be the "integrated circuit." Apple's proposal provides no notice of the boundaries of the "integrated circuit" and how to identify its "input[s]" as the claims require.

The specification's description of the "integrated circuit" further supports Qualcomm's construction. The patentees did not describe the integrated circuit as any arbitrary set of circuit elements, or a single element, on a substrate. Instead, the specification explains that the integrated circuit is a chip of connected logic and memory circuits: "The integrated circuit 10 may generally comprise the logic circuits 12 and the memory circuits 14 integrated onto a single semiconductor substrate (*or chip*)."[2] (Ex. A at 2:61-63 (emphasis added); *see also id.* at Fig. 1.) Thus, the "integrated circuit" is the entire chip made up of connected logic and memory circuit elements, not just any arbitrary subset of circuit elements within a chip. (Ex. A at 2:61-63, Fig. 1; *see also* Ex. D at ¶¶ 114-118.) Apple's contrary, dictionary definition-style construction ignores the specification's disclosure. *UltimatePointer, LLC v. Nintendo Co.*, 816 F.3d 816, 823-24 (Fed. Cir. 2016) (proposed meaning overbroad "in the specific context of the specification"); *Decisioning.com, Inc. v. Federated Dep't Stores, Inc.*, 527 F.3d 1300, 1308 (Fed. Cir. 2008).

Most importantly, the applicants' claim amendments and arguments to the

_____

[2] Semiconductor substrate and chip are synonyms. (Ex. D at ¶ 113; Ex. 13 to Ex. D at 277 ("**Integrated circuit** *n.* A device consisting of a number of connected circuit elements, such as transistors and resistors, fabricated on a single chip of silicon crystal or other semiconductor material. . . . *Also called:* chip."); Ex. 14 to Ex. D at 166, 570 ("**chip** . . . A small piece of silicon or other semiconductive material on which circuits can be placed"; "**integrated circuit** . . . A combination of interconnected circuit elements inseparably associated on or within a continuous substrate. . . . *Synonyms:* chip.").)

USPTO distinguishing the prior art refute Apple's overbroad construction. The applicants' amendments and arguments clearly distinguished their claimed invention from integrated circuits that generate either of the supply voltages on-chip. To overcome the examiner's rejection based on anticipation by U.S. Patent No. 7,120,161 ("Daga") (Ex. R), the applicants amended claim 1 of the '905 Patent to require that the "first supply voltage [be] <u>received on a first input to the integrated circuit</u>" and the "second supply voltage [be] <u>received on a second input to the integrated circuit</u>."[3] (Ex. S at 2-9, 21.) The applicants then argued that the amended claim was allowable because "Daga's integrated circuit *has only one power supply input to the integrated circuit* (ExtV$_{DD,}$ see Fig. 3)." (*Id.* at 27 (emphasis added).) Based on these amendments and arguments, the USPTO allowed claim 1 to issue.

Apple's construction would impermissibly broaden the claim scope to read on Daga, contrary to the applicants' claim amendments and representations to the USPTO. *Saffran v. Johnson & Johnson*, 712 F.3d 549, 559 (Fed. Cir. 2013); *Comput. Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1373-79 (Fed. Cir. 2008). Daga's Figure 3 shows a system-on-a-chip ("SOC") using two supply voltages, ExtV$_{DD}$ and RegV$_{DD}$. (Ex. R at Fig. 3, 3:13-24.) As shown by Figure 3, the first supply voltage ExtV$_{DD}$ 310 is generated outside of the SOC 300, while the second supply voltage RegV$_{DD}$ 330 is generated within the SOC 300 by a voltage regulator 315. (*Id.*) Under Apple's construction, an arbitrary line could be drawn around only Daga's microcontroller 335 and memory 340 to define the boundary of the "integrated circuit." (Ex. D at ¶ 126.) But Daga's voltage regulator 315, which generates the second supply voltage (RegV$_{DD}$), would then be outside the "integrated circuit" boundary—satisfying the claim. (*Id.*) This is precisely what the applicants told the USPTO Daga did not disclose. (*Id.*)

---

[3] The '559 Patent's claim 1 also refers to inputs to the integrated circuit.

### B. "received on a first / second input to the integrated circuit" ('905 Patent) and "receiving power from at least one first / second input to the integrated circuit" ('559 Patent)

| "received on a first / second input to the integrated circuit" | |
|---|---|
| **Apple's Construction** | **Qualcomm's Construction** |
| "provided to the integrated circuit on a first / second input" | "generated external to the integrated circuit and connected to the integrated circuit on a first / second input" |

| "receiving power from at least one first / second input to the integrated circuit" | |
|---|---|
| **Apple's Construction** | **Qualcomm's Construction** |
| "provided power from at least one first / second input to the integrated circuit" | "supplied by a first / second supply voltage generated external to the integrated circuit and connected to the integrated circuit on at least one first / second input" |

These claim terms are related and raise similar claim scope issues, so they are discussed together. Qualcomm contends that these terms require the two supply voltages to be generated external to the integrated circuit and connected to the integrated circuit on first and second inputs to the integrated circuit. This is required by the applicants' claim amendments and arguments made to the USPTO to overcome the prior art and secure issuance of the claims.[4]  *See supra* § I.A (discussing prosecution history of '905 Patent claim 1). This is also required by the

_____

[4] The '559 Patent does not expressly refer to supply voltages, but the "first voltage domain" and "second voltage domain" require separate first and second supply voltages. The '559 Patent defines a "domain": "A signal that is driven to a high assertion equal to a given supply voltage may be referred to as in the 'domain' of that supply voltage or 'referenced' to that supply voltage." (Ex. B at 5:22-25.) In addition, the '559 Patent states that "a supply voltage may be a voltage provided to a circuit to power the circuit." (*Id.* at 3:41-44.) A voltage domain that receives power from an input to the integrated circuit, as in the '559 Patent's claim 1, is supplied by a supply voltage connected to that input. (Ex. D at ¶¶ 142-143.) The supply voltage powers the voltage domain, enabling it to drive signals "to a high assertion equal to [that] supply voltage." (Ex. B at 5:22–25; *see also id.* at 7:48-50.)

specification and claim language. (*Id.*) Apple's unhelpful, tautological definitions do nothing more than change "received on" to "provided to" and reorder the words of the '905 Patent, and just change "receiving" to "provided" for the '559 Patent.

The applicants' prosecution history claim amendments and arguments clearly disavowed any coverage of integrated circuits that do not receive externally-generated and externally-connected first and second supply voltages. *Saffran*, 712 F.3d at 559; *Comput. Docking*, 519 F.3d at 1374-79. Qualcomm is entitled to rely on the applicants' statements made during prosecution of the '905 Patent. *Saffran*, 712 F.3d at 559; *Comput. Docking*, 519 F.3d at 1374-75. Apple cannot recapture through claim construction the claim scope the applicants disavowed during prosecution. *Comput. Docking*, 519 F.3d at 1379. Yet that would happen under Apple's proposed construction—Daga's second supply voltage (RegV$_{DD}$) generated within the SOC would satisfy these limitations. (Ex. D at ¶ 137.) But even without the applicants' disavowal, the claim language and specification disclose that the first and second supply voltages must be generated and connected external to the "integrated circuit"—as the claim language plainly states. *See supra* § I.A. Qualcomm's proposal should therefore be adopted, and Apple's rejected.

## C.    "during use" ('905 Patent, '559 Patent, and '534 Patent)

| "during use" | |
| --- | --- |
| **Apple's Construction** | **Qualcomm's Construction** |
| plain and ordinary meaning or "while operating" | indefinite |

### 1.    The Claim Language

The claims of the Campbell Patents use the phrase "during use" many times. In each instance, however, the object of the phrase "during use" is never stated. The specification and prosecution history fail to solve this mystery about the meaning and object of "during use" in each instance it appears. Thus, a person of skill in the art cannot determine the scope of the claims with reasonable certainty, and this phrase and the patent claims are indefinite and invalid. (Ex. D at ¶¶ 156-174);

*Nautilus*, 134 S. Ct. at 2124.  Furthermore, Apple's proposed construction, "while operating," does not resolve the question about what is being used (or operating) "during use" in each instance.  (Ex. D at ¶ 173.)

Claim 1 of the '534 Patent exemplifies this problem.  "During use" appears in three of its limitations: (1) "at least one logic circuit supplied by a first supply voltage ***during use***"; (2) "at least one memory circuit coupled to the logic circuit and supplied by a second supply voltage ***during use***"; and (3) "wherein a magnitude of the first supply voltage is less than a magnitude of the second supply voltage at least a portion of the time ***during use***."  (Ex. C at claim 1 (emphasis added).)  Focusing on the third limitation, its term "during use" lacks any antecedent, and nothing in the claim language specifies the object of the phrase.  (Ex. D at ¶ 166.)  But the questions is, "during use" of what?  "During use" could perhaps refer to use of the earlier logic circuit (*see* limitation (1)); use of the earlier memory circuit (*see* limitation (2)); use of both; or some other use of the "integrated circuit" or one of its other components.  (*Id.*)  Regardless, there is no clear or definitive answer in the claim, and the specification and the prosecution history also do not provide a definitive answer.  (*Id.* at ¶¶ 168-172.)  These different possibilities render claim 1 of the '534 Patent, and its dependent claims, indefinite.

An example further illustrates why the phrase "during use" in limitation (3) above renders these claims indefinite.  At the time the Campbell Patents were filed, logic circuitry could be powered off, while memory circuitry could be supplied with a minimum voltage sufficient for it to retain data.  (*Id.* at ¶ 165.)  Under this scenario, if "during use" refers to use of the logic circuit, then this limitation can be met <u>only if and when</u> the magnitude of the first supply voltage (i.e., logic voltage) is less than the magnitude of the second supply voltage (i.e., memory voltage) during use of the logic circuit—i.e., only when the logic circuit is powered on.  But if "during use" instead refers to use of the memory circuit, then this limitation could be met at any time that the memory is retaining data if a person of skill in the art

would consider that to be "use" of the memory circuit, regardless of the state of the logic circuit.[5] (*Id.*) Thus, what qualifies as "use" and "during use" cannot be determined, and the limitation is indefinite. And, as already discussed, there is no way to discern if "during use" in limitation (3) actually refers to the memory circuit, logic circuit, both circuits, the entire integrated circuit, or something else.

The phrase "during use" similarly renders the asserted claims of the '905 and '559 Patents indefinite. For example, claim 1 of the '905 Patent requires that "the memory array comprises a plurality of memory cells that are continuously supplied by the second supply voltage during use." An integrated circuit that can power off its memory circuitry while its logic circuitry is in use might continuously supply the memory cells with the second supply voltage during use of the memory cells, but it would not continuously supply the memory cells with the second supply voltage during use of the "integrated circuit" or "logic circuit." (*Id.* at ¶¶ 158-160.) Thus, the claim scope turns on what is the object of "during use." With respect to the '559 Patent, an integrated circuit that powers memory in order to retain stored data while the remainder of the integrated circuit does not receive power might have a "first voltage domain receiving power from at least one first input to the integrated circuit during use" of the "logic circuit" but lack a "first voltage domain receiving power from at least one first input to the integrated circuit during use" of the "integrated circuit." (*Id.* at ¶ 162.) These are only a few examples of the indefiniteness caused by the "during use" terms; there are many more. (*Id.* at ¶¶ 156-174.)

### 2. The Specification and Prosecution History

The specification mentions "during use" four times. (Ex. A at 2:6-9, 2:14-26,

---

[5] If such a device were to fall within the scope of claim 1 of the '534 Patent, it would raise additional validity questions, because this is not the "integrated circuit" that the patentees regarded as their invention. *Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1349 (Fed. Cir. 2002).

3:22-26.) None further clarifies the object of "during use" in each instance of the claims or cures their indefiniteness. (Ex. D at ¶ 170.)

Neither does the prosecution history. (*Id.* at ¶ 171.) Apple argued to the USPTO that "Daga teaches a non-volatile memory such as an EEPROM or Flash memory" and that "[i]n such memories, the memory array does not include memory cells that are continuously supplied with a supply voltage during use." (Ex. S at 26.) This refers to the second instance of "during use" in claim 1 of the '905 Patent ("wherein the memory array comprises a plurality of memory cells that are continuously supplied by the second supply voltage during use"). But these arguments do not define or narrow the object of "during use" in that limitation, because the argument is valid regardless of whether "during use" refers to the "integrated circuit," "memory circuit," or "memory cells." (Ex. D at ¶ 171.) The applicants also argued that Daga "fail[s] to teach or suggest 'the memory circuit comprises at least one memory array, and wherein the memory array comprises a plurality of memory cells that are continuously supplied by the second supply voltage during use" because Daga's "word lines (and bit lines) are only active during reads and writes." (Ex. S at 27.) This too offers no clarity; the applicants could have meant that the memory cells are not continuously supplied by the second supply voltage during use of the "integrated circuit," "memory circuit," "memory cells," "logic circuit," or any other circuit or circuit element. (Ex. D at ¶ 172.)

In the end, regardless of whether "during use" is not defined or is defined to mean "while operating," as Apple proposes, a person of skill in the art still would be unable to determine with reasonable certainty the object of what must be in use and operating "during use," as the claims recite. (*Id.* at ¶ 173.) The asserted claims of the Campbell Patents are therefore indefinite and invalid. (*Id.* at ¶ 174.)

## II.   The Youngs Patents

The Youngs Patents describe "techniques for conserving power usage in computer systems." (Ex. E at 1:19-20.) Both patents, which share a specification,

purport to teach reducing power consumption in processors "by reducing voltage supplied to an instruction-processing portion of the processor, while maintaining voltage to other portions of the processor." (*Id*. at 1:22-25.)

## A. "core" and "area" ('453 Patent)

| "core" | |
|---|---|
| **Apple's Construction** | **Qualcomm's Construction** |
| plain and ordinary meaning or "a logical or physical instruction processing mechanism" | Indefinite |

| "area" | |
|---|---|
| **Apple's Construction** | **Qualcomm's Construction** |
| "a portion of the processor excluding a core" | Indefinite |

In the context of the '453 Patent, a person of skill in the art is unable to determine with reasonable certainty which components of the "instruction processing system" of claim 1 fall within the claimed "core" and which fall within the claimed "area." Instead, by using these terms to define the claimed "instruction processing system," the patentee presents the public with a moving target, and neither the intrinsic evidence nor Apple's construction resolves the uncertainty.

### 1. The Scope of Claim 1 of the '453 Patent Is Uncertain

The terms "core" and "area" have no generally accepted meaning in the art such that a skilled artisan would understand the scope of claim 1 based on these terms alone. (Ex. G at ¶ 26.) Nor does the intrinsic evidence provide a clear one. Claim 1 tells the skilled artisan only that the "core" has "instruction-processing circuitry" and receives a "core voltage" while the "area" is "coupled to the core" and receives an "area voltage." (Ex. E at claim 1.) But claim 1 is not clear about what components make up the "core" or what components receive the core voltage. Likewise, claim 1 is silent regarding what components comprise the "area" and what components receive the area voltage. Thus, the terms "core" and "area" impart no certainty concerning the scope of claim 1.

## 2. The Intrinsic Record Makes Claim 1 Less Clear

Rather than clarify the scope of claim 1, the intrinsic record compounds the uncertainty over what each of the claimed "core" and "area" encompasses. Indeed, the specification does not even use "core" and "area" as standalone terms prior to their appearance in claim 1. Instead, the specification repeatedly uses the phrases "core power area" and "non-core power area" to define two mutually exclusive parts of the claimed instruction processing system. (*Id*. at 3:8-9; 3:30-31 ("[n]on-core power area 124 comprises *the* remaining portion of processor 102…") (emphasis added); Figs. 1A and 1B.) Even assuming the terms "core" and "area" are co-extensive with the phrases "core power area" and "non-core power area," however, the claim language is no more certain to a skilled artisan reading the '453 Patent. (Ex. G at ¶¶ 27-38.) That is because the specification lists certain components as falling within the "core power area" some of the time, and lists the same components falling within the "non-core power area" at other times, without providing any rationale for how to configure the components to practice (or avoid) the claims. (Ex. E at 3:9-15; 3:30-34; 4:34-37; Figs. 1A and 1B.)

For example, the specification informs a person of skill in the art that an L1 cache is "possibly" in the claimed core. (*Id*. at 3:12-14.) In the very next sentence, however, the specification tells the skilled artisan "L1 caches…can alternatively be located in [the] non-core power area." (*Id*. at 3:14-15.) It is thus indeterminable whether an L1 cache in the instruction-processing system of claim 1 is in the claimed "core" or the claimed "area." (Ex. G at ¶¶ 30-32.)

Similarly, the specification tells a person of skill in the art that L2 caches, cache tags, and cache snoop circuitry are located in the "non-core power area" (Ex. E at 3:30-34)—except when they are not. Once again, a subsequent description advises the skilled artisan that, in another embodiment, an L2 cache, cache tags, and cache snoop circuitry "are included in the core power area... rather than in [the] non-core power area." (*Id*. at 4:32-37.) Figures 1A and 1B reflect this ambiguity. (*Id*. at

Figs. 1A and 1B.)  The '453 Patent's arbitrary partitioning of components in the intrinsic record prevents a person of skill in the art from determining the scope of "core" or the "area" in the claims, thus rendering claim 1 indefinite and invalid. *Capital Security Systems, Inc. v. NCR Corporation*, 2018 WL 1181197 at *6 (Fed. Cir. 2018).

In short, claim 1 of the '453 Patent presents the skilled artisan with a moving target concerning whether components in the instruction-processing system such as L1 caches, L2 caches, cache tags, and cache snoop circuitry are part of the "core" (and, therefore, provided with the core voltage) or part of the "area" (and, therefore, provided with the area voltage).  As a result, the claims provide no public notice of what is covered by the '453 Patent.  Section 112 does not permit this lack of objective boundaries.  *Interval Licensing LLC v AOL, Inc.*, 766 F.3d 1364, 1371 (Fed. Cir. 2014); *see also Nautilus*, 134 S. Ct. at 2130 & n. 8 (indicating indefiniteness problem arises if claim language "might mean several different things and 'no informed and confident choice is available among the contending definitions'").

### 3.   <u>Apple's Constructions Do Not Resolve the Problem</u>

Construing "core" to mean "a logical or physical instruction processing mechanism" and "area" to mean "a portion of the processor excluding a core"—as Apple proposes—does not clarify the scope of the claims.  Apple's constructions merely leave skilled artisans wondering which components fall within a "logical or physical instruction processing mechanism" and which do not, just as they are left to wonder what falls within the "core" and "area."  (Ex. G at ¶¶ 39-40.)

### B. "wherein in a normal operation mode . . . the core voltage is a first value that is sufficient to maintain the state information of the instruction-processing circuitry" [Apple] or "sufficient to maintain the state information of the instruction-processing circuitry" [Qualcomm] ('453 Patent)

| Apple's Construction | Qualcomm's Construction |
|---|---|
| **Apple's Term:** plain and ordinary meaning or "wherein in a normal operation mode: . . . the core voltage is at least a value that maintains the state information of the instruction-processing circuitry."<br><br>**Qualcomm's Term:** "at least a value that maintains the state information of the instruction-processing circuitry" | **Apple's Term:** not the correct term for construction because it covers only one of two uses of disputed term in Claim 1 of the '453 Patent<br><br>**Qualcomm's Term:** "a minimum value that maintains state information of the instruction-processing circuitry, which minimum value is not sufficient to allow processing to continue" |

Claim 1 of the '453 Patent specifies that the core voltage needs to have a value "sufficient to maintain the state information of the instruction-processing circuitry" in the "normal operation mode" and in the "first power-saving mode." Qualcomm maintains that this term has the same meaning in both instances where it is used in claim 1 and should be construed consistent with the intrinsic evidence. *See Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1342 (Fed. Cir. 2001) ("a claim term should be construed consistently with its appearance in other places in the same claim or in other claims of the same patent"). Apple, on the other hand, ignores the intrinsic evidence and instead proposes construing the term so as to read this limitation out of the "normal operation mode." Because Qualcomm's construction finds explicit support in the intrinsic evidence, while Apple's proposed construction ignores the meaning the applicant ascribed to the phrase and violates claim construction law, Qualcomm's construction should be adopted.

Qualcomm's construction tracks the applicant's explanation of the disputed phrase in the specification and the prosecution history. In the specification, the applicant tells the skilled artisan "the voltage in core power 134 is reduced to the

minimum value that will maintain state information within core power area 126, but this voltage is not sufficient to allow processing to continue." (Ex. E at 4:18-21.) Moreover, in the prosecution history, the applicant explained in two passages that "the core voltage is reduced to a minimum voltage enough to maintain the processor state in a processor register, but not high enough to operate the instruction-processing circuitry" and "in one of the power-saving mode [sic] the core power voltage is reduced such that it is sufficiently high to maintain the processor state and sufficiently low to prevent the instruction-processing circuitry from processing instructions." (Ex. H at 9-10.) These explanations of the invention clarify the meaning of the disputed term and support Qualcomm's construction. *Fenner Investments, Ltd. v. Cellco Partnership*, 778 F.3d 1320, 1323 (Fed. Cir 2015) ("Any explanation, elaboration, or qualification presented by the inventor during patent examination is relevant, for the role of claim construction is to capture the scope of the invention that is disclosed, described, and patented.").

The skilled artisan would understand from the intrinsic record that the disputed phrase defines a minimum value for the core voltage, as Qualcomm contends. (Ex. G at ¶¶ 43-52.) Apple seemingly recognizes that "sufficient" defines a minimum value for the core voltage, but proposes (in an improper attempt to rewrite its poorly drafted claims) that the phrase also includes the range of voltages above this minimum value that is more than sufficient to maintain the state information of the instruction-processing circuitry. Apple's construction ignores the intrinsic record. In effect, Apple wants to read the core voltage limitation of having a value "sufficient to maintain the state information of the instruction-processing circuitry"—as the applicant explained it—out of the "normal operation mode."

C.    "power area" ('940 Patent)

| "power area" | |
|---|---|
| **Apple's Construction** | **Qualcomm's Construction** |
| plain and ordinary meaning or "grouping related to receiving power" | "arrangement of elements connected to the same power supply" |

The parties' dispute over the claim term "power area" in the '940 Patent appears to be fairly narrow, focusing on whether the term requires that each of the elements making up a particular "power area" be connected to the same power supply/source. Qualcomm's construction finds support in the intrinsic record and should be adopted. The '940 Patent breaks the processor into two distinct sections – a "non-core power area" and a "core power area." It further explains that separate corresponding power sources (i.e., "non-core power" and "core power") provide a voltage to each of the circuit elements within each respective section. Indeed, the '940 Patent specification expressly provides that the "non-core power area 124 receives non-core power 136 and core power area 126 receives core power 134." (Ex. F at 3:59-60.) Likewise, Figures 1A and 1B show a single power supply independently powering each of these power areas. (*Id*. at Figs. 1A and 1B; Ex. G at ¶¶ 53-55; Ex. P at 141:13-19, 217:7-21.) The prosecution history confirms this understanding. To overcome the prior art, the applicant partitioned the collection of elements in each power area on the basis of the power supply to which they were connected. (Ex. I at 7-8; *see also* Ex. G at ¶¶ 56-57.) Apple's construction, on the other hand, ignores the intrinsic evidence.

### D. "real-time clock" ('940 Patent)

| "real time clock" | |
|---|---|
| **Apple's Construction** | **Qualcomm's Construction** |
| plain and ordinary meaning or "provider of time-of-day services" | "circuit that provides time-of-day services to the processor" |

Qualcomm's proposed construction for "real-time clock" is lifted from the specification. (Ex. F at 3:36-37.) Apple's issue with Qualcomm's proposed construction seems to be that the "real-time clock" circuit in the claimed processor also might include firmware or software, in addition to the real-time clock circuitry. (Ex. P at 225:4-17.) But there can be no legitimate dispute that the "non-core power area" must include at a least a circuit that provides time of day services to the

processor because the non-core power 136 must be supplied to a circuit element, not firmware or software.  Accordingly, Qualcomm's construction should be adopted.

## III.    The de Cesare Patents

The de Cesare Patents[6] generally relate to power management of multiple components on, for example, a System on Chip ("SoC").  (Ex. J at 1:7-10.) According to the de Cesare Patents, the management of power consumption in multi-component systems having one or more processors is important in mobile applications, such as laptops or mobile phones that are often powered by batteries. (*Id.* at 1:11-24.)  In the prior art, it was known that power consumption could be reduced using certain techniques, including putting an idle processor into a "sleep state" in order to conserve power.  (*Id.* at 1:33-47; *see also id.* at 1:25-32 (discussing "clock gating" and "power gating" techniques to reduce power consumption of idle circuitry).)  Other components, whose performance are related to the processor, may also be brought to lower or higher performance states accordingly.  (*Id.* at 1:33-47) The processor must be "awakened" at a later time if it is to process instructions. (*Id.*)

In the de Cesare Patents, when a processor is awake and operative, its performance state may depend upon certain performance characteristics.  For example, a processor depends upon a so-called "clock" signal of rising and falling voltage to process instructions.  (*Id*. at 4:35-40; Ex. D at ¶ 47.)  If the clock frequency is increased, then the processor will process instructions at a higher rate, resulting in higher performance.  This performance increase comes at the cost of increased power consumption, however.  In addition to the clock frequency, the de

---

[6] The de Cesare Patents share the same written description.  This brief cites the '812 Patent, but the same disclosure is found in the '216 and '196 Patents.

Cesare patents identify other examples of characteristics that may impact a processor's (or other components') performance. (Ex. J at 4:40-52; Ex. D at ¶ 47.)

The de Cesare Patents disclose that power management is performed by a "power management unit" (PMU 28, annotated in yellow), which establishes the "performance states" of the components within certain "performance domains" (14A, 14B, 14C, 14D, 14E, and 14F, each annotated in blue) as shown by Figure 1 below. (*Id.* at Fig. 1, 3:63-4:13.) "A performance domain may be one or more components that may be controlled by the PMU 28 as a unit for performance configuration purposes." (*Id.* at 4:14-16; *see also id.* at 3:32-47).) The PMU sends control signals to the clock/voltage control 32 (annotated in green), which communicates to the power supply 12 the clock frequency and voltage to be supplied to the components within each performance domain. (*Id.* at 3:47-62.)



Fig. 1

According to the de Cesare Patents, one significant drawback to the prior art is that "[t]he sleep/wake transitions of processors and other components are changed under software control." (*Id.* at 1:48-49.) But because such software control was

Case No. 3:17-cv-01375-DMS-MDD

slow and inefficient, it "impact[ed] the power conserved and the performance of the [software] application," and limited how often the processors could be put to sleep. (*Id.* at 1:49-55.) The de Cesare Patents supposedly improved on the prior art by performing sleep/wake transitions "in hardware," and "automatically," as opposed to under software control. (*See e.g., Id.* at 2:16-30; Ex. D at ¶¶ 42-43.)

For claim construction, claim 8 of the '812 Patent is representative:

> 8. a plurality of components, each component included in one of a plurality of **performance domains**; and
>
> a **power management unit** configured to **establish a performance state** in each of the plurality of **performance domains**, and wherein the **power management unit** is configured to transition at least a first **performance domain** of the plurality of **performance domains** to a first performance state programmed into the **power management unit** responsive to a processor transitioning to a wakeup state, wherein the processor is transitioning from a sleep state, and wherein the wakeup state is different from **a prior performance state at which the processor was operating prior to entering the sleep state**.

Apple also asserts claims 2 and 6 of the '216 Patent and claims 2 and 3 of the '196 Patent.[7]

### A. "performance domain" ('812 Patent, '216 Patent, and '196 Patent)

| "performance domain" | |
|---|---|
| **Apple's Construction** | **Qualcomm's Construction** |
| "one or more components that may be controlled as a unit or independently for performance configuration purposes" | "one or more components that may be controlled by the power management unit as a unit for performance configuration purposes" |

The parties agree that a "performance domain" is one or more components that may be controlled "as a unit" for performance configuration purposes. But

---

[7] The term "prior performance state at which the processor was operating prior to entering the sleep state" above is specific to claim 8 of the '812 Patent.

Apple's proposed construction (i) improperly suggests that the component(s) within an individual performance domain can also be controlled "independently"—they cannot—and (ii) fails to include in its proposed construction that this control is performed by the power management unit.

Qualcomm's construction comes directly from the intrinsic evidence. The claim language supports Qualcomm's argument that components of a performance domain are controlled as a unit. Each asserted claim recites a "plurality of components" that are included in a "plurality of performance domains." (Ex. J at 14:9-10; Ex. K at 12:64-65; Ex. L at 12:64-65.) The claims then recite that the PMU acts to "establish a performance state" in each performance domain *as a whole*; the claim does not recite the PMU's establishing a performance state of an individual component of a performance domain apart from the state of the domain's other components. (Ex. J at 14:11-13; Ex. K at 13:1-8; Ex. L at 13:5-10.)

The specification further states that "[a] performance domain may be one or more components that may be controlled *by the PMU 28 as a unit* for performance configuration purposes." (Ex. J at 4:14-16 (emphasis added).) The specification continues by explaining that the PMU controls each performance domain as a whole, stating, "[t]hat is, the PMU 28 may be configured to establish *a corresponding performance state* for *each performance domain* … ." (*Id.* at 4:16-18 (emphasis added).) "The components that form a performance domain may *transition together* from one performance state to another performance state." (*Id.* at 4:20-21 (emphasis added).)

Apple's argument that the individual components of the performance domain may be controlled "independently" is based on a misunderstanding of the specification. The specification contrasts the unit-based control of components of a single performance domain with the independent control of "components in different performance domains," stating, "[o]n the other hand, components in different performance domains may be independent of each other … and may have

independently-determined performance states." (*Id.* at 4:22-27.) This passage clearly refers to components that are in different performance domains; not that components within the same performance domain can be controlled as a unit "or independently" as Apple and its expert seem to suggest. (Ex. M at ¶ 27.) The de Cesare Patents say no such thing.

Apple's construction also fails to mention that it is the PMU's unitary control of one or more components that defines those components as being a discrete performance domain. The asserted claims recite a "power management unit configured to establish a performance state in each of the plurality of performance domains." (*See*, e.g., Ex. J at 14:11-13.) This is identical to the specification, which repeatedly discloses that the PMU establishes the performance state of a performance domain. (*See*, e.g. Ex. J at 4:16-20, 5:50-52.)

## B. "power management unit" ('812 Patent, '216 Patent, and '196 Patent)

| "power management unit" | |
|---|---|
| **Apple's Construction** | **Qualcomm's Construction** |
| "hardware and/or software that causes a performance domain to transition to a performance state" | "a circuit that manages power consumption by automatically transitioning in hardware the performance states of a plurality of performance domains" |

The parties dispute three aspects of the definition of "power management unit": (1) whether the power management unit must be implemented in hardware, or can be "hardware and/or software;" (2) whether the power management unit may transition performance states of a single performance domain, or whether it must transition performance states of a "plurality of performance domains"; and (3) whether these transitions must take place "automatically."

First, the power management unit must be implemented in hardware, and cannot be purely software or a combination of hardware and software. The title of the de Cesare Patents states, "*[h]ardware automatic performance state transitions in system on processor sleep and wake events*," and the first sentence of the abstract

describes the power management unit (i.e., PMU) as "automatically transition[ing] **(in hardware)** the performance states of one or more performance domains in a system." (Ex. J at [54] and [57] (emphasis added).)  As already discussed, the specification criticizes the many shortfalls of transitioning performance states "under software control." (*Id.* at 1:48-58.)  The specification then states that the advantage of the supposedly-innovative PMU is controlling performance state transitions "in hardware," enabling more rapid state transitions and increasing efficiency—distinguishing this PMU from a purely software-controlled implementation. (*Id.* at 1:62-65, 2:16-30; Ex. D at ¶¶ 42-45, 49.)  The specification further describes the PMU as being part of an "integrated circuit," i.e., hardware. (*See* Ex. J. at Fig. 1 (PMU 28), 3:47-50.)  Apple's construction of PMU would impermissibly broaden the asserted claims to read on the specification's admitted software-based prior art, and suffer from the very same deficiencies that the applicants argued existed with that prior art.

Apple's software-only construction also contradicts statements it made to the USPTO during prosecution of the '812 Patent.  *Comput. Docking*, 519 F.3d at 1374 ("Statements made during prosecution may also affect the scope of the claims.").  During prosecution, the USPTO rejected then-pending claim 17 (which would later issue as claim 10) as unpatentable subject matter because the entire claimed method was "directed to software only." (Ex. N at 2-3.)  In response, Apple pointed to the power management unit as an "express recitation of hardware in, e.g., claim 17"— thereby stating that the PMU must be hardware. (Ex. O at 14; *see also Fenner Invs., Ltd.*, 778 F.3d at 1323 ("Any explanation, elaboration, or qualification presented by the inventor during patent examination is relevant.").)

Indeed, Apple's expert Dr. Mooney has conceded that the PMU cannot be software only as Apple proposes, testifying, "[i]t is my professional opinion that a power management unit cannot only be software because the eventual clock signaling, gate signaling to the components that are being controlled would involve

boolean logic hardware."  (Ex. Q at 61:9-17; *see also id.* at 61:18-62:9 (additional Mooney testimony that a PMU must have and can be exclusively hardware).)

Apple bases its mistaken construction on the specification's statement that the PMU can be "programmable" by other software running on the SoC.  (Ex. M at ¶ 33; Ex. J at 5:49-52.)  But Apple conflates being able to configure the PMU using other software that is not part of the PMU (i.e., the PMU driver) with the PMU itself.  *Id.*  A programmable hardware solution is still hardware—even if it is "configured" by other software to "transition (in hardware) the performance states of one or more performance domains in a system."  (Ex. D at ¶ 68; Ex. J at 1:62-65.)  Also, this "programming" is done by changing the data values stored within the PMU's "performance configuration registers," but stored data values are not "software."  (Ex. D at ¶ 71; Ex. J at Fig. 2, 7:38-50.).  The asserted claims only recite the PMU, *not* any software that might be used to configure these registers and their values.  *Ventana Med. Sys., Inc. v. Biogenex Labs., Inc.*, 473 F.3d 1173, 1181 (Fed. Cir. 2006) ("When the claim addresses only some of the features disclosed in the specification, it is improper to limit the claim to other, unclaimed features.").

Second, the PMU does not merely establish a performance state of *a* performance domain.  Instead, a *plurality* of performance domains are transitioned.  This is recited by the claim language.  For example, claim 8 recites, among other things, "a plurality of performance domains."  (Ex. J at 14:9-10.)  The claim then recites that the PMU "is configured to establish a performance state in each of the plurality of performance domains."  (*Id.* at 14:11-13.)  Figure 1 similarly discloses a plurality of performance domains configured by a single PMU.  (*Id.* at Fig. 1.)  Figure 2 further discloses that the PMU includes a plurality of configuration registers, one for each performance domain.  (*Id.* at Fig. 2, 2:48-49; Ex. D at ¶ 71.)  The PMU establishes the performance state in each performance domain controlled by the PMU.  (Ex. J at Fig. 2, 2:48-49.)

Third, Apple mistakenly omits that the PMU manages power consumption by "automatically transitioning" the performance states of a plurality of performance domains.  The same passages within the de Cesare Patents explaining that the PMU is a hardware (not software) power management solution further explain that any performance state transition by the PMU is performed automatically.  (Ex. J at [54], [57], 1:62-65, 3:65-4:7, 8:13-17; Ex. D at ¶ 69.)

### C. "establish a . . . performance state" ('812 Patent, '216 Patent, and '196 Patent)

| "establish a … performance state" | |
|---|---|
| **Apple's Construction** | **Qualcomm's Construction** |
| plain and ordinary meaning or "set the . . . one or more performance characteristics to the appropriate values for the performance state" | "to cause the performance domain to apply the performance state to that domain" |

A person of skill in the art would understand that "establish a … performance state" in the context of the intrinsic evidence requires the PMU to cause the performance state (and its performance characteristic values) to actually be applied *in* a performance domain by the domain's components.  (Ex. D at ¶¶ 75, 77; Ex. T at 486 (defining "establish" as "to cause to be or happen, bring about.").)  The specification describes that performance state transitions "occur *in* the performance domains," including by communicating the new settings to control units (e.g., clock/voltage control unit 32) that will cause the new performance states to occur in the performance domains.  (Ex. J at 5:44-47, 5:59-6:11 (emphasis added); Ex. D at ¶¶ 75, 77.)  Further, Figure 3 discloses that the PMU not only loads the sleep or wake state values for each performance domain (steps 42 and 50), but that each performance domain will also "Transition to New Performance States" (steps 44 and 52).  (Ex. J at Fig. 3, 9:25-29, 9:45-59, 10:17-26.)

Apple argues that there is no need to define this term.  Yet Apple's proposed construction highlights that there is no clear, plain and ordinary meaning of this term, and accordingly, the term must be construed.  *O2 Micro Int'l Ltd. v. Beyond*

*Innovation Tech. Co.*, 521 F.3d 1351, 1361 (Fed. Cir. 2008).  As explained above, it is not enough for the PMU to only "set" the performance state values, as Apple proposes.  The PMU must cause those values to actually be applied by the components of the performance domain, and the components must then transition to the required performance states.

Indeed, Apple's expert Dr. Mooney testified that more is required than the PMU's merely "setting" the performance state values.  Instead, Dr. Mooney testified that "establishing" includes a second step in which the "[performance state] values are established or applied or set there is a finishing step where they're all in effect." (Ex. Q at 139:7-14; *see also id.* at 138:13-144:13 (testifying about the meaning of "establish a … performance state" including that "it also includes that those values have been affected or implemented or have changed in the chip").)

Apple's construction should also be rejected as introducing the vague words "appropriate values," which is not found in the intrinsic evidence.  (Ex. D at ¶ 78.) There is no guidance from Apple about what these words supposedly mean in the context of "establish[ing] a performance state" in each performance domain.

### D.  "a prior performance state at which the processor was operating prior to entering the sleep state" ('812 Patent)

| "a prior performance state at which the processor was operating prior to entering the sleep state" | |
|---|---|
| **Apple's Construction** | **Qualcomm's Construction** |
| "the performance state at which the processor was last operating before the transition to the sleep state began" | plain and ordinary meaning |

This claim term appears only in claim 8 of the '812 Patent.  Apple's proposal erroneously rewrites this claim term to add an additional limitation.  The claim language recites "a prior performance state at which the processor was operating prior to entering the sleep state."  The meaning of this term is clear and needs no further definition.  The term refers to "a performance state" (or states) at which the processor "was operating" some time before the processor "enter[ed] the sleep

state." This is consistent with the specification, which explains that the post-sleep performance state of a processor or other components can differ from their pre-sleep performance state or states. (Ex. J at 8:13-23; Ex. D at ¶¶ 84-85.)

Apple impermissibly re-writes and narrows the words "a prior performance state" to be "the performance state at which the processor was last operating before the transition to the sleep state began"—i.e., only the last, pre-sleep performance state of the processor. Apple's rewrite must be rejected for several reasons. First, it is not what the claim says, and it is legal error to rewrite claims. *See K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1364 (Fed. Cir. 1999) ("Courts do not rewrite claims; instead, we give effect to the terms chosen by the patentee.") Second, it is well accepted in claim construction that the article "a" refers to "one or more"—here, one or more of a plurality of prior performance states—not merely the last pre-sleep performance state of the processor. *See, e.g., Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1342–43 (Fed. Cir. 2008) ("That 'a' or 'an' can mean 'one or more' is best described as a rule, rather than merely as a presumption or even a convention."). Third, it introduces additional problems of how to identify what is the processor's "last operating" pre-sleep performance state under Apple's definition; the '812 Patent provides little guidance about this issue. Fourth, there is no need for any alternative construction or definition, because the claim as written is already clear. *Phillips*, 415 F.3d at 1314 ("In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words."). For all of these reasons, Apple's proposed rewrite should be rejected.

Dated: August 8, 2018

Respectfully submitted,

By: *s/ Kelly V. O'Donnell*
   Kelly V. O'Donnell
**JONES DAY**
Karen P. Hewitt (SBN 145309)
kphewitt@jonesday.com
Randall E. Kay (SBN 149369)
rekay@jonesday.com
John D. Kinton (SBN 203250)
jkinton@jonesday.com
Kelly V. O'Donnell (SBN 257266)
kodonnell@jonesday.com
4655 Executive Drive, Suite 1500
San Diego, California 92121
Telephone: (858) 314-1200
Facsimile: (858) 345-3178

William E. Devitt (*pro hac vice*)
(Ill. Bar No. 6229133)
wdevitt@jonesday.com
John M. Michalik (*pro hac vice*)
(Ill. Bar No. 6280622)
jmichalik@jonesday.com
77 West Wacker Drive, 35th Floor
Chicago, Illinois 60601
Telephone: (312) 269-4240

Keith B. Davis (*pro hac vice*)
(TX Bar No. 24037895)
kbdavis@jonesday.com
2727 North Harwood Street
Dallas, Texas 75201
Telephone: (214) 969-4528
Facsimile: (214) 969-5100

**QUINN EMANUEL URQUHART &
SULLIVAN, LLP**
David A. Nelson (*pro hac vice*)
(Ill. Bar No. 6209623)
davenelson@quinnemanuel.com

Stephen Swedlow (*pro hac vice*)
(Ill. Bar No. 6234550)
stephenswedlow@quinnemanuel.com
500 West Madison St., Suite 2450
Chicago, Illinois 60661
Telephone:  (312) 705-7400
Facsimile:  (312) 705-7401

Alexander Rudis (*pro hac vice*)
(N.Y. Bar No. 4232591)
alexanderrudis@quinnemanuel.com
51 Madison Ave., 22nd Floor
New York, New York 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100

Sean S. Pak (SBN 219032)
seanpak@quinnemanuel.com
50 California St., 22nd Floor
San Francisco, California 94111
Telephone: (415) 875-6600
Facsimile: (415) 875-6700

**CRAVATH, SWAINE & MOORE LLP**
Evan R. Chesler (*pro hac vice*)
(N.Y. Bar No. 1475722)
echesler@cravath.com
Keith R. Hummel (*pro hac vice*)
(N.Y. Bar No. 2430668)
khummel@cravath.com
Richard J. Stark (*pro hac vice*)
(N.Y. Bar No. 2472603)
rstark@cravath.com
Gary A. Bornstein (*pro hac vice*)
(N.Y. Bar No. 2916815)
gbornstein@cravath.com
J. Wesley Earnhardt (*pro hac vice*)
(N.Y. Bar No. 4331609)
wearnhardt@cravath.com
Yonatan Even (*pro hac vice*)
(N.Y. Bar No. 4339651)

yeven@cravath.com
Vanessa A. Lavely (*pro hac vice*)
(N.Y. Bar No. 4867412)
vlavely@cravath.com
Worldwide Plaza, 825 Eighth Avenue
New York, New York 10019
Telephone: (212) 474-1000
Facsimile: (212) 474-3700

*Attorneys for Counterclaim-Defendants*
QUALCOMM INCORPORATED
QUALCOMM TECHNOLOGIES, INC.

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that a true and correct copy of the above and foregoing document has been served on August 8, 2018, to all counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system.

Executed on August 8, 2018 at San Diego, California.

*s/ Kelly V. O'Donnell*
Kelly V. O'Donnell
kodonnell@jonesday.com