Juanita R. Brooks, SBN 75934, brooks@fr.com
Seth M. Sproul, SBN 217711, sproul@fr.com
Frank Albert, SBN 247741, albert@fr.com
Joanna M. Fuller, SBN 266406, jfuller@fr.com
Robert M. Yeh, SBN 286018, ryeh@fr.com
Fish & Richardson P.C.
12390 El Camino Real
San Diego, CA 92130
Phone: 858-678-5070 / Fax: 858-678-5099

Ruffin B. Cordell, DC Bar No. 445801, *appearing pro hac vice*, cordell@fr.com
Lauren A. Degnan, DC Bar No. 452421, *appearing pro hac vice*, degnan@fr.com
Fish & Richardson P.C.
1000 Maine Avenue, S.W. Suite 1000
Washington, D.C. 20024
Phone: 202-783-5070 / Fax: 202-783-2331

Mark D. Selwyn (SBN 244180), mark.selwyn@wilmerhale.com
Wilmer Cutler Pickering Hale and Dorr LLP
950 Page Mill Road
Palo Alto, CA 94304
Phone: 650-858-6000 / Fax: 650-858-6100

Attorneys for Defendant/Counterclaim-Plaintiff Apple Inc.

*[Additional counsel identified on signature page.]*

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| QUALCOMM INCORPORATED,<br><br>Plaintiff,<br><br>v.<br><br>APPLE INC.,<br><br>Defendant.<br><br>AND RELATED COUNTERCLAIMS. | Case No. 3:17-CV-1375-DMS-MDD<br><br>**DEFENDANT AND COUNTERCLAIM PLAINTIFF APPLE INC.'S OPENING CLAIM CONSTRUCTION BRIEF**<br><br>Date:  September 5, 2018<br>Time:  9:00 a.m.<br>Place:  Courtroom 13A<br>Judge:  Hon. Dana M. Sabraw |

# **TABLE OF CONTENTS**

I.     INTRODUCTION ................................................................................................1

II.    LEGAL STANDARDS FOR CLAIM CONSTRUCTION.............................1

III.   U.S. PATENT NOS. 7,355,905; 7,760,559; AND 8,098,534 ...........................2

    A.   "integrated circuit" ('905 patent, claim 1; '559 patent, claims 1, 2, 3; '534 patent, claims 1, 3, 4)......................................3

    B.   "received on a first / second input to the integrated circuit" ('905 patent, claim 1); "receiving power from at least one first / second input to the integrated circuit" ('559 patent, claim 1)..........................................................4

    C.   "during use" ('905 patent, claim 1; '559 patent, claims 1, 2; '534 patent, claim 1) ..........................................6

IV.    U.S. PATENT NOS. 7,383,453 AND 8,433,940 ................................................7

    A.   "core" and "area" ('453 patent, claims 1, 2, 4) ..........................8

    B.   "sufficient to maintain the state information of the instruction-processing circuitry" ('453 patent, claims 1, 2, 4) ......................................................11

    C.   "power area" ('940 patent, claims 9, 11) ...................................14

    D.   "real-time clock" ('940 patent, claims 9, 11) ...........................15

V.     U.S. PATENT NOS. 8,271,812; 8,443,216; AND 8,656,196 ...........................16

    A.   "performance domain" ('812 patent, claim 8; '216 patent, claim 1; '196 patent, claims 1, 2, 3)...............................17

    B.   "power management unit" ('812 patent, claim 8; '216 patent, claims 1, 2; '196 patent, claim 1) ................................19

    C.   "establish a . . . performance state" ('812 patent, claim 8; '216 patent, claim 1; '196 patent, claim 1) ................................22

    D.   "a prior performance state at which the processor was operating prior to entering the sleep state" ('812 patent, claim 8)....................................................23

VI.    CONCLUSION................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Accent Packaging, Inc. v. Leggett & Platt, Inc.,*
    707 F.3d 1318, 1325–26 (Fed. Cir. 2013) ...................................................18

*Action Star Enter. Co. v. KaiJet Tech. Int'l Ltd.,*
    No. CV-1208074-BRO-MRX, 2014 WL 12595331 (C.D. Cal. Jan. 27,
    2014) ...........................................................................................................15

*AIA Eng'g Ltd. v. Magotteaux Int'l S/A,*
    657 F.3d 1264 (Fed. Cir. 2011) ..................................................................13

*Biosig Instruments, Inc. v. Nautilus, Inc.,*
    783 F.3d 1374 (Fed. Cir. 2015) ....................................................................2

*Cadence Pharm., Inc. v. Exela PharmSci Inc.,*
    780 F.3d 1364 (Fed. Cir. 2015) ..................................................................16

*Cal. Inst. of Tech. v. Hughes Commc'ns Inc.,*
    35 F. Supp. 3d 1176 (C.D. Cal. 2014) ........................................................10

*Carl Zeiss Vision Int'l GMBH v. Signet Armorlite, Inc.,*
    No. 07-cv-0894 DMS (POR), 2008 WL 4951984 (S.D. Cal. June 2,
    2008) (Sabraw, J.) .......................................................................................20

*CytoLogix Corp. v. Ventana Med. Sys., Inc.,*
    424 F.3d 1168 (Fed. Cir. 2005) ..................................................................24

*dunnhumby USA, LLC v. emnos USA Corp.,*
    No. 13-CV-0399, 2015 WL 1542365 (N.D. Ill. Apr. 1, 2015) ....................10

*Enthone Inc. v. BASF Corp.,*
    No. 1:15-CV-0233-TJM-DEP, 2016 WL 6679493 (N.D.N.Y. June 17,
    2016), *report and recommendation adopted,* No. 1:15-CV-233, 2016 WL
    4257355 (N.D.N.Y. Aug. 11, 2016) ............................................................16

*GE Lighting Solutions, LLC v. AgiLight, Inc.,*
    750 F.3d 1304 (Fed. Cir. 2014) .................................................................1, 2

*i4i Ltd. P'ship v. Microsoft Corp.,*
    598 F.3d 831 (Fed. Cir. 2010), *aff'd,* 564 U.S. 91 (2011) ...........................19

*Interactive Gift Exp., Inc. v. Compuserve Inc.*,
    256 F.3d 1323 (Fed. Cir. 2001) ...................................................................23

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
    134 S. Ct. 2120 (2014) ...............................................................................2

*Oatey Co. v. IPS Corp.*,
    514 F.3d 1271 (Fed. Cir. 2008) .................................................................13

*Omega Eng'g, Inc. v. Raytek Corp.*,
    334 F.3d 1314 (Fed. Cir. 2003) ...................................................................2

*Pactiv, LLC v. Multisorb Techs., Inc.*,
    No. 10 C 461, 2013 WL 120234 (N.D. Ill. Jan. 9, 2013), *aff'd*, 621 F.
    App'x 665 (Fed. Cir. 2015) ......................................................................12

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) .............................................................1, 2

*Pitney Bowes, Inc. v. Hewlett-Packard Co.*,
    182 F.3d 1298 (Fed. Cir. 1999) .................................................................20

*Power-One, Inc. v. Artesyn Techs., Inc.*,
    599 F.3d 1343 (Fed. Cir. 2010) .................................................................23

*TASER Int'l, Inc. v. Stinger Sys.*,
    No. 2:09-cv-289-MMD-PAL, 2012 WL 3562371 (D. Nev. Aug. 16,
    2012) ..................................................................................................12

*Thorner v. Sony Computer Entm't Am. LLC*,
    669 F.3d 1362 (Fed. Cir. 2012) ..................................................................1

*Viasat, Inc. v. Space Sys./Loral, Inc.*,
    No. 3:12-cv-00260-H, 2013 WL 12061852 (S.D. Cal. May 29, 2013) .......................18

*Wi-Fi One, LLC v. Broadcom Corp.*,
    887 F.3d 1329 (Fed. Cir. 2018) .................................................................13

**Statutes**

35 U.S.C. § 282(a) ...................................................................................2

Case No. 3:17-CV-01375-JAH-MDD

# I.    INTRODUCTION

Proper claim construction begins with the plain meaning of terms informed by the intrinsic evidence. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314-15 (Fed. Cir. 2005). For this reason, a usage consistent with and supported by the specification and the embodiments within a patent is almost always the proper construction. *Id.* at 1316. Deviations from the specification are unusual and justified by only an unmistakably clear disclaimer. *GE Lighting Solutions, LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014). Qualcomm nonetheless repeatedly violates these elementary tenets. Qualcomm artificially restricts the claimed inventions by adding limitations that do not exist, relying on cherry-picked specification quotes that Qualcomm misapplies to contradict the complete teachings of the patents—sometimes embodiments described in the very next sentence. Qualcomm also conjures indefiniteness arguments for nearly every asserted claim—arguments that deny the plain language of the claims, deviate from the written description, and disregard the knowledge of one of skill in the art.

For these reasons, Qualcomm's constructions should be rejected. Apple's constructions, on the other hand, find solid support in the law and fit with the plain meaning of the disputed terms and the intrinsic and extrinsic evidence.

# II.    LEGAL STANDARDS FOR CLAIM CONSTRUCTION

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude,'" and as such claim construction must focus on the claim language itself. *Phillips*, 415 F.3d at 1312. The construction "that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end the correct construction." *Id.* at 1316. Claim terms "are generally given their ordinary and customary meaning" as understood by the skilled artisan at the time of the invention. *Id.* at 1313. "There are only two exceptions to this general rule: 1) when a patentee sets out a definition and acts as his own lexicographer; or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution." *Thorner v. Sony Computer Entm't Am.*

*LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012). "The standards for finding lexicography and disavowal are exacting." *GE Lighting*, 750 F.3d at 1309.

Claim construction begins with the intrinsic evidence—namely, the claim language, the specification, and the prosecution history. *Phillips*, 415 F.3d at 1312–17. The claims provide important guidance both through "the context in which a term is used" and "differences among claims." *Id.* at 1314–15. The specification is "always highly relevant." *Id.* at 1315. However, the specification must be used with care because it is improper to read limitations from embodiments described in the specification into the claims. *Id.* at 1323. The prosecution history may shed light on what a term means, but "it often lacks the clarity of the specification and thus is less useful for claim construction purposes," *id.* at 1317, and it will not limit claim scope unless it contains a "clear and unmistakable" disclaimer. *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1325–26 (Fed. Cir. 2003). Extrinsic evidence, like dictionaries and treatises, may be considered, but plays a limited role in claim construction. *Phillips*, 415 F.3d at 1320–21.

"[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2124 (2014). An accused infringer bears the burden of proving by clear and convincing evidence that a claim is indefinite. *Biosig Instruments, Inc. v. Nautilus, Inc.*, 783 F.3d 1374, 1377 (Fed. Cir. 2015); *see also* 35 U.S.C. § 282(a) ("A patent shall be presumed valid.").

## III.   U.S. PATENT NOS. 7,355,905; 7,760,559; AND 8,098,534

The '905, '559, and '534 patents (Decl. of Robert M. Yeh[1] Exs. 1-3, collectively the "Campbell Patents")[2] relate to methods that allow for different voltage levels in the

---

[1] All references to exhibits are to exhibits of Declaration of Robert M. Yeh in Support of Defendant / Counterclaim-Plaintiff Apple Inc.'s Opening Claim Construction Brief.

[2] The Campbell Patents (Ex. 1 (U.S. 7,355,905 ("'905")); Ex. 2 (U.S. 7,760,559 ("'559"); Ex. 3 (U.S. 8,098,534 ("'534"))) are related patents. They share the same specification and all claim priority to U.S. App. No. 11/173,565 filed on July 1, 2005, now the '905 patent.

memory and logic portions of an integrated circuit in view of what the patents describe as the "increase in importance" of "manag[ing] . . . power consumed by an integrated circuit.". (Ex. 1 ('905) at Abstract, 1:14–19.)   Reducing power consumption can be difficult because, while "[p]ower consumption in an integrated circuit is related to the supply voltage provided to the integrated circuit" (*id.* at 1:28–29), the amount that the supply voltage to the memory can be reduced is limited because "[a]s supply voltage decreases below a certain voltage, the ability to reliably read and write the memory decreases." (*Id.* at 1:43–44.)   The Campbell Patents solve these thermal and power management issues by separating the supply voltages into "at least one logic circuit supplied by a first supply voltage and at least one memory circuit . . . supplied by a second supply voltage." (*Id.* at 2:4–6; *see also* Ex. 4 (Decl. of Robert L. Stevenson ("Stevenson Decl.")) ¶ 21.)   This allows the voltage of the logic circuits to be lower, and "[r]educing the supply voltage generally leads to reduced power consumption." (Ex. 1 ('905) at 1:36–37.)

A.     **"integrated circuit"** ('905 patent, claim 1; '559 patent, claims 1, 2, 3; '534 patent, claims 1, 3, 4)

| Disputed Term | Apple's Construction | Qualcomm's Construction |
|---|---|---|
| "integrated circuit" | "one or more circuit elements that are integrated onto a single semiconductor substrate" | "a chip made up of connected circuit elements" |

Here, the parties primarily dispute whether an integrated circuit refers to circuit elements, which are on a semiconductor substrate (Apple), or whether a chip itself is an integrated circuit (Qualcomm).  The claims, the written description, and the prosecution history all support Apple's construction.  (Ex. 4 (Stevenson Decl.) ¶¶ 23–35.)

The claim language supports Apple's construction.  Nothing in the claims requires an "integrated circuit" to be the chip itself.  Rather, all that the claims require is that the integrated circuit contains interconnected circuit elements, in this particular case a logic circuit and memory circuit.  (*Id.* ¶ 25.)  For example, Claim 1 of the '905 specifically recites "An integrated circuit comprising: at least one logic circuit … and at least one

memory circuit….." (Ex. 1 ('905) at 11:12–15.) The other claims contain similar descriptions of integrated circuits as containing a number of circuit elements. This construction is consistent with the plain language of the claims. Dictionary definitions provided by both parties confirm this proposed claim construction. For example, the Microsoft Computer Dictionary, cited by Qualcomm, defines an integrated circuit as "a device consisting of a number of connected circuit elements, such as transistors and resistors, fabricated on a single chip of silicon crystal or other semiconductor material," which does not require an integrated circuit to be the chip itself, but rather—consistent with Apple's construction—describes connected circuit elements on a semiconductor substrate. (Ex. 4 (Stevenson Decl.) ¶ 33 & Ex. J; *see also id.* at Exs. F–I, H–L.)

The written description and prosecution history further support Apple's construction. The written description repeatedly describes "integrated circuit" as comprising logic and memory circuit elements, not as a chip. (*See, e.g.*, Ex. 1 ('905) at Abstract, 2:3–9, 2:49–63; *see also* Ex. 4 (Stevenson Decl.) ¶ 26.) Further, the written description explains the "integrated" aspect of the term, explaining that the memory and logic elements are "integrated onto a single semiconductor substrate (or chip)"—again not the chip itself. (Ex. 1 ('905) at 2:61–63; *see also* Ex. 4 (Stevenson Decl.) ¶ 29.) Nothing in the prosecution history defines "integrated circuit" differently from this usage. (Ex. 4 (Stevenson Decl.) ¶ 32.)

**B.** **"received on a first / second input to the integrated circuit"** ('905 patent, claim 1); **"receiving power from at least one first / second input to the integrated circuit"** ('559 patent, claim 1)

| Disputed Term | Apple's Construction | Qualcomm's Construction |
|---|---|---|
| "received on a first / second input to the integrated circuit" | "provided to the integrated circuit on a first / second input" | "generated external to the integrated circuit and connected to the integrated circuit on a first / second input" |
| "receiving power from at least one first / second input to the integrated circuit" | "provided power from at least one first / second input to the integrated circuit" | "supplied by a first / second supply voltage generated external to the integrated circuit and connected to the integrated circuit on at least one first / second input" |

4

The parties' dispute centers on Qualcomm's attempt to change the claim language and insert extraneous language into the claims. The claim language, written description, and prosecution history support Apple's construction. (*See* Ex. 4 (Stevenson Decl.) ¶¶ 36–44.)

The claim language supports Apple's construction given that Apple's construction amounts to the plain meaning of the claims. (*See id.* ¶ 37.) In addition, the specification uses the phrase "provided to the integrated circuit" in the same way that the claims use "received on a first [or second] input." (*Id.* ¶ 38.) For example:

> The logic circuits 12 are coupled to the memory circuits 14. The logic circuits 12 are powered by a first supply voltage **provided to the integrated circuit** 10 (labeled $V_L$ in FIG. 1). The memory circuits 14 are powered by a second power supply voltage **provided to the integrated circuit** 10 (labeled $V_M$ in FIG. 1).

(Ex. 1 ('905) at 2:53–58[3].) This passage's language mirrors the claim language, except that instead of a supply voltage being "received," the supply voltage is "provided to the integrated circuit." Nothing in the prosecution history counsels a different interpretation. (Ex. 4 (Stevenson Decl.) ¶ 43.)

Qualcomm improperly seeks to insert language not found in the claims. Nothing in either the claims or the written description indicates the source of the voltage being provided to the integrated circuit. (*Id.* ¶¶ 41–42.) Indeed, "generated externally" does not appear in the claims, specification, or prosecution history. Further, without any basis in the intrinsic record, Qualcomm inexplicably changes "power" to "voltage" in claim 1 of the '559. The Court should reject Qualcomm's attempt to rewrite the claims under the guise of construction.

---

[3] For all references, emphasis has been added unless otherwise noted.

C.   **"during use"** ('905 patent, claim 1; '559 patent, claims 1, 2; '534 patent, claim 1)

| Disputed Term | Apple's Construction | Qualcomm's Construction |
|---|---|---|
| "during use" | plain and ordinary meaning.  To the extent the Court finds that further construction is necessary, "while operating" | Indefinite. |

The term "during use" is unambiguous to the skilled artisan when read in context of the claim language and specification.  Qualcomm creates the parties' dispute by arguing that "during use" is indefinite, but ignores the intrinsic evidence, the knowledge of one of ordinary skill, and common sense.  (Ex. 4 (Stevenson Decl.) ¶¶ 45–49.)

The claim language itself supports the plain and ordinary meaning of the phrase "during use."  (*Id.* ¶ 46.)  The claims illustrate its meaning in relation to the operation of the circuit elements.  For example:

- "at least one logic circuit *operating* in a first voltage domain *during use*" (Ex. 2 ('559) at cl. 1.)

- "at least one memory circuit coupled to the logic circuit, wherein the at least one memory circuit comprises a plurality of static random access memory (SRAM) cells *operating* in a second voltage domain *during use*" (*Id.*)

Consistent with the plain and ordinary meaning, the claims indicate that the logic circuit and the memory circuit are operating "during use."  (Ex. 4 (Stevenson Decl.) ¶ 48.)  The written description also uses this plain and ordinary meaning by using the term "during use" in relation to the operation of the claimed circuit:

> The supply voltage for the memory circuits **14** ($V_M$) may be maintained at the minimum supply voltage that provides for robust memory *operation* (or greater, if desired).  Thus, the $V_L$ supply voltage may be less than the $V_M$ supply voltage *during use*.  At other times, the $V_L$ supply voltage may exceed the $V_M$ supply voltage *during use* (e.g. at times when higher performance is desired and higher power consumption is acceptable to achieve the higher performance).

(Ex. 2 ('559) at 3:26–37; *see also* Ex. 4 (Stevenson Decl.) ¶ 47.)

The written description further illustrates that "during use" refers to the period when both the logic and memory circuits are operating, unsurprising as the patents concern the interplay between logic and memory circuits.  (Ex. 4 (Stevenson Decl.) ¶ 48.)

6

For example, the claims refer to both recited logic and memory circuits operating during use:

- "the memory circuit is configured to be read and written responsive to the logic circuit even if the first supply voltage is less than the second supply voltage **during use**" (Ex. 1 ('905) at cl. 1.)

- "wherein a magnitude of the first supply voltage is less than a magnitude of the second supply voltage at least a portion of the time **during use**" (Ex. 3 ('534) at cl. 1.)

(*See also* Ex. 2 ('559) at cl. 1 (above).)   The specification also describes the use of the logic and memory circuits during operation:

> The logic circuits **12** may generally implement the **operation for which the integrated circuit is designed**.  The logic circuits **12** may generate various values **during operation**, which the logic circuits **12** may store in the memory circuits **14**.  Additionally, the logic circuits **12** may read various values from the memory circuits **14** on which **to operate**.

(Ex. 1 ('905) at 2:64–3:2.)   Accordingly, the Court should adopt either the plain and ordinary meaning or the related meaning "while operating."

## IV.   U.S. PATENT NOS. 7,383,453 AND 8,433,940

The '453 and '940 patents (Exs. 6 and 7, collectively the "Youngs Patents")[4] relate to saving power by placing different portions of a processor in different power modes. Advancements in processor technology led to faster and smaller processors, but also increased power leakage, a form of power consumption that does not contribute to the processor's function.  (Ex. 6 ('453) at 1:27–58.)   Increased power consumption was especially problematic for battery operated devices, such as laptops, with limited power supplies.  (*Id.*)  To reduce power consumption, the Youngs Patents disclose innovative power conservation techniques whereby the instruction-processing core(s) of a processor and the non-instruction processing area(s) of a processor may receive differentiated clock signaling and voltage as part of different operation and power-saving modes.  (*Id.* at 1:65–2:9; *see also* Ex. 8 (Decl. of Sherief Reda ("Reda Decl.")) ¶ 23.)  For example, in one mode, to conserve power, the clock signal to the instruction-processing core is inactive and the

---

[4] The Youngs Patents (Ex. 6 (U.S. 7,383,453 ("'453")); Ex. 7 (U.S. 8,433,940 ("'940"))) are related patents.  They share the same specification and both claim priority to application No. 10/135,116, filed on April 29, 2002, now U.S. Patent No. 6,920,574.

7

voltage to the instruction-processing core is less than in its normal operation.  (Ex. 6 ('453) at 4:59–5:10.)

   A.   **"core"** and **"area"** ('453 patent, claims 1, 2, 4)[5]

| Disputed Term | Apple's Construction | Qualcomm's Construction |
|---|---|---|
| "core" | plain and ordinary meaning.  To the extent the Court finds that further construction is necessary, "a logical or physical instruction processing mechanism" | Indefinite. |
| "area" | "a portion of the processor excluding a core" | Indefinite. |

      The '453 patent's asserted claims recite an "instruction processing system" comprising "a core with instruction-processing circuitry" and "an area coupled to the core."  These terms are unambiguous to the skilled artisan when read in context of the claim language and specification.  Qualcomm argues that both "core" and "area" are indefinite, but ignores the intrinsic evidence, the knowledge of one of ordinary skill, and common sense.

      Taking "core" first, the claims recite "a ***core*** with ***instruction-processing circuitry***."  (Ex. 6 ('453) at cl. 1.)  As is apparent from the claim language alone, the '453 patent uses the term "core" consistent with its plain and ordinary meaning—"a logical or physical instruction processing mechanism."  A person of ordinary skill in the art was well aware of what a core was, the existence of multi-"core" processors, and that the cores in those processors perform instruction processing.  (*See, e.g.*, Ex. 8 (Reda Decl.) ¶¶ 27–31; Ex. 9 (Reda Dep. Tr.) at 55:16-57:11.)  Indeed the concept of a core was so ubiquitous that there simply should not be any debate regarding its definiteness.  (Ex. 9 (Reda Dep. Tr.) at 56:5–8 ("When you ask the plain, ordinary meaning of core is that any core, an instruction-processing mechanism[,] could be logical or physical."); *id.* at 74:20–75:3.)  Consistent with the plain and ordinary meaning of "core," the specification describes that "***[c]ore*** power area includes the ***instruction-processing*** portion of processor 102.  Specifically, ***core*** power area 126 ***includes arithmetic-logic unit*** 104."

---

[5] As the terms "core" and "area" are related and the dispute over their construction is likewise related, they are addressed together.

(Ex. 6 ('453) at 3:10–13; *see also* Ex. 8 (Reda Decl.) ¶ 28.)  Figures 1A and 1B illustrate this idea, showing a "***core*** power area 126" with "***arithmetic-logic unit*** 104" that "provides ***computational and logical operations*** for processor 102." (Ex. 6 ('453) at 3:7–17.)  The patent further explains that the "voltage applied to ***core power*** 134 remains sufficiently high during ***instruction processing*** so that core power area 126 remains fully active." (*Id.* at 4:13–15.)

As for "area," claim 1 distinguishes "a core with instruction-processing circuitry" from "an ***area*** coupled to the core." (*Id.* at cl. 1; *see also* Ex. 8 (Reda Decl.) ¶ 36.)  In other words, from the plain language of the claims alone, "area" is "a portion of the processor excluding a core," as Apple proposes.  The written description provides explicit guidance that the area makes up "the remaining portion of processor 102." (Ex. 6 ('453) at 3:30–37.)  The specification further describes an area by its contents: "***non-core*** power area 124 includes portions of processor 102 that are ***not directly involved in processing instructions***." (*Id.* at 3:34–36.)

One of skill in the art was well aware that, as described in the '453, a processor contains instruction processing components and auxiliary components. (Ex. 9 (Reda Dep. Tr.) at 118:14–20.)  Various terminology was used in the field to describe this conceptual dichotomy, including, for example, core and un-core. (Ex. 8 (Reda Decl.) ¶ 37 (noting an "uncore" is "not in the processing core," but rather includes "circuits on a chip that are not executing program instructions").)  One of skill in the art reading the '453 patent would understand that the applicant chose the terminology of "core" and "area" to capture this dichotomy. (Ex. 8 (Reda Decl.) ¶¶ 34–36; Ex. 9 (Reda Dep. Tr.) at 120:8–21.)  As such, an "area" must contain auxiliary components and, indeed, the patent describes just that: "Non-core power area 124 comprises the remaining portion of processor 102 and includes interrupt processor 112, real-time clock 114, clock distribution circuitry." (Ex. 6 ('453) at 3:30–32; Ex. 8 (Reda Decl.) ¶ 36; Ex. 9 (Reda Dep. Tr.) at 82:14–82:25.)  The patent further underscores the core / area distinction by associating voltages with each. (*E.g.*, Ex. 6 ('453) at Fig. 1A ("core power 134" and "non-

9

1   core power 136") & cl. 1 ("core voltage" and an "area voltage"); Ex. 9 (Reda Dep. Tr.)

2   at 133:14–19, 134:6–135:9.)

3        Even though the specification delineates between a "core" and an "area,"

4   Qualcomm complains that the terms are indefinite because the patent describes that the

5   L1 cache and the L2 cache may be in a core or in an area, depending on the particular

6   embodiment.  Because the specification does not limit L1 and L2 caches to a specific

7   location, Qualcomm deems the claims indefinite.  Qualcomm's argument is incorrect as

8   a matter of law—claims may simultaneously cover alternative embodiments without

9   being indefinite.  *See, e.g., dunnhumby USA, LLC v. emnos USA Corp.,* No. 13-CV-0399,

10  2015 WL 1542365, at *29 (N.D. Ill. Apr. 1, 2015) ("A claim is not indefinite merely

11  because it covers broad possibilities and encompasses multiple embodiments of the

12  claimed terms.")  In *dunnhumby*, for example, the court rejected the argument that a claim

13  was indefinite simply because "the person of ordinary skill would not know whether

14  storing something **with** a user profile means to be stored in the user profile, or next to

15  the user profile, or in the same file as the user profile, or in the same network or computer

16  as the user profile." *Id.* (emphasis in original); *see also Cal. Inst. of Tech. v. Hughes Commc'ns

17  Inc.,* 35 F. Supp. 3d 1176, 1194 (C.D. Cal. 2014) ("The fact that a term covers broad

18  possibilities does not render it indefinite, as long as a person of ordinary skill can identify

19  the outer boundaries, expansive though they may be.").

20       Contrary to Qualcomm's suggestion, the '453 **does** set out an objective anchor by

21  which to differentiate a core from an area.  The components of a core and an area are

22  defined and identified based on **whether they are directly involved in processing**

23  **instructions**.  (*Compare* Ex. 6 ('453) at 3:10–11 ("Core power area includes the

24  instruction-processing portion of processor 102."), *with id.* at 3:34–36 ("[N]on-core

25  power area 124 includes portions of processor 102 that are not directly involved in

26  processing instructions.").)  This objective criteria resolves the question Qualcomm

27  raises regarding the L1 cache and L2 cache—if either is directly involved in processing

28  instructions, it is part of a core; if either is not directly involved in processing instructions,

10

it is part of an area.  Figures 1A and 1B bear out this definition.  Figure 1A illustrates an embodiment where the L2 cache, cache tags and cache snoop circuitry are not directly involved in instruction processing (and are therefore part of a non-core area).  Figure 1B illustrates an alternative embodiment where the L2 cache, cache tags, and cache snoop circuitry are directly involved in instruction processing (and are therefore part of a core).  For at least these reasons, Apple's constructions should be adopted and Qualcomm's indefiniteness arguments rejected.

**B.**     **"sufficient to maintain the state information of the instruction-processing circuitry"** ('453 patent, claims 1, 2, 4)

| Disputed Term | Apple's Construction | Qualcomm's Construction |
|---|---|---|
| "sufficient to maintain the state information of the instruction-processing circuitry"[6] | "at least a value that maintains the state information of the instruction-processing circuitry" | "a minimum value that maintains state information of the instruction-processing circuitry, which minimum value is not sufficient to allow instruction processing to continue" |

The parties' dispute concerning the term "sufficient to maintain the state information of the instruction-processing circuitry" raises two issues:  (1) whether this term is limited to the ***minimum*** value that maintains state information of the instruction-processing circuitry and (2) whether the term excludes values "sufficient to allow instruction processing to continue."  Neither restriction is warranted by the '453's claims, specification, or prosecution history.  This term should be given its plain and ordinary meaning of "at least a value that maintains the state information of the instruction-processing circuitry."

One of ordinary skill in the art reading the '453 would understand that the claim term "sufficient to maintain the state information of the instruction-processing circuitry" means that the voltage can be a range of values including the absolute minimum to maintain the state information, as well as a higher values that allow both the maintenance

---

[6] Apple maintains its objection to Qualcomm's proposed term which ignores the context of its use in the claims. Apple discusses this proposed term in both contexts in which it appears in the asserted claims – "normal operation mode" and "first power saving mode."

of state information and processing.  (*See* Ex. 8 (Reda Decl.) ¶ 45.)  Such a person would not equate sufficient with a minimum value, but rather with a range.  (Ex. 9 (Reda Dep. Tr.) at 115:12–116:13, 165:19–25, 167:22–168:1, 170:15–21.)  As Dr. Reda testified, "the voltage range of the state information is a superset of the voltage required for instruction processing."  (Ex. 9 (Reda Dep. Tr.) at 189:3–6; *see also id.* at 116:7–11 ("[T]he entire window for operation to process instruction . . . is a subset of the window of voltage required to retain the state information.").)  Interpreting "sufficient" to mean "at least" is consistent with constructions by other courts.  *See, e.g.*, *Pactiv, LLC v. Multisorb Techs., Inc.*, No. 10 C 461, 2013 WL 120234, at *13 (N.D. Ill. Jan. 9, 2013), *aff'd*, 621 F. App'x 665 (Fed. Cir. 2015) ("The proportions required by ["**sufficient** proportions"] are simply that there be **enough** salt to combine with water to create an electrolyte that causes the iron to absorb at least some oxygen."); *TASER Int'l, Inc. v. Stinger Sys.*, No. 2:09-cv-289-MMD-PAL, 2012 WL 3562371, at *5 (D. Nev. Aug. 16, 2012) (defining "high voltage" to mean "voltage **sufficient** to arc across a significant air gap, i.e. **at least** several thousand volts").

Moreover, any construction of "sufficient to maintain the state information of the instruction-processing circuitry" must account for the fact that this term appears in two clauses of claim 1 describing two operating modes: (1) a "normal operation mode" ("wherein in a normal operation mode…the core voltage is a first value that is sufficient to maintain the state information of the instruction-processing circuitry; the core is active") and (2) a "first power saving mode" ("wherein in a first power-saving mode …the core voltage is sufficient to maintain the state information of the instruction-processing circuitry").  Apple's proposal does so.  Qualcomm's does not.

Beginning with the first clause, **normal operation** mode means that the core can operate.  This conclusion is reinforced by the claim requirement that the "core is active" in this mode.  (Ex. 6 ('453) at cl. 1.)  Thus, in "normal operation mode," the core must receive a voltage that is sufficient to maintain the state information and to perform instruction processing.  (*Id.* at cl. 1, 4:13–15 ("The voltage applied to core power 134

12

remains sufficiently high during ***instruction processing*** so that core power area 126 remains fully ***active***").)   Apple's construction of "sufficient to maintain the state information of the instruction-processing circuitry" allows for this normal operation mode because the only restriction it imposes on the core voltage is that it be "at least a value that maintains the state information of the instruction-processing circuitry." Qualcomm's construction, in contrast, prohibits the core voltage from being "sufficient to allow instruction processing to continue" in "normal operation mode."   Thus, under Qualcomm's construction, the core is inoperable during "***normal operation*** mode," which is nonsensical.   This goal-seeking construction does violence to the claims by rendering them inoperable and, therefore, cannot be correct.   *AIA Eng'g Ltd. v. Magotteaux Int'l S/A*, 657 F.3d 1264, 1278 (Fed. Cir. 2011) ("[A] construction that renders the claimed invention inoperable should be viewed with extreme skepticism."); *see also Wi-Fi One, LLC v. Broadcom Corp.*, 887 F.3d 1329, 1345–46 (Fed. Cir. 2018) (rejecting proposed construction that resulted in a configuration which "would not work" and adopting construction "faithful to the invention disclosed in the specification").

With respect to the second clause, the "first power-saving mode" clause recited in claim 1, the only mandated difference from normal operation mode is that "the clock signal to the core is inactive."  (Ex. 6 ('453) at cl. 1.)  Nothing in the claim or the written description requires that the core voltage necessarily be lower than it was in the normal operation mode.  Rather, the patent describes multiple embodiments of power-saving modes.  In one, the clock is halted, but the core voltage remains at instruction-processing levels.  (Ex. 6 ('453) at 4:61–64 ("[T]he system enters a normal nap mode, which involves halting the processor ***without reducing any voltages*** (step 208).  Typically, halting the processor involves removing the clock signals to the core power area.").)  In the other power-saving mode, the core voltage is "not sufficient to allow processing to continue." (Ex. 6 ('453) at 4:18–22.)   Because Qualcomm's construction excludes the first embodiment above, it should be rejected.  *See, e.g.*, *Oatey Co. v. IPS Corp.*, 514 F.3d 1271, 1276 (Fed. Cir. 2008) (reversing construction excluding embodiment).

### C.   "power area" ('940 patent, claims 9, 11)

| Disputed Term | Apple's Construction | Qualcomm's Construction |
|---|---|---|
| "power area" | plain and ordinary meaning. To the extent the Court finds that further construction is necessary, "grouping related to receiving power" | "arrangement of elements connected to the same power supply" |

The parties' dispute here centers on whether a "power area" is defined based on requirements for *receiving power*, as Apple proposes, or requirements based on connection to an amorphous power supply, as Qualcomm contends. The '940 clearly describes grouping processor components into a "power area" based on requirements for receiving power, not connection to a power supply: "[n]on-core power area 124 *receives non-core power* 136 and core power area 126 *receives core power 134*." (Ex. 7 ('940) at 3:59–60.) Similarly, Figures 1A and 1B show different processor components grouped into "non-core power area 124" and "core power area 126" according to the power they receive (*e.g.*, "non-core power 136" or "core power 134"). (*Id.* at Figs. 1A, 1B; *see also id.* at 2:46–51, 3:2–5, 4:22–23; Ex. 8 (Reda Decl.) ¶¶ 48–49.) The specification is consistent—a "power area" is a "grouping related to *receiving* power."

Qualcomm instead proposes a construction that would require components within a "power area" to be "connected to the same power supply." There is no basis in the plain language of the '940 claims or specification for such a construction. The '940 simply does not mandate anything about the power supplies or connection to them, only the differentiated receipt of power. (*See* Ex. 8 (Reda Decl.) ¶ 50.) In fact, the term "power supply" never appears in the claims or specification. Rather, Qualcomm's expert takes this language from an unrelated patent (Ex. 10 (Decl. of Richard A Belgard ("Belgard Decl.") ¶¶ 56–57 (discussing the understanding of "[a] person of ordinary skill in the art (familiar with Vaglica)")), and improperly imports it into the claims. For this reason alone, Qualcomm's construction should be rejected.

Qualcomm's construction also injects unnecessary ambiguity into the claims. It is unclear to one of skill in the art what "the same power supply" means. (*See* Ex. 8 (Reda

Decl.) ¶ 51; Ex. 9 (Reda Dep. Tr.) at 135:13–24, 215:16–216:2 ("What is exactly power supply? . . . [E]verything ultimately is connected to a power supply.").) "Power supply" could, for example, refer to the ultimate source of device power like a battery or power cord, the entire power distribution network of a processor, or the voltage regulator of a specific component. (*See* Ex. 8 (Reda Decl.) ¶ 51.) Because one of ordinary skill would be confused by Qualcomm's introduction of "power supply" in its construction, it cannot be correct. *Action Star Enter. Co. v. KaiJet Tech. Int'l Ltd.*, No. CV-1208074-BRO-MRX, 2014 WL 12595331, at *8 (C.D. Cal. Jan. 27, 2014) ("[T]he Court should [not] confer upon unambiguous terms, which were obviously intended in their plain and ordinary sense, a strained and convoluted definition.").

**D.    "real-time clock"** ('940 patent, claims 9, 11)

| Disputed Term | Apple's Construction | Qualcomm's Construction |
|---|---|---|
| "real-time clock" | plain and ordinary meaning. To the extent the Court finds that further construction is necessary, "provider of time-of-day services" | "circuit that provides time-of-day services to the processor" |

With respect to "real-time clock," the parties dispute whether the Court should narrow the plain and ordinary meaning of "real-time clock" to one embodiment. The '940 uses "real-time clock" according to its plain and ordinary meaning, which is captured by Apple's proposal: "provider of time-of-day services." Apple's construction is consistent with both the understanding of one of ordinary skill in the art and the specification. Conversely, Qualcomm's construction artificially narrows the term to just one embodiment, a "circuit."

The '940 provides a straightforward description of "real-time clock" consistent with its plain and ordinary meaning: "***Real-time clock 114 provides time-of-day services to processor 102***." (Ex. 7 ('940) at 3:36–37.) Even Qualcomm's expert admits: "This passage ['940 at 3:35–39] of the specification is an excellent description of one definition well-known to a person of ordinary skill in the art, that is, a real-time clock, sometimes called a 'time of day clock,' is a ***device that provides time-of-day services***

15

1   *to a processor.*"  (Ex. 10 (Belgard Decl.) ¶¶ 60–61.)

2          The '940 specification does not limit a "real-time clock" to a "circuit" (as

3   advocated by Qualcomm) or any other particular implementation.  Not only does the

4   written description provide no limitation, one of ordinary skill would have recognized

5   that real-time clocks had various embodiments beyond just a "circuit" and would

6   therefore not limit "real-time clock" to a circuit implementation.  (*See* Ex. 8 (Reda Decl.)

7   ¶¶ 54–58; Ex. 9 (Reda Dep. Tr.) at 220:19–24 ("[T]he realtime clock could be part circuit,

8   part firmware."); Ex. 11 (Belgard Dep. Tr.) at 55:10–12 ("Q. Can hardware in

9   combination with software provide time-of-day services? A. Sure.").)   Because

10  Qualcomm's construction imports into the term "real-time clock," a limitation not

11  present in the claims or the specification, it should be rejected.  *See, e.g.*, *Enthone Inc. v.*

12  *BASF Corp.*, No. 1:15-CV-0233-TJM-DEP, 2016 WL 6679493, at *12 (N.D.N.Y. June

13  17, 2016), *report and recommendation adopted*, No. 1:15-CV-233, 2016 WL 4257355

14  (N.D.N.Y. Aug. 11, 2016) (rejecting proposed limiting construction where "nowhere in

15  the claim or written description is the depicted structure limited to a block copolymer");

16  *cf. Cadence Pharm., Inc. v. Exela PharmSci Inc.*, 780 F.3d 1364, 1369 (Fed. Cir. 2015) ("[E]ven

17  if all of the embodiments discussed in the patent included a specific limitation, it would

18  not be proper to import from the patent's written description limitations that are not

19  found in the claims themselves.").  The term "real-time clock" should be given its plain

20  meaning, "provider of time-of-day services."

21  **V.**     **U.S. PATENT NOS. 8,271,812; 8,443,216; AND 8,656,196**

22          The '812, '216, and '196 patents (Exs. 12–14, collectively the "de Cesare Patents")[7]

23  describe processor power management solutions.  The de Cesare Patents explain that

24  reducing the power consumption of processors can enhance the battery life of mobile

25  devices and reduce cooling requirements.  (Ex. 12 ('812) at 1:12–24.)  These patents also

27  ────────────────────
[7] The de Cesare Patents (Ex. 12 (U.S. 8,271,812 ("'812")); Ex. 13 (U.S. 8,443,216
28  ("'216")); Ex. 14 (U.S. 8,656,196 ("'196"))) are related in that the '196 is a continuation
of the '216 which is a continuation of the '812 whose filing date is April 7, 2010. They
share the same patent specification.

describe how processor components transition between performance states (e.g., wake, sleep, idle, processing states). (*See, e.g.*, *id.* at 1:33–47.) For example, if a processor is not needed, it may enter a sleep state. (*Id.*) To prevent other system components from wasting power by continuously operating at levels required to support an active processor, the de Cesare Patents provide various power management strategies in which components in performance domains transition between performance states quickly and with minimal power consumption. (*See, e.g.*, *id.* at 1:62–2:41, 7:58–8:23; *see* Ex. 15 (Decl. of Vincent Mooney ("Mooney Decl.") ¶¶ 22, 46.)

**A.    "performance domain"** ('812 patent, claim 8; '216 patent, claim 1; '196 patent, claims 1, 2, 3)

| Disputed Term | Apple's Construction | Qualcomm's Construction |
| --- | --- | --- |
| "performance domain" | "one or more components that may be controlled as a unit or independently for performance configuration purposes" | "one or more components that may be controlled by the power management unit as a unit for performance configuration purposes" |

The dispute between the parties on this term centers on two issues: (1) whether components within a "performance domain" may be controlled either as a unit or independently for performance configuration purposes; and (2) whether the power management unit alone must control a "performance domain."

With respect to the first issue, the specification unambiguously confirms that components may be either controlled as a unit, or independently controlled, and thus Apple's construction is the correct one. Specifically, the written description discloses that components in a "performance domain" may be controlled as a unit: "A performance domain may be one or more components that may be controlled by the PMU 28 as a unit for performance configuration purposes." (Ex. 12 ('812) at 4:14–16.) The specification also explicitly states that the components within a performance domain can have their performance state and performance characteristics independently controlled: "performance characteristics that apply to more than one component in a performance domain and that may be independent[ly] controlled." (*Id.* at 5:25–27.) The

17

patent provides further examples of "independent" control: "components in different performance domains may be independent of each other, at least from the standpoint of hardware, and may have independently-determined performance states." (*Id.* at 4:22–25.)  Still other examples reinforce the specification teaching of independent control: "For example, if the processor is powered off in the sleep state and other components are in the same performance domain, *the voltage for the processor may be set separately from the voltage for the other components* that remain active." (*Id.* at 5:20–24.)

One of ordinary skill in the art would understand that performance domain components may be controlled independently of each other. (*See* Ex. 15 (Mooney Decl.) ¶¶ 27–28; Ex. 16 (Mooney Dep. Tr.) at 73:4–5.)  The de Cesare Patents illustrate this point through an example involving a processor and a component, both in the same performance domain: "In embodiments in which a processor is in a performance domain with other components, the other components may remain active during times that the processor is in the sleep state.  For example, the component 18 in the performance domain 14A may remain active during times that the processor 16A is in the sleep state." (Ex. 12 ('812) at 5:29–36.)  Moreover, a skilled artisan would recognize the need for independent control because it allows the L2 cache to "remain active to maintain cache coherence." (*See id.* 5:36–43; Ex. 16 (Mooney Dep. Tr.) at 72:10–15 ("[T]here can be additional performance domains where those independent components . . . have say a different clock frequency or different voltage").)

Qualcomm's construction wrongly requires performance domain components to be controlled only as a unit.  *First*, Qualcomm improperly excludes the above-cited embodiments where the components are controlled independently.  *See Viasat, Inc. v. Space Sys./Loral, Inc.*, No. 3:12-cv-00260-H, 2013 WL 12061852, at *4 (S.D. Cal. May 29, 2013) ("[T]his court interprets the claim language according to the embodiments in the specification and the surrounding claim language." (*citing Accent Packaging, Inc. v. Leggett & Platt, Inc.*, 707 F.3d 1318, 1325–26 (Fed. Cir. 2013))); Ex. 15 (Mooney Decl.) ¶ 28.)

***Second***, the power management unit alone need not necessarily control a "performance domain." The plain language of the claims illustrates that a "performance domain" may be controlled outside of a power management unit. Claim 1 of the '216, for example, describes a "power management unit . . . configured to transition a second performance domain" in response to a "first performance domain including the processor transitioning to a second performance state." (Ex. 13 ('216) at cl. 1.) Likewise, the specification describes that the power management unit is not the only mechanism for controlling performance domains. (*See, e.g.*, Ex. 12 ('812) at Abstract ("The PMU ***may*** control the transition of the performance domains."); *id.* at 3:5–7 (""[M]ay' is used in a permissive sense."); Ex. 15 (Mooney Decl.) ¶ 29; Ex. 16 (Mooney Dep. Tr.) at 122:14–17, 124:16–18 ("There may be additional performance domains not controlled by the PMU on the chip on specific embodiments.")); *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 844 (Fed. Cir. 2010), *aff'd*, 564 U.S. 91 (2011) (refusing to limit claims because "[t]he specification's permissive language . . . does not clearly disclaim systems lacking these benefits.") For example, "performance domain[] transition may be hardware controlled by the PMU 28, ***or*** may be software controlled using the valid indications in the performance configuration registers." (Ex. 12 ('812) at 8:57–60.) Thus, the power management unit must control the transition of the "second performance domain," but need not control the "first performance domain." (*See* Ex. 13 ('216) at cl. 1.)

As such, Apple's construction appropriately captures the plain language of the claims and the intrinsic record.

**B.    "power management unit"** ('812 patent, claim 8; '216 patent, claims 1, 2; '196 patent, claim 1)

| Disputed Term | Apple's Construction | Qualcomm's Construction |
|---|---|---|
| "power management unit" | plain and ordinary meaning. To the extent the Court finds that further construction is necessary, "hardware and/or software that causes a performance domain to transition to a performance state" | "a circuit that manages power consumption by automatically transitioning in hardware the performance states of a plurality performance domains" |

19

1     The dispute here centers on whether the Court should import embodiments from

2   the specification into the claims.  Unsurprisingly, a "power management unit" manages

3   power.  As the de Cesare Patents explain, a "power management unit" can "establish a

4   corresponding performance state for each performance domain, and . . . control

5   transitions between performance states in each performance domain." (Ex. 12 ('812) at

6   4:16–20.)  Such transitions occur when the criteria described in the claims are satisfied.

7   (*See, e.g., id.* at cl. 8.)  Because one of ordinary skill in the art would readily understand

8   this idea, (*see* Ex. 15 (Mooney Decl.) ¶¶ 32–37; Ex. 16 (Mooney Dep. Tr.) at 65:6–24),

9   the Court need not construe "power management unit."

10    Should the Court construe this term, only Apple's construction is consistent with

11  the intrinsic evidence.  Qualcomm's construction, in contrast, strips the claims of clarity

12  and is unduly narrow because it adds three improper limitations that are otherwise absent

13  from the claims: (1) limiting a power management unit to a hardware-only

14  implementation; (2) requiring automatically transitioning between states; and (3)

15  requiring a transition of performance states in a plurality of performance domains.  With

16  its three added limitations, Qualcomm "asks the Court to essentially rewrite the claim,

17  which is beyond the scope of this Court's power."  *See Carl Zeiss Vision Int'l GMBH v.*

18  *Signet Armorlite, Inc.*, No. 07-cv-0894 DMS (POR), 2008 WL 4951984, at *3 (S.D. Cal.

19  June 2, 2008) (Sabraw, J.) (declining to import "numerous limitations" from exemplary

20  embodiments into claims); *see also Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298,

21  1309–11 (Fed. Cir. 1999) (cautioning against importing limitations into the claims that

22  are not found in the claims themselves).

23    As to the first, the specification supports Apple's construction that a "power

24  management unit" transitions a performance domain using either hardware and/or

25  software.  For example, the de Cesare Patents explain that a "power management unit

26  may be ***programmable***," thus implying a combination of hardware and software.  (Ex.

27  12 ('812) at 2:9–12; *see also id.* at Abstract ("The target performance states to which the

28  performance domains are to transition ***may be programmable in the PMU by***

20

1   *software*.”); Ex. 16 (Mooney Dep. Tr.) at 182:25–183:2.)   As a further example of a

2   combination of software and hardware, the de Cesare Patents describe a “**PMU driver**”

3   that “**may invoke the transition.**”   (Ex. 12 (’812) at 11:31–35; *see also* Ex. 15 (Mooney

4   Decl.) ¶ 33 (“The reference to PMU driver [in the de Cesare Patents] tells one of skill in

5   the art that the power management unit of the claims is a combination of hardware and

6   software.”).)   Likewise, state transitions may be software-managed.   (Ex. 12 (’812) at

7   Abstract (“**[S]oftware** may signal the PMU that a processor in the system is to enter the

8   sleep state.”); *id.* at 8:38–39 (“**[S]oftware** may use processor instruction execution

9   mechanisms to cause the processor to enter the sleep state.”); Ex. 16 (Mooney Dep. Tr.)

10  at 184:24–185:2 (“You could implement a power management unit in software.   That

11  would have to interface to the hardware through interface logic in order to affect the

12  transitions being requested.”).)

13       As to the second, Qualcomm inappropriately excludes an embodiment of the

14  specification by requiring that **all** state transitions occur automatically.   The specification

15  explicitly states the opposite: “in addition to the automatic performance state transitions

16  performed for sleep and wake transitions in the processors, the software 60 may also

17  change performance states directly based on the activity in the system as a whole. . . .

18  **The software 60 may directly request such changes**.” (Ex. 12 (’812) at 10:63–11:3.)

19  The specification offers further embodiments contradicting Qualcomm’s construction.

20  For example, “[t]he [power management unit] 28 may be configured to automatically

21  transition one or more of the performance domains 14A-14F.” (*Id.* at 4:2–4.)   However,

22  in other embodiments, “the closely linked performance domains may transition to

23  different performance states in response to the corresponding processor entering the

24  sleep state.” (*Id.* at 8:52–55.)   This demonstrates not only that may a state transition be

25  not automatic, but that it may be directly software managed.   Moreover, one of ordinary

26  skill would not necessarily understand transitions to occur automatically.   (*See* Ex. 15

27  (Mooney Decl.) ¶ 35 (“[P]ower management unit initiated transitions occur in the system

28  on a chip when the criteria described in the claims are satisfied.”); Ex. 16 (Mooney Dep.

Tr.) at 113:16–20, 114:20–115:2 ("[T]he definition of power management unit is more general than specifically saying it must automatically transition.").)

As to the third, the specification directly contradicts Qualcomm's construction requiring transitioning performance states in a plurality of performance domains. The written description explains that the power management unit may alter the "the performance states of *one or more* performance domains." (Ex. 12 ('812) at Abstract; *accord id.* at 10:67–11:2 ("[E]ven if the processors are not going to the sleep state, changes in the performance state *of one or more performance domains* may be desirable."); Ex. 15 (Mooney Decl.) ¶ 36; Ex. 16 (Mooney Dep. Tr.) at 134:17–19 ("[P]ower management unit can also control a single performance domain.").) Indeed, the claims themselves require only a single performance domain to transition states: "wherein the power management unit is configured to transition *at least a first performance domain* of the plurality of performance domains to a first performance state." (Ex. 12 ('812) at cl. 8.)

### C.   "establish a . . . performance state" ('812 patent, claim 8; '216 patent, claim 1; '196 patent, claim 1)

| Disputed Term | Apple's Construction | Qualcomm's Construction |
|---|---|---|
| "establish a . . . performance state" | plain and ordinary meaning. To the extent the Court finds that further construction is necessary, "set the . . . one or more performance characteristics to the appropriate values for the performance state" | "to cause the performance domain to apply the performance state to that domain" |

The parties dispute how a performance state is "established" or "set" for components within a performance domain. Apple contends "establish a . . . performance state" as used in the de Cesare Patents means "set the . . . one or more performance characteristics to the appropriate values for the performance state." This construction is clear, easy to understand, and supported by the specification. In contrast, Qualcomm's construction is confusing and contrary to common sense.

Qualcomm's construction, requiring performance domains to "apply" their own

performance states, "is illogical and does not accord with the plain import of the claim language." *Interactive Gift Exp., Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1336 (Fed. Cir. 2001) (overruling construction of "material object" in claim that required "the information" to be reproduced on the "material object" as "the information itself"); (*see also* Ex. 15 (Mooney Decl.) ¶ 41; Ex. 16 (Mooney Dep. Tr.) at 138:7–11.)  A "performance domain" is merely a set of one or more components and therefore does not establish performance states.  (Ex. 15 (Mooney Decl.) ¶ 41; Ex. 16 (Mooney Dep. Tr. at 138:1–2.)  Qualcomm's construction thus creates the possibility of confusion with "power management unit" and its role with respect to establishing performance states in performance domains.  *See Power-One, Inc. v. Artesyn Techs., Inc.*, 599 F.3d 1343, 1348 (Fed. Cir. 2010) ("The terms of the patent claims, as construed by the court, must ensure that the jury fully understands the court's claim construction rulings and what the patentee covered by the claims.").

Consistent with Apple's construction, Qualcomm admits that a "performance state" is "a combination of ***performance characteristics*** for the components in a corresponding performance domain."[8]  (*See* Doc. No. 250 (Jt. Claim Const. Stmt.) at 2; *see also* Ex. 12 ('812) at 4:31–33.)  One or more performance characteristics, such as such as "supply voltage," (Ex. 12 ('812) at 4:31–62), must be set to the appropriate value to achieve the desired performance state.  (*See* Ex. 15 (Mooney Decl.) ¶ 40; Ex. 16 (Mooney Dep. Tr.) at 139:9–14.)   In one embodiment, for example, "***the voltage for the processor may be set*** separately from the voltage for the other components that remain active." (Ex. 12 ('812) at 5:22–24; *see also id.* at 5:19–28.)   Therefore, Qualcomm's construction should be rejected.

**D.**    **"a prior performance state at which the processor was operating prior to entering the sleep state"** ('812 patent, claim 8)

| Disputed Term | Apple's Construction | Qualcomm's Construction |
|---|---|---|
| "a prior performance state at which the processor was | "the performance state at which the processor was last operating before | Plain and ordinary |

---

[8] The parties agree to this construction of "performance state."

23

| operating prior to entering the sleep state" | the transition to the sleep state began" | meaning |
|---|---|---|

Qualcomm proposes plain and ordinary meaning for this term.  Apple agrees, so long as that plain and ordinary meaning is consistent with "the performance state at which the processor was last operating before the transition to the sleep state began." To the extent Qualcomm does not agree, then this claim construction dispute must be resolved now.[9]

When read in light of the claims and the specification, this term simply means "the performance state at which the processor was last operating before the transition to the sleep state began." (*See* Ex. 16 (Mooney Dep. Tr.) at 146:19–22.)  The specification explains that when a processor undergoes a sleep-to-wake transition, "the wake performance state is different from **the** performance state prior to the processor transitioning to the sleep state," (e.g., an idle state).  (*See* Ex. 12 ('812) at 8:21–23; Ex. 15 (Mooney Decl.) ¶ 46.)  When considering that much of the specification is directed to achieving such transitions quickly and with minimal power impact, this must be true.  For example, the '812 explains that complex transitions (e.g., idle-to-sleep-to-wake transitions) pose different performance level requirements than more basic wake-to-sleep-to-wake transitions.  (*See* Ex. 12 ('812) at 1:42–46.)  To perform such transitions efficiently, the system stores performance state configurations in, for example, registers.  (*See id.* at 7:58–10:12, 8:13–23.)  Claim 8 thus refers to not just **any** performance state but **the** performance state just before the transition to sleep.  (Ex. 15 (Mooney Decl.) ¶ 46; Ex. 16 (Mooney Dep. Tr.) at 152:20–153:7.)

Consequently, the Court should accept Qualcomm's assertion of plain meaning only if Qualcomm confirms that plain meaning is the plain-meaning construction

---

[9] Qualcomm had claimed that the term was indefinite, offering multiple proposed meanings, but has now abandoned that position, claiming the term should receive its plain and ordinary meaning.  At the close of claim construction, Apple wants no confusion regarding that plain and ordinary meaning.  *See, e.g., CytoLogix Corp. v. Ventana Med. Sys., Inc.*, 424 F.3d 1168, 1172 (Fed. Cir. 2005) (allowing experts to argue claim construction to the jury is "improper" because "[t]he risk of confusing the jury is high").

1   proposed by Apple.  Otherwise, the Court must decide the dispute.

2   **VI.**   **CONCLUSION**

3        For the above reasons, and those to be stated in later briefing and at argument,

4   Apple respectfully requests that the Court adopt Apple's constructions.

Dated:  August 8, 2018                    Respectfully submitted,

By: /s/ Robert M. Yeh
    Juanita R. Brooks, SBN 75934, brooks@fr.com
    Seth M. Sproul, SBN 217711, sproul@fr.com
    Frank Albert, SBN 247741, albert@fr.com
    Joanna M. Fuller, SBN 266406, jfuller@fr.com
    Robert M. Yeh, SBN 286018, ryeh@fr.com
    Fish & Richardson P.C.
    12390 El Camino Real
    San Diego, CA 92130
    Phone: 858-678-5070 / Fax: 858-678-5099

    Ruffin B. Cordell, DC Bar No. 445801, appearing *pro hac vice*, cordell@fr.com
    Lauren A. Degnan, DC Bar No. 452421, appearing *pro hac vice*, degnan@fr.com
    Fish & Richardson P.C.
    1000 Maine Avenue, S.W. Suite 1000
    Washington, D.C. 20024
    Phone: 202-783-5070 / Fax: 202-783-2331

    Benjamin C. Elacqua, TX SBN 24055443, appearing *pro hac vice*, elacqua@fr.com
    John P. Brinkmann, TX SBN 24068091, appearing *pro hac vice*, brinkmann@fr.com
    Fish & Richardson P.C.
    One Houston Center, 28th Floor
    1221 McKinney
    Houston, TX 77010
    Phone: 713-654-5300 / Fax: 713-652-0109

    Christopher O. Green, GA SBN 037617 appearing *pro hac vice,* cgreen@fr.com
    Brian P. Boyd, GA SBN 553190 appearing pro hac vice, bboyd@fr.com
    Fish & Richardson P.C.
    1180 Peachtree St., NE, 21st Floor
    Atlanta, GA 30309
    Phone: 404-892-5005 / Fax: 404-892-5002

Betty Chen, SBN 290588, bchen@fr.com
Katherine D. Prescott, SBN 215496, prescott@fr.com
Fish & Richardson P.C.
500 Arguello Street, Suite 500
Redwood City, CA 94063
Phone: 650-839-5070 / Fax: 650-839-5071

Phillip W. Goter, MN SBN 392209, appearing
*pro hac vice*, goter@fr.com
Fish & Richardson P.C.
60 South 6th Street, Suite 3200
Minneapolis, MN 55402
Phone: 612-335-5070

Mark D. Selwyn, SBN 244180,
mark.selwyn@wilmerhale.com
Wilmer Cutler Pickering Hale and Dorr LLP
950 Page Mill Road
Palo Alto, CA 94304
Phone: 650-858-6000 / Fax: 650-858-6100

William F. Lee, MA Bar No. 291960 appearing
*pro hac vice*, william.lee@wilmerhale.com
Joseph J. Mueller, MA Bar No. 647567 appearing *pro hac vice*, joseph.mueller@wilmerhale.com
Timothy Syrett, MA Bar No. 663676, appearing
*pro hac vice*, timothy.syrett@wilmerhale.com
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, MA 02109
Phone: 617-526-6000 / Fax: 617-526-5000

Nina S. Tallon, DC Bar No. 479481 appearing
*pro hac vice*, nina.tallon@wilmerhale.com
Wilmer Cutler Pickering Hale and Dorr LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006
Phone: 202-663-6000 / Fax: 202-663-6363

William A. Isaacson, DC Bar No. 414788, appearing *pro hac vice*, wisaacson@bsfllp.com
Karen L. Dunn, DC Bar No. 1002520, appearing *pro hac vice*, kdunn@bsfllp.com
Boies, Schiller & Flexner LLP
1401 New York Avenue, N.W.
Washington, DC 20005
Phone: 202-237-2727 / Fax: 202-237-6131

*Attorneys for Defendant/Counterclaim-Plaintiff APPLE INC.*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been served on August 8, 2018 to all counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system per Civil Local Rule 5.4. Any other counsel of record will be served by electronic mail, facsimile and/or overnight delivery.

Executed on August 8, 2018, at San Diego, California.

*/s/ Robert M. Yeh*
Robert M. Yeh
Attorney for Defendant/Counterclaim-Plaintiff,
Apple, Inc.
Email: ryeh@fr.com

Case No. 3:17-CV-01375-JAH-MDD