David A. Nelson (*pro hac vice*)
(Ill. Bar No. 6209623)
davenelson@quinnemanuel.com
**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
500 West Madison St., Suite 2450
Chicago, Illinois 60661
Telephone: (312) 705-7400
Facsimile: (312) 705-7401

Karen P. Hewitt (SBN 145309)
kphewitt@jonesday.com
Randall E. Kay (SBN 149369)
rekay@jonesday.com
**JONES DAY**
4655 Executive Drive, Suite 1500
San Diego, California 92121
Telephone: (858) 314-1200
Facsimile: (844) 345-3178

*[Additional counsel identified on signature page]*

*Attorneys for Plaintiff and Counterclaim Defendants*
QUALCOMM INCORPORATED AND
QUALCOMM TECHNOLOGIES, INC.

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| QUALCOMM INC.,<br><br>Plaintiff,<br><br>v.<br><br>APPLE INC.,<br><br>Defendant.<br><br>AND RELATED COUNTERCLAIMS | Case No. 3:17-cv-1375-DMS-MDD<br><br>**QUALCOMM'S OPPOSITION TO APPLE'S DAUBERT MOTION TO EXCLUDE TESTIMONY OF DRS. PRINCE, KENNEDY, BROGIOLI, AND KELLEY**<br><br>Judge:  Hon. Dana M. Sabraw<br><br>Hearing Date: January 11, 2019 |

# **TABLE OF CONTENTS**

**Page**

I.   INTRODUCTION ............................................................................... 1

II.  DR. PRINCE'S SURVEY IS RELEVANT AND IS BASED ON
     ESTABLISHED PRINCIPLES AND METHODS ............................................ 2

     A.   Dr. Prince's Survey, Conducted on Relevant Topics and Under
          Accepted Principles, Is Admissible ............................................... 3

     B.   Apple's Critiques of Dr. Prince's Work Are Incorrect and
          Contrary to Apple's Own Prior Positions ...................................... 6

          1.   Dr. Prince's Survey Is Sufficiently Tied to the Claims ................. 7

          2.   Apple's Claim That The Survey Is Unreliable Because It
               Does Not Account For Unpatented Features Is Wrong And
               Contradicted by Apple's Own Prior Statements ......................... 9

II.  APPLE'S ATTACKS ON DR. KENNEDY'S OPINIONS ARE
     UNFOUNDED AND ARE NOT A BASIS FOR EXCLUSION .................... 11

     A.   Dr. Kennedy Provided A Thorough Bargaining Power Analysis
          Supported by Multiple Analytic Methods...................................... 11

     B.   Dr. Kennedy's Opinion Regarding The Cost of ████████████
          ████████ Flash Is Methodologically Sound................................... 16

III. DR. BROGIOLI'S TESTIMONY IS RELEVANT AND SHOULD NOT
     BE EXCLUDED ................................................................................ 19

     A.   Dr. Brogioli's Opinions are Relevant to the Issue of Qualcomm's
          Alleged Anticompetitive Behavior ................................................ 19

     B.   Dr. Brogioli Opinions are Proper Expert Testimony ..................... 20

IV.  DR. KELLEY'S OPINIONS ON POWER SAVINGS PROVIDE A
     REASONABLE DETERMINATION OF THE BENEFITS ACHIEVED
     BY THE '558 PATENT .................................................................... 21

     A.   Apple's Challenges Go To The Evidentiary Weight, Not
          Admissibility, Of Dr. Kelley's Opinions ...................................... 22

     B.   Apple's Arguments Are Not Supported By The Evidentiary
          Record ........................................................................................ 23

1

## **TABLE OF AUTHORITIES**

2
**Page**

3
## **Cases**

4
*Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*,
 738 F.3d 960 (9th Cir. 2013) ............................................................................ 3

5

6
*Apple Inc. v. Motorola, Inc.*,
 757 F.3d 1286 (Fed. Cir. 2014) ............................................................ 21, 22, 23

7
*Apple, Inc. v. Samsung Elecs. Co.*,
 Case No. 5:12-cv-00630-LHK, 2014 WL 794328
8
 (N.D. Cal. Feb. 25, 2014) ........................................................................ 4, 6, 7, 8

9
*Clicks Billiards, Inc. v. Sixshooters, Inc.*,
 251 F.3d 1252 (9th Cir. 2001) ......................................................................... 3

10

11
*Content Guard Holdings v. Amazon*,
 2015 WL 11089749 (E.D. Tex. Aug. 6, 2015) ............................................... 15

12
*Daubert v. Merrell Dow Pharm. Inc.*,
 43 F.3d 1311 (9th Cir. 1995) ......................................................................... 20

13

14
*Daubert v. Merrell Dow Pharm., Inc.*,
 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993) ............................ 18

15
*Fractus, S.A. v. Samsung*,
 No. 6:09-CV-203-LED-JDL, 2011 WL 7563820 (E.D. Tex. Apr. 29, 2011) .......... 9

16

17
*Fujifilm Corp. v. Motorola Mobility LLC*,
 No. 12-CV-03587, 2015 WL 1737951 (N.D. Cal. Apr. 8, 2015) ..................... 8

18
*Gaylord v. United States*,
 777 F.3d 1363 (Fed. Cir. 2015) ...................................................................... 22

19

20
*Largan Precision Co. v. Samsung Elecs. Co.*,
 No. 13-CV-2740, 2015 WL 10857530 (S.D. Cal. Nov. 30, 2015) .................. 4

21
*Limelight Networks, Inc. v. XO Commc'ns, LLC*,
 2018 WL 678245 (E.D. Va. Feb. 2, 2018) ............................................... 14, 15

22

23
*Messick v. Novartis Pharm. Corp.*,
 747 F.3d 1193 (9th Cir. 2014) ......................................................................... 3

24
*Micro Chem., Inc. v. Lextron, Inc.*,
 317 F.3d 1387 (Fed. Cir. 2003) ...................................................................... 18

25

26
*MobileMedia Ideas, LLC v. Apple Inc.*,
 209 F. Supp. 3d 756 (D. Del. 2016) ................................................................. 9

27
*NetAirus Techs., LLC v. Apple, Inc.*,
 2013 WL 12322092 (C.D. Cal. Oct. 23, 2013) ............................................. 8, 9

28

*Odyssey Wireless, Inc. v. Apple Inc.*,
  No. 15-CV-01735, 2016 WL 7644790 (S.D. Cal. Sept. 14, 2016) .................passim

*Sentius Int'l LLC v. Microsoft Corp.*,
  5:13–cv–00825–PSG (N.D. Cal. 2015), 2015 WL 331939....................................10

*Southland Sod Farms v. Stover Seed Co.*,
  108 F.3d 1134 (9th Cir. 1997) ...................................................................................3

*Summit 6, LLC v. Samsung Elecs. Co.*,
  802 F.3d 1283 (Fed. Cir. 2015) ..........................................................................3, 8

*TCL Commc'ns Tech. Holdings, Ltd. v. Telefonaktiebolaget LM Ericsson*,
  No. 15-cv-2370-JVS-DFM, 2018 WL 4488286 (C.D. Cal. Sept. 14, 2018) ........8, 9

*Townsend v. Monster Beverage Corp.*,
  303 F. Supp.3d 1010 (C.D. Cal. 2018) ....................................................................3

*TV Interactive Data Corp. v. Sony Corp.*,
  929 F. Supp. 2d 1006 (N.D. Cal. 2013)...................................................4, 6, 10, 11

*Visteon Glob. Techs., Inc. v. Garmin Int'l, Inc.*,
  No. 10-CV-10578, 2016 WL 5956325 (E.D. Mich. Oct. 14, 2016) ......................11

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.   INTRODUCTION

Apple's motion asserts challenges that, at most, go to the weight of the testimony. None is a basis for excluding any of the challenged opinions.  The motion should be denied.

First, Apple tries to poke holes in Qualcomm's damages expert opinions, arguing Dr. Prince's survey and Dr. Kennedy's opinions relying thereon are inadmissible. Apple's critiques of the survey fly in the face of many opinions admitting conjoint surveys in smartphone patent litigation.  Apple fails to acknowledge or address its repeated, unsuccessful attempts to exclude similar surveys offered by Dr. Prince, including recently in this Court.  Apple likewise ignores that it has argued opposite positions when offering its own conjoint surveys.  Dr. Prince's survey is relevant and was conducted using widely-accepted methodology.  There is no basis to exclude it.

Second, Apple attempts to mischaracterize Dr. Kennedy's bargaining power analysis, ignoring the in-depth, case specific analysis in his report, misleadingly claiming he adopted an improper rule of thumb.  Not so, as his analysis makes clear. Apple also complains about the quality of the information Dr. Kennedy used to estimate the cost of the flash component the patent enabled Apple to avoid—a quintessential cross-examination argument.  Moreover, Apple ignores that Dr. Kennedy's use of publicly available information was necessitated by Apple's failure to produce any evidence of the cost of this component during discovery.  Apple's complaints about Dr. Kennedy's analysis do not identify any methodological flaw warranting exclusion.

Third, Apple rehashes its motion to strike Dr. Brogioli's expert report—arguing, once again, that Qualcomm should be foreclosed from rebutting Apple's pervasive narrative about Qualcomm's allegedly anticompetitive conduct.  Nowhere in its motion does Apple agree not to offer evidence regarding Qualcomm's licensing policies or their allegedly anticompetitive impact.  Qualcomm is entitled to offer rebuttal testimony from Dr. Brogioli to help the jury understand ████████████████████████

1                  ██████████████████████████ Rather than address this evidence head-

2 on, Apple asks this Court to exclude Qualcomm's rebuttal from the case.

3          Finally, Apple challenges Dr. Kelley's opinions regarding the power savings

4 attributable to the '558 Patent.  Dr. Kelley relied on documents and testing performed

5 by Qualcomm in the ordinary course of business to compare the power savings

6 attributable to its implementation of envelope-tracking—functionality enabled by the

7 '558 Patent.  Apple does not challenge the framework for Dr. Kelley's opinions, nor

8 does it posit different estimated savings or alternative evidence that Dr. Kelley failed to

9 consider.  Instead, Apple suggests a different comparison *could* have been performed,

10 an argument that has no place in a *Daubert* motion and which ignores that the

11 comparison it proposes was not feasible.

## II.   DR. PRINCE'S SURVEY IS RELEVANT AND IS BASED ON ESTABLISHED PRINCIPLES AND METHODS

13          Apple seeks to exclude Dr. Prince's survey on two grounds.  First, it argues the

14 survey results are not "linked to the asserted claims" because battery life is allegedly

15 only improved by the asserted patents when the device is "displaying 3D graphics or

16 connecting to distant cell towers," whereas Dr. Prince surveyed the value of battery life

17 during "heavy use of a smartphone."  (Mot. at 9.)  This argument fails.  Dr. Prince

18 measured the value of improvements in battery life, which is exactly what Qualcomm's

19 technical experts identified as the benefit of the inventions, so the results are "linked to

20 the asserted claims."  Apple's quibbles about how battery life is described in the survey

21 go to weight, not admissibility.  Second, Apple argues the survey results do not identify

22 the value of "the claimed features relative to all unpatented features," and that the

23 willingness-to-pay ("WTP") results are too high.  (*Id.* at 12.)  This argument fails too.

24 ████████████████████████, it is impossible to include every smartphone feature in

25 a survey, yet courts have routinely admitted conjoint surveys in smartphone patent cases,

26 including ones offered by Apple.  Apple's claim that the survey is flawed because the

27 willingness-to-pay measurements of all phone features could total more than the

1   purchase price of the phone distorts conjoint methodology, is a 180 degree turn from

2   Apple's prior positions, and has been rejected by multiple courts.

3        Apple's motion also ignores three dispositive facts.  First, the law of this Circuit

4   makes clear Apple's criticisms go to weight, not admissibility.  Second, Apple brought

5   and lost a very similar motion to exclude a very similar survey by Dr. Prince in this very

6   Court six months ago.  Third, Apple has offered very similar conjoint surveys as a basis

7   for damages in smartphone patent cases where it was plaintiff—and in opposing *Daubert*

8   motions it has taken (and prevailed on) positions diametrically opposed to those it offers

9   now.  Dr. Prince used an established and widely-used methodology, applied it carefully,

10  consistent with academic literature and case law, and generated reliable results.

11       **A.   Dr. Prince's Survey, Conducted on Relevant Topics and Under Accepted Principles, Is Admissible**

12       Apple ignores the standard under which this Court reviews survey analysis on a

13  *Daubert* motion.[1]  In the Ninth Circuit, "[t]he admissibility threshold for survey evidence

14  . . . is notably low."[2]  *Townsend v. Monster Beverage Corp.*, 303 F. Supp. 3d 1010, 1025

15  (C.D. Cal. 2018).  "The offering party need only show that the survey is relevant and

16  conducted according to accepted principles."  *Id.*  "[A]s long as they are conducted

17  according to accepted principles . . . survey evidence should ordinarily be found

18  sufficiently reliable under *Daubert*."  *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d

19  1134, 1143 n.8 (9th Cir. 1997).  After the survey is found "relevant and conducted

20  according to accepted principles," the "issues of methodology, survey design, reliability,

21  the experience and reputation of the expert, critique of conclusions, and the like go to

22  the weight of the survey rather than its admissibility."  *Clicks Billiards, Inc. v.

23  Sixshooters, Inc.*, 251 F.3d 1252, 1263 (9th Cir. 2001).

24

---

25  [1]   This Court follows Ninth Circuit law for *Daubert* determinations.  *See Summit 6,*
26  *LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1294 (Fed. Cir. 2015).
    [2]   *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013)
27  ("Basically, the judge is supposed to screen the jury from unreliable nonsense opinions,
    but not exclude opinions merely because they are impeachable."); *Messick v. Novartis*
28  *Pharm. Corp.*, 747 F.3d 1193, 1196 (9th Cir. 2014) ("Rule 702 should be applied with
    a 'liberal thrust' favoring admission.").

As another trial court in this Circuit held in accepting conjoint surveys offered by Apple, "the framing of questions for purposes of surveys is generally an issue of weight, not admissibility." *Apple, Inc. v. Samsung Elecs. Co.*, Case No. 5:12-cv-00630-LHK, 2014 WL 794328, at *18 (N.D. Cal. Feb. 25, 2014). Only when "a description of a patent in survey . . . var[ies] so much from what is claimed that the survey no longer 'relate[s] to any issue in the case' and is 'not relevant and, ergo, non-helpful,'" should the survey be excluded. *Id.*; *see also Largan Precision Co. v. Samsung Elecs. Co.*, No. 13-CV-2740, 2015 WL 10857530, at *2 (S.D. Cal. Nov. 30, 2015) (denying *Daubert* motion challenging survey). The selection of features for inclusion in a survey is also a critique that goes to weight, not admissibility. *TV Interactive Data Corp. v. Sony Corp.*, 929 F. Supp. 2d 1006, 1025–26 (N.D. Cal. 2013) (denying motion to exclude conjoint survey where movant argued "exclusion of the majority of product attributes" "led respondents to overvalue each of the product attributes" tested).

Dr. Prince's survey easily meets the standards of relevance and acceptable principles. The value of increased battery life to consumers, a benefit that Qualcomm's technical experts identified for three of the patents-in-suit, is directly relevant to the royalty Apple would pay at a hypothetical negotiation. (*E.g.*, Ex. 3[3] (Annavaram Rpt.) at 20; Ex. 4 (Baker Rpt.) at 170; Ex. 5 (Kelley Rpt.) at 13, 197.) Dr. Prince employed a well-accepted and commonly used survey tool called "choice-based conjoint analysis" to assess consumers' willingness-to-pay for various smartphone features. (Ex. 1 (Prince Rpt.) at 12.) Conjoint analysis allows companies to understand how consumers value a particular feature. (*Id.*) It is frequently used in litigation, including for patent valuation,[4] in commercial settings,[5] and by both policy makers and academic researchers.[6] Apple

---

[3] All exhibit citations are to the Declaration of Zachary Flood, filed concurrently.
[4] *E.g.*, *Odyssey Wireless, Inc. v. Apple Inc.*, No. 15-CV-01735, 2016 WL 7644790, at *9 (S.D. Cal. Sept. 14, 2016) (admitting conjoint analysis testing value of smartphone upload speed and collecting cases admitting conjoint analyses).
[5] Rao, V., *Applied Conjoint Analysis*, Springer Publishers, 2014 (Ex. 23), at 365; http://www fsgexperts.com/wpcontent/uploads/2013/01/FSG-IP-Damages-CLE.pdf (Ex. 24), at 3.
[6] Rao, V., *Applied Conjoint Analysis*, Springer Publishers, 2014 (Ex. 23), at 365.

1  itself has used conjoint surveys in patent litigation to value smartphone features.[7]

2  Dr. Prince's conjoint analysis presented survey respondents with descriptions of

3  different hypothetical smartphones with a range of different features, and asked which

4  device they would prefer.  (*Id.*)  Dr. Prince conducted interviews and focus groups to

5  ensure the survey correctly identified the features and was understandable to

6  respondents.  (*Id* at 14.)  Dr. Prince used the relationship between the estimated

7  willingness-to-pay for storage (derived from the survey) and the market price of storage

8  (e.g., $100 more for twice as much storage) to calibrate the survey results, ensuring they

9  provided data as closely tied to real-world decision-making as possible.  (*Id.* at 22-23.)

10  Dr. Prince then conducted a series of statistical robustness checks to further validate the

11  results.  (*Id.* at 25-26.)  In sum, Dr. Prince used established survey methods.

12  Apple has not addressed that it has twice offered conjoint surveys over *Daubert*

13  challenges and has failed in three prior *Daubert* motions attacking Dr. Prince's

14  methodology.  In two separate smartphone patent cases in the Northern District of

15  California, Apple offered conjoint surveys as part of its damages methodologies.  5:11-

16  cv-1846; 5:12-cv-630.  In both cases, Apple's expert conducted conjoint surveys

17  containing no more than seven features (including far more minor features than battery

18  life) to generate willingness-to-pay numbers that were used by Apple's damages experts.

19  And in both cases, those surveys were admitted over *Daubert* challenges.

20  Apple also has challenged surveys by Dr. Prince in three previous cases[8] and each

21  time its *Daubert* motion has been denied.  (*See* Ex. 2 (Prince Dep.) at 13:8-12; 14:10-

22

---

23  [7]   http://www.fsgexperts.com/wp-content/uploads/2013/01/FSG-IP-Damages-
    CLE.pdf, at 26-29 (Ex. 24); (*see Apple Inc. v. Samsung Elecs. Co.*, 11-cv-01846-LHK

24  (N.D. Cal.), Dkt. 2130-1 (Ex. 25); *Apple Inc. v. Samsung Elecs. Co.*, 12-cv-00630-LHK
    (N.D. Cal.), Dkt. 1182. (Ex. 26)).

25  [8]   (*ContentGuard Holdings, Inc. v. Google Inc. et al.*, 2:14-cv-00061-JRG (E.D. Tex.)
    Dkt. 298 ("Defendants' dissatisfaction with the description of the patented features in

26  the survey goes to weight, not admissibility") (Ex. 29); *Wi-LAN Inc. v. HTC*, 2:11-cv-
    00068-JRG (E.D. Tex.) Dkt. 597, at 49, 62 (Defendants argued that "Dr. Prince

27  artificially focuses consumers on a few key functionalities"; the court rejected the
    challenge:  "With regard to Dr. Prince and the Daubert motion concerning his surveys,

28  the Court finds that the Defendant has not shown anything inherently unreliable and
    that they can adequately respond to the same through cross-examination.") (Ex. 30).)

13.)  Indeed, Apple moved to exclude Dr. Prince's survey results in a case before this Court just a few months ago.  (*Apple Inc. v. Wi-LAN Inc.*, 3:14-cv-02235-DMS-BLM (S.D. Cal.), Dkt. 338. (Ex. 27).)  Dr. Prince's survey in that case relied on substantially the same procedure that Dr. Prince applies here, and Apple made substantially the same challenge that it raises again here.  (*See id.*)[9]  In denying that motion, this Court joined the others in finding Dr. Prince's surveys admissible.

Apple's motion does not address any of this.  It made no effort to explain how this survey fails where its own conjoint surveys and Dr. Prince's prior ones did not.  That is because both authority and Apple's own prior arguments make clear this challenge is baseless.

### B. Apple's Critiques of Dr. Prince's Work Are Incorrect and Contrary to Apple's Own Prior Positions

Apple argues that Dr. Prince's survey results are flawed because his "willingness-to-pay calculations could *sum* to a price greater than the price customers pay for an iPhone."[10] (Mot. at 12.)  However, as Apple previously (and successfully) argued in the Northern District, willingness-to-pay "values *cannot be simply added up*."[11]  (5:12-cv-00630-LHK (N.D. Cal.), Dkt. 857-3 at 11 ("*Apple v. Samsung Daubert* Opp.") (Ex. 28)); *Apple, Inc.*, 2014 WL 794328, at *15 n.7 (accepting Apple's argument that "the willingness-to-pay results of the conjoint survey cannot be added in this way"); *see also TV Interactive Data*, 929 F. Supp.2d at 1026 (rejecting the same "extrapolation" argument Apple raises here).  Likewise, Apple argues Dr. Prince's survey is flawed because it did "not include the *numerous untested factors* that also influence smartphone purchasing." (Mot. at 13.)  But again, Apple does not disclose it previously

---

[9]  Just as Apple argues here, Apple argued that Dr. Prince's survey did not apportion the patented features (Ex. 27 at 17-19), that Dr. Prince's willingness-to-pay calculations could exceed the price of the device (*id.* at 18), and that conjoint surveys are not reliable under the same cases it cites again here.  (*Id.* at 19-23.)

[10]  This is consistent with Apple's conjoint survey in the second *Apple v. Samsung* case, where the sum of consumers' willingness-to-pay for just five user-interface patented features was $358.  (5:12-cv-00630-LHK (N.D. Cal.), Dkt. 1993 at 92 (Velluro Rpt.) (Ex. 31).)

[11]  Emphasis in this brief is added unless otherwise noted.

argued that "the literature uniformly recognizes testing *too many distraction features* can *cause serious problems*" and has successfully offered conjoint surveys for smartphones testing only seven features. (*Apple v. Samsung Daubert* Opp. at 6.)  Apple also argues Dr. Prince's survey questions were too broad relative to the scope of the claims (Mot. at 9), again without acknowledging its previous position that the "precise wording of questions" "go[es] to the *weight of the survey rather than its admissibility*." ((*Id.* at 9, 11) ("[I]f Samsung contends these [feature] descriptions are inaccurate, that is an issue it can address at trial—it is not an appropriate basis for a motion to exclude.").)

> ### 1.   Dr. Prince's Survey Is Sufficiently Tied to the Claims

Apple complains that Dr. Prince's survey asked consumers about the value of additional battery life during "heavy use" periods, whereas Apple contends the patent claims only relate to particular use cases, such as "displaying 3D graphics."  (Mot. at 9.) According to Apple, because "the survey did not ask about these specific uses," the results should be excluded.  (*Id.*)  This argument fails across the board.

First, displaying 3D graphics, such as when playing graphically intensive video games, *is* a "heavy use" of the device, and tends to drain battery more quickly than when the phone is in standby mode.  (Annavarum Rpt. at 20, 155, 158, 220 (describing accused functionalities as "complex, graphics-intensive application programs," "*power-hungry* high precision math instructions," and the "*most power consuming* instructions"); *see also* https://www.apple.com/batteries/ (noting that the "single biggest factor affecting battery life and lifespan" are phone activities—comparing "videos and *games*" to "email and word processing").)

Second, Apple's quibble with Dr. Prince describing 3D graphics-intensive gaming as a "heavy use" is precisely the kind of critique that goes to weight, not admissibility.  *See Apple, Inc.*, 2014 WL 794328, at *18 (denying exclusion of Apple conjoint survey and holding that "the framing of questions for purposes of surveys is generally an issue of weight, not admissibility.").  Likewise, Apple's complaint that the power savings from each patent are not available in each and every possible use case

goes to weight, but more importantly misunderstands how Dr. Prince's survey results are used by Dr. Kennedy. *Id.* (rejecting exclusion of survey unless the "description of a patent in survey . . . var[ies] so much from what is claimed that the survey no longer 'relate[s] to any issue in the case'").  Dr. Kennedy apportions the value of additional battery life measured by Dr. Prince to the specific component's power savings resulting from the patented technology and further apportions that value based on that component's portion of the overall phone power consumption.  (Kennedy Rpt. at 47.) There is no requirement that Dr. Prince's survey, which is merely one step in Qualcomm's damages analysis, make every required apportionment.  *Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1296-97 (Fed. Cir. 2015) (approving damages expert's multi-step apportionment).

Apple also complains that Dr. Prince did not ask consumers about an improvement in battery life of 19.5 minutes, and instead asked how they valued improvements in larger increments.  (Mot. at 11.)  This too goes to weight, and ignores Dr. Prince's extensive explanation of why survey interpolation is a well-accepted and reliable methodology appropriately applied here.[12]  (Prince Rpt. at 37-38; Prince Dep. at 170-205; *see also Fujifilm Corp. v. Motorola Mobility LLC*, No. 12-CV-03587, 2015 WL 1737951, at *6 (N.D. Cal. Apr. 8, 2015) (rejecting *Daubert* challenge because the surveyed features needed only to "correlate" with the patented technologies).

Apple's reliance on *NetAirus* and *TCL Communications* is misplaced, as neither case involved a conjoint survey.  Instead, both excluded an outmoded survey technique that asked direct questions regarding willingness to pay, *i.e.*, "How much would you be willing to pay for [a particular] feature?"  *NetAirus Techs., LLC v. Apple, Inc.*, 2013 WL 12322092 (C.D. Cal. Oct. 23, 2013); *TCL Commc'ns Tech. Holdings, Ltd. v. Telefonaktiebolaget LM Ericsson*, No. 15-cv-2370-JVS-DFM, 2018 WL 4488286, at *28 (C.D. Cal. Sept. 14, 2018).  In *TCL*, the expert erred because he "focused on one

---

[12]   Apple also argues that Dr. Prince's results are non-linear, but Dr. Prince explained in his report that they are linear for the *marginal consumer*.  (Prince Rpt. at 37-38.)

feature at a time instead of presenting the bundle of phone features consumers evaluate in reality, and also singled out certain features." 2017 WL 6611635, at *29 (citations omitted). As the *TCL* court noted, "[r]esearch shows that asking survey respondents direct questions about their willingness to pay for individual features and feature differences has been shown to be unreliable." *Id.* The *NetAirus* court confronted the same technique (although it didn't identify it as such), and excluded a single question from the survey, which "[i]n contrast to the questions designed to avoid suggesting an answer," directly asked whether Wi-Fi was worth $20. 2013 WL 12322092, at *4. Both *TCL* and *NetAirus* therefore addressed a discredited methodology called "contingent valuation" where the respondents are directly asked to provide the value of a particular feature. That is not what Dr. Prince did here; he did not ask direct questions about value. (Prince Rpt. at 12.) Indeed, Dr. Prince "concluded that this approach was inappropriate" to perform his measurements because surveys using contingent valuation "have been shown to provide unreliable measurements." (Prince Rpt. n. 34.)[13]

2. Apple's Claim That The Survey Is Unreliable Because It Does Not Account For Unpatented Features Is Wrong And Contradicted by Apple's Own Prior Statements

Apple argues Dr. Prince's survey should have "apportioned" the value of battery life against "all unpatented features" in a smartphone. (Mot. at 9.) But accepting this argument would render conjoint surveys inadmissible in all smartphone cases, where the product has hundreds of features, ████████████████████████████████

████████████████████████████████████████████████

---

[13] The out-of-circuit *Fractus* case also provides no help to Apple. First, this one-page, unreported opinion from the Magistrate is not based on the Ninth Circuit's survey standard. Further, in that case the survey results tested the value of internal antennas as opposed to the actual inventive benefits—"multiband functionality and reduced size." *Fractus, S.A. v. Samsung*, No. 6:09-CV-203-LED-JDL, 2011 WL 7563820, at *1 (E.D. Tex. Apr. 29, 2011). There is also no indication that the experts in *Fractus* apportioned those survey results at all. *Id.* In contrast, Dr. Prince's survey directly reflects the power efficiency of the inventions as identified by Qualcomm's technical experts, and as discussed the data were apportioned appropriately. *Supra* II.B.1; *see also MobileMedia Ideas, LLC v. Apple Inc.*, 209 F. Supp. 3d 756, 765–66 (D. Del. 2016) (rejecting Apple *Daubert* motion based on *Fractus* because the survey question was "sufficiently tied to [the expert] opinion regarding the benefit of the patent").

1  ████████████████████   Surveys valuing selected
2  smartphone features are routinely admitted by courts, including those in this Circuit.
3  *See, e.g.*, *Odyssey Wireless*, 2016 WL 7644790, at *10 (denying *Daubert* motion arguing
4  "the [conjoint] survey focuses on only certain attributes of a smartphone").  Apple
5  successfully opposed a *Daubert* on precisely this ground while using a conjoint survey
6  to value smartphone features far smaller than battery life.  (*Apple v. Samsung Daubert*
7  Opp.)  And, as discussed above, Dr. Prince's survey measurements are just part of
8  Qualcomm's damages analysis.

9      As explained above, Dr. Prince went to great lengths to identify an appropriate set
10  of features to survey, and Apple identifies no methodological flaws with his selection,
11  other than his choice not to include an impossibly large set of survey features.  (*Cf. Apple
12  v. Samsung Daubert* Opp. at 6 ("[T]he literature uniformly recognizes testing ***too many
13  distraction features can cause serious problems***. Indeed, . . . long questionnaires lead
14  to survey exhaustion and poor results.").)  As Apple has recognized in the past, "typical
15  full-profile conjoint studies in practice . . . involve about six or fewer attributes."  (*Id.* at
16  7.)  This is precisely what Dr. Prince has done.  *See also Apple Inc.*, 929 F. Supp. 2d at
17  1025-26 (citing literature stating testing fewer variables in a conjoint leads to "better
18  predictive value" and prevents respondents from being "overwhelmed by too much
19  data.").  In any case, feature selection goes to weight, not admissibility.  *TV Interactive
20  Data Corp.*, 929 F. Supp. 2d at 1025–26; *Sentius Int'l LLC v. Microsoft Corp.*, 5:13–cv–
21  00825–PSG (N.D. Cal. 2015), 2015 WL 331939 at *5 (denying motion to exclude
22  survey that "asked respondents only about their preferences for the two accused features
23  when the accused products include thousands of features").

24      The *Oracle* case Apple cites is inapposite because, ***as Apple itself has previously
25  explained***, the expert in *Oracle* predicted market share rather than measuring diminished
26  demand as Dr. Prince did here.  (*Apple v. Samsung Daubert* Opp. at 4.)  As Apple argued,
27  the difference between predicting market share and measuring diminished demand is not
28  "semantic or insubstantial—they are fundamentally different concepts."  (*Id.*)

Furthermore, as other courts have discussed, in *Oracle* "the expert tested seven features in the analysis, three of which were covered by the patented technology, and four of which were not . . . [but] the expert offered no principle[d] basis for selecting the four non-patented features for inclusion in the analysis." *TV Interactive*, 929 F. Supp. 2d at 1026. What Dr. Prince did is distinguishable because, just as in *TV Interactive*, he "conducted his conjoint analysis in two phases," where he first established a "principled basis for choosing the [] features which would be tested alongside [patented features]" and then measured the "[patented] values relative to the other features." *Id.*; *supra* (describing principled basis for choosing features).[14]

## II. APPLE'S ATTACKS ON DR. KENNEDY'S OPINIONS ARE UNFOUNDED AND ARE NOT A BASIS FOR EXCLUSION

Apple's motion challenges Dr. Kennedy's bargaining power analysis and his opinion regarding the cost of the flash component Apple was able to avoid by using the patented invention of the '949 patent. Apple fundamentally mischaracterizes Dr. Kennedy's bargaining power analysis, and its challenge to Dr. Kennedy's flash cost opinion is an improper attempt to package cross-examination arguments as methodological issues that also ignores its own failure to produce relevant cost information. Neither challenge has merit.[15]

### A. Dr. Kennedy Provided A Thorough Bargaining Power Analysis Supported by Multiple Analytic Methods

After calculating the incremental profits attributable to the infringing features of the patents-in-suit, Dr. Kennedy performed an in-depth analysis of Apple and Qualcomm's relative bargaining power to determine how the parties would split those

---

[14]   Apple also relies on an out-of-circuit case for its apportionment argument, but in *Visteon* the court excluded the survey expert because in that survey "the only 'value' expressed . . . [was] the relative value of the four asserted patented features to *one another*." *Visteon Glob. Techs., Inc. v. Garmin Int'l, Inc.*, No. 10-CV-10578, 2016 WL 5956325, at *6 (E.D. Mich. Oct. 14, 2016). Dr. Prince's survey, by contrast, covered many other important non-patented features, including price, screen size, storage, and brand.

[15]   Apple also seeks to exclude Dr. Kennedy's opinions relying on Dr. Prince's survey (Mot. at 17) based on its meritless attacks on Dr. Prince's survey. For the reasons set forth *supra* at Section I, Apple's request must be rejected.

1 | incremental profits at the hypothetical negotiation. (Ex. (Kennedy Rpt.) at 90-98.) In

2 | addition to his *Georgia-Pacific* analysis, which also addresses issues relevant to

3 | bargaining power, Dr. Kennedy analyzed a "number of factors that influence bargaining

4 | power":

> Those factors include: financial indicators (███████████████
> ██████████████) that are slightly in Apple's favor; Qualcomm's
> lower weighted average cost of capital suggesting a slightly higher share
> of the incremental profits for Qualcomm under the Rubinstein model; ███
> ███████████████████████████████.

8 | (*Id.* at 98.)

9 | Specifically, Dr. Kennedy analyzed relevant financial metrics such as the parties'

10 | revenues, profitability, cash position, R&D expenditures and credit ratings, and

11 | concluded that "[s]ome metrics are neutral, but Apple is somewhat larger, has more cash

12 | and has a higher credit rating than Qualcomm." (*Id.* at 90-91.) The financial metrics he

13 | analyzed included factors identified by ████████████████████████████████

14 | ████████████████████████ as important to Apple in licensing negotiations. (*Id.* at

15 | 91, 95-96.)

16 | Dr. Kennedy also applied the well-regarded and litigation-tested bargaining

17 | model developed by Ariel Rubinstein ("Rubinstein model"). (*Id.* at 91.) The Rubenstein

18 | model considers the relevant discount factor for each party in a potential negotiation—

19 | often through a party's weighted average cost of capital ("WACC")—in determining the

20 | ultimate outcome of the negotiation. (*Id.* at 91-92.) Dr. Kennedy determined

21 | Qualcomm's WACC at the time of the first hypothetical negotiation was ███% while

22 | Apple's was ███%, "implying a profit split ████████████████████████████████

23 | ████████████████████" (*Id.* at 94.) Dr. Kennedy determined Qualcomm's WACC at the

24 | time of the later hypothetical negotiation for the '936 patent was ███% while Apple's

25 | was ███%, "implying a profit split ████████████████████████████████████

26 | ██████" (*Id.* at 94.) As discussed below, Dr. Kennedy prepared a second set of

27 | calculations relaxing the assumption that Qualcomm would move first in the

28 | negotiations, which lowered Qualcomm's percentage. His analysis resulted "███████

1  █████████████████████████████████████████████████" for each

2  of the two hypothetical negotiations.  (*Id.*)  This result was consistent with Dr.

3  Kennedy's broader financial metric analysis: "[a]s expected, two large, profitable

4  operating companies, each with ample resources, have roughly balanced shares of the

5  incremental profits to be split in the hypothetical negotiation." (*Id.* at 94-95.)  Dr.

6  Kennedy also considered the impact of Apple's prior litigation positions; specifically,

7  that it had previously sought per unit royalty rates ranging from $1.61 up to $15

8  including for a patent with claimed benefits comparable to those of the '949 Patent. (*Id.*

9  at 97-98.)

10      Based on all of these considerations, Dr. Kennedy concluded "Apple and

11  Qualcomm's relative bargaining power would be balanced and support an equal split of

12  incremental profits." (*Id.* at 98.)  Notwithstanding that Dr. Kennedy's report sets forth

13  all of his analysis in detail, Apple's motion mischaracterizes Dr. Kennedy's analysis and

14  wrongly asserts it is "untethered to the facts of the case," based "on unjustifiable

15  assumptions," and constitutes an "inappropriate rule of thumb" 50-50 split "with no

16  basis at all." (Mot. at 15-17.)  None of that is accurate.

17      <u>First</u>, Dr. Kennedy's in-depth bargaining power analysis *is* tied to the facts of the

18  case.  Dr. Kennedy analyzed the parties' financial metrics *at the times of the hypothetical*

19  *negotiations*, ████████████████████████████. (*Id.* at 90-

20  91.)  His analysis under the accepted Rubinstein model "incorporates *company-specific*

21  information to generate a quantitative split of incremental profits."  (*Id.* at 94-95.)

22  Further, Dr. Kennedy analyzed the assumptions underlying the Rubinstein model and

23  concluded they were largely "consistent with the assumptions of the hypothetical

24  negotiation." (*Id.* at 93-94.)  For the one assumption he identified as not as consistent

25  with the hypothetical negotiation here—the first mover advantage—he adjusted and

26  accounted for it. (*Id.*)  Dr. Kennedy also analyzed other case-specific factors influencing

27  bargaining power, such as the non-quantified benefits of the patented technology, which

28  are specific to the infringing features but were not included in the incremental profits to

be split.  (*Id.* at 95.)  Apple's claim that Dr. Kennedy's opinion is untethered to this case cannot be squared with the actual substance of his analysis.

Second, Dr. Kennedy properly assessed the Rubinstein model as one data point in his broader bargaining power analysis.  As an initial matter, Apple does not argue the Rubinstein model is fundamentally improper.  Nor could it;[16] not only has it been used in litigation for this purpose, Apple's damages expert here has used it in the past ▮

▮

▮ (Ex. 7 (Prowse Dep.) at 199:22-200:2, 201:1-6.)  Rather, Apple picks at a few common sense assumptions and mischaracterizes the way Dr. Kennedy applied and relied on the model.

Apple's complaints about Dr. Kennedy's supposedly "unjustified assumptions," including that "Apple would prefer to get access to the licensed patents sooner rather than later," that "there is an increasing cost to delay," that "the parties to the negotiation make sequential offers and counteroffers," and that "Apple and Qualcomm would have an equal chance of being first mover in the negotiation," are a stretch on their face.  (Mot. at 15-16.)  These assumptions are not only justified—they are rooted in common sense and basic financial economics which dictates that receiving a dollar today is worth more than a dollar tomorrow.  They are also essential to the hypothetical negotiation construct, which assumes the parties are willing licensors and licensees.[17]

Apple's assertion that Dr. Kennedy's use of the Rubinstein model is flawed in the same way the *Limelight* court found Dr. Prowse's—Apple's damages expert here—

---

[16]   The Rubinstein model is a well-regarded, peer-reviewed approach to assessing the outcome of a negotiation.  (*See, e.g.*, Martin J. Osborne and Ariel Rubinstein, Bargaining and Markets (1990), https://pdfs.semanticscholar.org/db16/6725b7b6b8a553cacf43a536cb3f815180ab.pdf ; Rubinstein, A. (1982), "Perfect Equilibrium in a Bargaining Model," *Econometrica*, 50 (1) pg. 97-100, http://arielrubinstein.tau.ac.il/papers/11.pdf.)

[17]   Apple also mischaracterizes Dr. Kennedy's reliance on these assumptions.  They are premises of the Rubinstein model, not overall assumptions underlying Dr. Kennedy's opinions.  As discussed *infra*, Dr. Kennedy examined these premises and concluded they were consistent with the facts of this case and the hypothetical negotiation construct.

completely ignores the difference in how Dr. Prowse and Dr. Kennedy used that model in their analyses.  In *Limelight*, "to determine how the parties would split the revenues, [Dr.] Prowse *relied on* Rubenstein's model," and applied a "modified version of the Rubinstein model to predict the results of the hypothetical negotiation and determine how the parties would split" incremental revenues.  *Limelight Networks, Inc. v. XO Commc'ns, LLC*, 2018 WL 678245, at *3 (E.D. Va. Feb. 2, 2018).[18]  Unlike Dr. Prowse in *Limelight*, Dr. Kennedy analyzed the Rubinstein model as only one part of his holistic bargaining power analysis.  He did "not consider the Rubinstein model, and the underlying WACCs generating the profit splits, **in isolation.**"  (Kennedy Rpt. at 95.) Instead, his ultimate multifaceted opinion "stands without relying upon the Rubinstein model," which served as a check "provid[ing] additional support for my conclusion that Qualcomm's and Apple's bargaining power and split of profits would be balanced." (*Id.* at 94-95.)

Dr. Kennedy's use of the Rubinstein model is far more akin to the analysis upheld in *Content Guard Holdings v. Amazon*, 2015 WL 11089749 (E.D. Tex. Aug. 6, 2015). The *Content Guard* court rejected a challenge to a damages expert's use of the Rubinstein model, explaining the expert properly "identifie[d] the premises of the Rubinstein model and attempt[ed] to explain how they appl[ied] to the facts of this particular case."  2015 WL 11089749, at *8.  That is what Dr. Kennedy did here.  He undertook an in-depth evaluation of the model's assumptions and concluded they were largely "consistent with the assumptions of the hypothetical negotiation."  (Kennedy Rpt. at 93.)  For example, Dr. Kennedy explained that the model's assumption that "both parties are assumed to have positive rates of time preference, was "easily satisfied and confirmed by measurement of Qualcomm and Apple's discount rates."  (*Id.*)  Dr. Kennedy did not blindly accept the Rubinstein model's premises.  Indeed, with respect

---

[18]  The *Limelight* court made clear the Rubinstein model was "potentially admissible" and was not "a rule of thumb or a 50-50 split"—it simply rejected Dr. Prowse's particular use of it.  *Limelight*, at *2.

1    to the model's assumption of a first-mover advantage, because the hypothetical

2    negotiation is silent as to this assumption Dr. Kennedy *adjusted* his analysis to assume

3    "Apple and Qualcomm would have an equal chance of being the first mover." (*Id*. at

4    93-94.)

5         Finally, despite devoting two pages of its motion to attacking Dr. Kennedy's

6    Rubinstein analysis and its resulting ███ split ███████████, Apple's primary

7    complaint appears to be that Dr. Kennedy did not adopt that specific split. (Mot. at 16.)

8    Apple misleadingly argues that ████████████████████████████████████

9    ███████████████████████████████████████████████████████████████

10   ███████ (Mot. at 16.) Not so. As discussed above, Dr. Kennedy relied on multiple

11   analytic approaches to assess bargaining power including (1) comparing the parties'

12   financial metrics, ████████████████████████████████████████████

13   ███████, (2) applying the Rubinstein bargaining model in light of the parties' WACC's,

14   (3) distilling the negotiation-specific implications of his broader *Georgia-Pacific*

15   analysis, and (4) considering Apple's prior litigation history. (Kennedy Rpt. at 90-98.)

16   Nor did he "reject" the results of his Rubinstein analysis, as his report makes clear. (*Id*.

17   at 94-95 (noting the Rubinstein model analysis "does provide additional support for my

18   conclusion").) Dr. Kennedy's Rubinstein analysis simply resulted in a range of

19   bargaining splits very close to 50-50, which provided further support for his ultimate

20   conclusion that an even split was appropriate. That Apple does not like the resulting

21   even split does not make it a "rule of thumb." Apple's attacks on Dr. Kennedy's

22   bargaining power analysis are meritless.

23        **B.    Dr. Kennedy's Opinion Regarding The Cost of ████████████**
            **Flash Is Methodologically Sound**

24

25        Dr. Kennedy calculated the incremental profit associated with the '949 Patent's

26   flashless boot functionality by measuring the cost of the █████████████ flash

27   component that Apple was able to avoid including in each infringing iPhone through its

28   use of the '949 patented technology. (Kennedy Rpt. at 4-5.) Dr. Kennedy had to comb

1  through publicly available information about the price of this component because
2  "Apple has not produced documents from which [he could] sufficiently determine the
3  cost of a ▮▮▮▮▮▮▮▮ flash to Apple at the time of the hypothetical negotiation."
4  (*Id*. at 53-54.)

5      Qualcomm propounded document requests that should have captured Apple
6  documents reflecting the cost of this component.  Qualcomm's requests in the ITC
7  companion case included those for "documents reflecting Apple's analysis, review, and
8  evaluation of flashless booting . . . including but not limited to [the] value of eliminating
9  the need for a separate flash memory for modem processors." (Ex. 8 (ITC RFP No. 67).)
10 Qualcomm's requests in this action included those for documents and communications
11 "reflecting, comprising, or discussing any benefit, ***such as in terms of cost or area***
12 ***savings, of employing a modem processor without an associated flash memory.***" (Ex.
13 9 (RFP No. 146).)  Apple agreed to produce in response to these requests.  (Ex. 10
14 (Apple's Response to RFP No. 146).)  Qualcomm also propounded an interrogatory
15 asking Apple to provide any costs it intended to rely upon in this litigation.  (Ex. 11
16 (Special Rog No. 15).) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
17 ▮▮▮▮. (*Id*.) Further, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
18 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
19 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮. (Ex. 12 (Garg Dep. Tr.) at 17:11-
20 18:1, 24:18.)

21     As a result of Qualcomm's inability to obtain this information in discovery, Dr.
22 Kennedy identified the only publicly available cost information about the most
23 comparable flash component and adjusted that cost to account for different memory
24 capacities and for changes in flash pricing over time.  (Kennedy Rpt. at 53-54.)  Based
25 on this, Dr. Kennedy concluded ▮▮▮▮▮▮▮ flash would have cost $▮▮ per unit
26 at the time of the hypothetical negotiation.  (*Id*.)  After failing to identify the cost of the
27 cost of this component in discovery, Apple now seeks to exclude Dr. Kennedy's opinion
28 as to the cost of that component based solely on its claim that the information Dr.

1  Kennedy used to estimate that cost is imperfect.  (Mot. at 17-18.)  Apple's complaint is

2  not only one of its own making, it is one properly addressed through cross examination,

3  not a *Daubert* motion.  Dr. Kennedy's reliance on publicly available information to

4  estimate the cost of this component is not a methodological flaw, which is confirmed by

5  Apple's lack of supporting authority.

6      Apples cites zero authority for its position that the only permissible cost evidence

7  must have come through Apple itself.  Nor could it.  Disputes regarding the proper source

8  of cost information in a situation like this are quintessentially issues of fact that belong

9  before a jury.  *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 596, 113 S. Ct. 2786,

10 2798, 125 L. Ed. 2d 469 (1993) (noting the "traditional and appropriate means" of

11 attacking imperfect but admissible evidence is through "[v]igorous cross-examination,

12 presentation of contrary evidence, and careful instruction on the burden of proof."); *see*

13 *also Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1392 (Fed. Cir. 2003) ("When

14 … the parties' experts rely on conflicting sets of facts, it is not the role of the trial court

15 to evaluate the correctness of facts underlying one expert's testimony.").

16      Additionally, while Apple criticizes Dr. Kennedy's reliance on public cost

17 information, Apple itself has *still* failed to present *any* evidence as to the cost of this

18 flash component.  In his rebuttal to Dr. Kennedy's report, Apple's expert Dr. Prowse —

19 who enjoys unfettered access to Apple—presented no alternative cost information for



20 ▮▮▮▮▮▮▮▮ flash. ▮▮▮▮▮▮▮▮▮▮

21 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

22 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

23 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

24 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

25 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Ex. 14 (Rinard Rpt.) at 298;

26 Ex. 15 (APL-QC1065_00594682) at -700); Ex. 16 (APL-QC1065_00594134) at -155.)

27      Determining a component cost through publicly available sources is not a

28 methodological flaw.  Apple is free to cross examine Dr. Kennedy about its

disagreement with his cost estimate, but that disagreement is not a basis for exclusion.

## III.   DR. BROGIOLI'S TESTIMONY IS RELEVANT AND SHOULD NOT BE EXCLUDED

Apple's motion is a rehash of its motion to strike Dr. Brogioli's expert report. While Apple describes its motion to strike as based on "procedural grounds" (Mot. at 18 n.8), the bottom line is that both motions are premised on the same argument-- the alleged irrelevancy of Dr. Brogioli's testimony. But Dr. Brogioli's testimony is relevant to an issue *Apple* chose to inject into this case: Qualcomm's allegedly anticompetitive conduct. (*See* Dkt. 115 at 22–23.) Qualcomm is entitled to rebut Apple's arguments by establishing that Qualcomm is an innovator in baseband chipset design.

### A.   Dr. Brogioli's Opinions are Relevant to the Issue of Qualcomm's Alleged Anticompetitive Behavior

Apple argues Dr. Brogioli's opinions are "not relevant to any issue in this case." (Mot. at 19.) But since the outset of this case, Apple has claimed this is "not an ordinary patent case" because "Qualcomm has employed a host of sales and licensing practices designed to impairs its competitors[]" in order to "cement" its market position because "Qualcomm has never been an industry leader for technologies outside of earlier cellular standards." (Dkt. 115 at 22–23.) Apple has pursued, and has indicated it will continue to pursue, these theories throughout this case. (*See* Dkt. 462-7; Dkt. 462-8 at ¶ 152; Dkt. 462-9 at 7-31.) Dr. Brogioli's testimony is relevant to these theories.

Contrary to Apple's suggestion that its statements in its CMS (Dkt. 115) eleven months ago are not representative of its theories in this case (Mot. at 19-20), Apple has pursued those same theories ███████████████████████████████████████████ ██████████████████████████████████████████. Dr. Brogioli's testimony serves to rebut those theories, not with mere "inflammatory innuendo," but with a detailed analysis of facts ███████████████████████████████████████████████ ████████████████████████████, allowing Intel to develop a product that could compete, technically, with Qualcomm's innovative offering. (*See* Ex. 17 (Brogioli Rpt.) at 54-71.) Because Dr. Brogioli's testimony "speaks clearly and directly to an

issue in dispute in the case"—Qualcomm's alleged anticompetitive behavior—and includes an analysis of facts relating to that issue, there is no legitimate concern that it could "mislead the jury." (Mot. at 20.)  *See Daubert v. Merrell Dow Pharm. Inc.*, 43 F.3d 1311, 1321 n.17 (9th Cir. 1995) (scientific expert testimony should not be excluded if "it speaks clearly and directly to an issue in dispute in the case, and … will not mislead the jury").

Apple's withdrawal of its equitable defenses of patent misuse and unclean hands does not mean Dr. Brogioli's testimony is irrelevant.  Apple ignores that, despite withdrawing those defenses, Apple has stated its intent to introduce evidence relating to Qualcomm's allegedly anticompetitive conduct at trial.  (Dkt. 462-7.)  Dr. Brogioli's testimony remains relevant to Apple's claims of anticompetitive conduct, irrespective of Apple's formal withdrawal of its defenses.

**B.    Dr. Brogioli Opinions are Proper Expert Testimony**

Apple's second argument is that Dr. Brogioli's opinions are allegedly not expert testimony.  (Mot. at 20-21.)  To support its position, Apple relies on a gross mischaracterization of ALJ Pender's decision in ITC Investigation No. 1065 excluding Dr. Brogioli's testimony.  (Mot. at 20.)  In that decision, ALJ Pender found that Dr. Brogioli's witness statements were "procedurally deficient" because Qualcomm had not "proferred him as an expert witness nor identified the subject matter of his expertise." (Dkt. 465-19 at 4.)  In addition, ALJ Pender based his opinion on Dr. Brogioli's failure to "discuss[] the statutory public interest factors []or explain[] the relevance of the documents he discusses to those factors."  (*Id.* at 4.)  But because this is not an ITC case, Dr. Brogioli's expert reports do not suffer from the procedural deficiencies that ALJ Pender identified.[19]

_____

[19]    Indeed, in the second ITC Investigation between the parties, Apple's *Daubert* motion was ***denied*** and Dr. Brogioli was ***allowed to testify***.  (Mot. at 19 n.10.)  Here, Dr. Brogioli's testimony relates to substantially the same evidence from Apple's Radar system.  Just as in 337-TA-1093, his testimony should not be excluded.



14 Without Dr. Brogioli's

15 testimony, this technical evidence would not be understandable by the jury.

## IV. DR. KELLEY'S OPINIONS ON POWER SAVINGS PROVIDE A REASONABLE DETERMINATION OF THE BENEFITS ACHIEVED BY THE '558 PATENT

Apple does not challenge the reliability of Dr. Kelley's general methodology, namely, determining the benefits attributable to the '558 patent at a device (*e.g.*, smartphone) level based on power savings achieved in the radio-frequency power amplifier ("RF PA") of the device. Rather, Apple disputes select factual underpinnings of Dr. Kelley's opinion. While Apple's challenges are incorrect on their face, they at best go to the weight of Dr. Kelley's opinions, not admissibility, and thus should be reserved for cross-examination. *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1315 (Fed. Cir. 2014) ("[Q]uestions regarding which facts are most relevant or reliable to calculating a reasonable royalty are 'for the jury.'") (citation omitted).

The substance of Dr. Kelley's opinions is based on a sound and unchallenged methodology. The Accused Products introduced at the time of the hypothetical

negotiation were mobile devices that used the '558 patent's inventions to perform envelope tracking ("ET") for Long-Term Evolution ("LTE"), a wide bandwidth and "power hungry" communication standard.  Dr. Kelley opined that the '558 inventions were foundational for performing ET on a mobile device, and based on that opinion used measured power performance data for Qualcomm's commercial products, including the QFE1100—the first commercial ET chip that also supported LTE.[20]

Apple attacks Dr. Kelley's opinions in two ways.  First, Apple contends that Dr. Kelley should have determined the power savings by comparing a QFE1100-based mobile device with an earlier collaboration between Qualcomm and Apple that did not practice the '558 patent (*i.e.*, the QET8001), rather than with a device performing "average power tracking" ("APT").  (Mot. at 22.)  Apple contends that such a comparison would have provided a more accurate representation of power savings than the one performed by Dr. Kelley.  (*Id*.)  Second, Apple asserts that, in determining the device-level power savings attributable to the RF PA, Dr. Kelley purportedly did not account for the time the Accused Products operate outside of ET mode.  (*Id*. at 22-23.)  Both of Apple's challenge are—at best—based on disputed factual underpinnings of Dr. Kelley's analysis, not his methodology.  Accordingly, Apple's *Daubert* challenge against Dr. Kelley should be rejected.

### A.  Apple's Challenges Go To The Evidentiary Weight, Not Admissibility, Of Dr. Kelley's Opinions

As an initial matter, Apple's challenges fall outside of *Daubert* because they go to the evidentiary weight, not admissibility, of Dr. Kelley's opinion.  The law is well-settled that "questions regarding which facts are most relevant or reliable to calculating a reasonable royalty are 'for the jury.'"  *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1315 (Fed. Cir. 2014) (citations omitted).  "[E]stimating a 'reasonable royalty' is not an exact science."  *Id*.  Furthermore, "[i]t is common for parties to choose different, reliable

---

[20]  Ex. 5 (Kelley Rpt.) ¶332; Ex. 19 (QCAppleITC-06792481) at slide 11; Ex. 19 (Marra 1065 WS) at Q136 ("The selective boost and offset ideas that we described in the '558 patent were key innovations that made the QFE1100 possible ….").

1   approaches in a single case and, when they do, the relative strengths and weaknesses
2   may be exposed at trial or attacked during cross-examination." *Id.*; *see also Gaylord v.*
3   *United States*, 777 F.3d 1363, 1368 (Fed. Cir. 2015) ("Determining a reasonable royalty
4   does not require 'mathematical exactness,' but a 'reasonable approximation' under the
5   circumstances of a given case.). Thus, the focus of admissibility should be whether the
6   expert testimony was "the product of reliable principles and methods," not whether it
7   "produced a correct degree of estimation." *Apple*, 757 F.3d at 1320.

8       Here, Apple does not challenge the reliability of Dr. Kelley's general
9   methodology, *i.e.*, (1) assessing the power savings in the relevant component (*i.e.*, the
10  RF PA) attributable to the '558 invention and (2) translating that number into the device-
11  level power savings. Rather, Apple disputes a few hand-picked factual and technical
12  underpinnings of Dr. Kelley's opinion. For example, Apple implicitly accepts Dr.
13  Kelley's methodology for comparing a product implementing the invention to a
14  benchmark, but merely differs on what benchmark is the "correct comparison." (Mot.
15  at 22.) Even if one were to accept Apple's argument that the QET8001 would have been
16  a more accurate benchmark, which as explained below is unsupported, that is not
17  grounds to exclude Dr. Kelley's opinions. *See Apple*, 757 F.3d at 1714-15 ("That one
18  approach may better account for one aspect of a royalty estimation does not make other
19  approaches inadmissible."). Similarly, Apple does not contest Dr. Kelley's
20  methodology for determining that the RF PA conservatively accounts for 18.4% of total
21  device power, and in fact does not even dispute the 18.4% number itself. Rather, Apple
22  merely argues that the 18.4% should be further reduced to account for the times when
23  ET is not used. (Mot. at 22-23.) But that only relates to "the correct degree of
24  estimation" and should be reserved for the jury. *Apple*, 757 F.3d at 1718. Apple's
25  attempt to preclude Dr. Kelley's testimony on these issues should be rejected.

26      **B.    Apple's Arguments Are Not Supported By The Evidentiary Record**
27          Even if the Court were to delve into the factual underpinnings that Apple
28  improperly challenges here, it would show that Apple's arguments are not supported by

1   the evidentiary record.  First, Apple's argument that Dr. Kelley did not perform the
2   "correct comparison" hinges on Apple's assertion that the QET8001 was "readily
3   available" for testing.  (Mot. at 22.)  However, Apple provides no evidence that the
4   QET8001 was readily available.  Apple's contention fails for this reason alone.  *See*
5   *Odyssey Wireless*, 2016 WL 7644790, at *7 (rejecting Apple's contention that a different
6   test should have been performed where defendants "fail[ed] to support this contention
7   with any evidence in the record showing that such a test or simulation is possible or
8   practical").  In fact, the undisputed evidence shows that the QET8001 was never
9   commercialized because Apple cancelled the project during the development stage.  (*See*
10  Ex. 33 (Mathe Dep. Tr.) 285:4-8 (testifying that Apple cancelled the QET8001 project);
11  Ex. 18 (QCAppleITC-06792481) at 13 ("[T]he [QET8001] project was cancelled").)
12  Thus, contrary to Apple's assertion, it would not have been possible or practical to
13  conduct Apple's hypothetical testing.

14      Apple's hypothetical comparison also would not have been appropriate because
15  the QET8001, unlike the Accused Products and the QFE1100, did not support LTE.  (*See*
16  Ex. 19 (Marra 1065 WS) at Q51 ("the QFE1100 added support for LTE.").)  Because
17  LTE uses more power and has much higher bandwidth than 3G, it is far more challenging
18  to implement ET for LTE than 3G.  (*Id*; Ex. 5 (Kelley Rpt.) at 208.)  As a result, any
19  data comparing the QFE1100 to the QET8001 would improperly reflect the different
20  power requirements of LTE and 3G rather than the power savings due to the '558
21  invention, and therefore the QET8001 would have been a far less effective benchmark
22  in determining the relevant power savings in the Accused Products.  By comparison, Dr.
23  Kelley's reliance on documents reflecting testing performed by Qualcomm in the
24  ordinary course of business for the purpose of developing and commercializing its
25  embodying ET chips offers a much more reliable estimate of the power savings
26  attributable to the '558 Patent.

27      Lastly, Apple argues that Dr. Kelley's 18.4% figure (based on the power
28  consumption by a power amplifier) is overstated because it purportedly includes time

1   when the mobile device is not in ET mode.  (Mot. at 23.)  Based solely on testimony of

2   Apple employee Ron Dimpflmaier that



12          Moreover, any negligible impact of the time not using ET while operating at this

13   much lower RF PA power is more than accounted for by the conservative approach used

14   by Dr. Kelley in his analysis.  For instance, in apportioning the total power consumption

15   to the power consumed by the cellular components based on the *Carroll*'s studies, Dr.

16   Kelley took the average of all use cases (43.6%), despite acknowledging that the more

17   applicable use case for ET would be the "business" case, in which cellular accounts for

18   51% of the total power.  (*See* Kelley Rpt. at 208.)  Dr. Kelley noted that 43.6% is a

19   conservative estimate also because *Carroll* involves a GSM device, which is less power

20   hungry than LTE devices like the Accused Products.  (*Id*. at 209.)  Dr. Kelley was also

21   explicit that estimating the RF PA power consumption at the same level as the baseband

22   processor is conservative, given that an RF PA consumes far more power than the

23   baseband at higher power transmissions, which are when ET is most beneficial and thus

24   the most relevant cases.  (*Id*. at 214.)

25          Accordingly, Apple's attempts to exclude Dr. Kelley's opinions on power savings

26   by the '558 patent should fail for being based on inappropriate grounds for a *Daubert*

27   challenge and contrary to the evidentiary record.

28

DATED:  December 28, 2018          Respectfully Submitted,

By /s/ Valerie Lozano

JONES DAY
Karen P. Hewitt (SBN 145309)
kphewitt@jonesday.com
Randall E. Kay (SBN 149369)
rekay@jonesday.com
John D. Kinton (SBN 203250)
jkinton@jonesday.com
Kelly V. O'Donnell (SBN 257266)
kodonnell@jonesday.com
4655 Executive Drive, Suite 1500
San Diego, California 92121
Telephone: (858) 314-1200
Facsimile: (858) 345-3178

QUINN EMANUEL URQUHART &
SULLIVAN, LLP
David A. Nelson (*pro hac vice*)
(Ill. Bar No. 6209623)
davenelson@quinnemanuel.com
Stephen Swedlow (*pro hac vice*)
(Ill. Bar No. 6234550)
stephenswedlow@quinnemanuel.com
500 West Madison St., Suite 2450
Chicago, Illinois 60661
Telephone: (312) 705-7400
Facsimile: (312) 705-7401

Scott L. Watson (SBN 219147)
scottwatson@quinnemanuel.com
Valerie A. Lozano (SBN 260020)
valerielozano@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

Richard W. Erwine (*pro hac vice*)
(N.Y. Bar No. 2753929)
richarderwine@quinnemanuel.com
Alexander Rudis (*pro hac vice*
forthcoming)
(N.Y. Bar No. 4232591)
alexanderrudis@quinnemanuel.com
Patrick D. Curran (SBN 241630)
patrickcurran@quinnemanuel.com
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100

Sean S. Pak (SBN 219032)
seanpak@quinnemanuel.com
Michelle A. Clark (SBN 243777)
michelleclark@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, CA 94111
Telephone: (415) 875-6600
Facsimile: (415) 875-6700

CRAVATH, SWAINE & MOORE LLP
Evan R. Chesler (*pro hac vice*)
(N.Y. Bar No. 1475722)
echesler@cravath.com
Keith R. Hummel (*pro hac vice*)
(N.Y. Bar No. 2430668)
khummel@cravath.com
Richard J. Stark (*pro hac vice*)
(N.Y. Bar No. 2472603)
rstark@cravath.com
Gary A. Bornstein (*pro hac vice*)
(N.Y. Bar No. 2916815)
gbornstein@cravath.com
J. Wesley Earnhardt (*pro hac vice*)
(N.Y. Bar No. 4331609)
wearnhardt@cravath.com
Yonatan Even (*pro hac vice*)
(N.Y. Bar No. 4339651)
yeven@cravath.com
Vanessa A. Lavely (*pro hac vice*)
(N.Y. Bar No. 4867412)
vlavely@cravath.com
Antony L. Ryan (*pro hac vice*)
(N.Y. Bar. No. 2784817)
aryan@cravath.com
David R. Marriott (*pro hac vice*)
(N.Y. Bar. No. 2682565)
dmarriott@cravath.com
Worldwide Plaza, 825 Eighth Avenue
New York, NY 10019
Telephone: (212) 474-1000
Facsimile: (212) 474-3700

JODIE W. CHENG, P.C.
Jodie W. Cheng (SBN 292330)
jwcheng@jwc-legal.com
One Market Street
Spear Tower, 36th Floor
San Francisco, CA 94105
Telephone: (415) 293-8308

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Attorneys for Plaintiff and
Counterclaim Defendants
QUALCOMM INCORPORATED and
QUALCOMM TECHNOLOGIES, INC.*