Nina S. Tallon, DC Bar No. 479481, *appearing pro hac vice*
WILMER CUTLER PICKERING HALE AND DORR LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006
Phone: 202-663-6000 / Fax: 202-663-6363

Joseph J. Mueller, MA Bar No. 647567, *appearing pro hac vice*,
WILMER CUTLER PICKERING HALE AND DORR LLP
60 State Street
Boston, MA 02109
Phone: 617-526-6000 / Fax: 617-526-5000

Juanita R. Brooks, SBN 75934, brooks@fr.com
Seth M. Sproul, SBN 217711, sproul@fr.com
FISH & RICHARDSON P.C.
12390 El Camino Real
San Diego, CA 92130
Phone: (858) 678-5070/ Fax: (858) 678-5099

Ruffin B. Cordell, DC Bar No. 445801, *pro hac vice*, cordell@fr.com
Lauren A. Degnan, DC Bar No. 452421, *pro hac vice*, degnan@fr.com
FISH & RICHARDSON P.C.
1000 Maine Avenue, Suite 1000
Washington, D.C.  20024
Phone:  202-783-5070 / Fax:  202-783-2331

[*Additional counsel identified on signature page*]

*Attorneys for Defendant/Counterclaim Plaintiff Apple Inc.*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| QUALCOMM INCORPORATED,<br><br>    Plaintiff,<br><br>    v.<br><br>APPLE INC.,<br><br>    Defendant.<br><br>AND RELATED COUNTERCLAIMS. | Case No. 3:17-cv-1375-DMS-MDD<br><br>APPLE INC.'S TRIAL BRIEF<br><br><br>Trial Date: March 4, 2019<br>Judge: Hon. Dana Sabraw |

Pursuant to Civil Local Rule 16.1.f.9, Apple submits this trial brief to summarize its theories of the case.

## I. INTRODUCTION

Qualcomm accuses Apple's iPhone 7, iPhone 7 Plus, iPhone 8, iPhone 8 Plus, and iPhone X containing an Intel baseband chipset as made, used, offered for sale, or sold within the United States as of July 27, 2018 and containing software on such products as of that date ("accused products") of infringing U.S. Patent Nos. 8,838,949 (the "'949 patent"), 8,633,936 (the "'936 patent"), and 9,535,490 (the "'490 patent") (collectively, the "asserted patents"). Qualcomm accuses a subset of these products—the iPhone 8, iPhone 8 Plus, and iPhone X—of infringing the '936 patent. Apple expects the evidence to show that (1) Apple does not directly, indirectly, or willfully infringe any claim of the asserted patents; (2) the asserted patent claims are invalid; and (3) Qualcomm's inflated damages claim is unsupported by the law or facts.

## II. LEGAL STANDARDS

### A. Infringement

To establish infringement, Qualcomm must prove by a preponderance of the evidence that the accused products contain every limitation in the asserted claims. If even one limitation is missing or not met as claimed, there is no literal infringement. *Riles v. Shell Expl. & Prod. Co.*, 298 F.3d 1302, 1308 (Fed. Cir. 2002); *Meyer Intellectual Props. Ltd. v. Bodum, Inc.*, 690 F.3d 1354, 1370 (Fed. Cir. 2012).

"To find infringement under the doctrine of equivalents, any differences between the claimed invention and the accused product must be insubstantial." *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1322 (Fed. Cir. 2014). Prosecution history estoppel "limits the broad application of the doctrine of equivalents by barring an equivalents argument for subject matter relinquished when a patent claim is narrowed during prosecution." *Conoco, Inc. v. Energy & Envtl. Int'l, L.C.*, 460 F.3d 1349, 1363 (Fed. Cir. 2006) (citing *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 733-34 (2002)). Prosecution history estoppel applies when the

applicant "mak[es] a narrowing amendment to the claim" for a reason "[]related to patentability." *Conoco*, 460 F.3d at 1363; *Festo*, 535 U.S. at 735; *Honeywell Int'l Inc. v. Hamilton Sundstrand Corp.*, 370 F.3d 1131, 1141-43 (Fed. Cir. 2004). Application of the doctrine of equivalents is limited by the "all elements rule," which provides that the doctrine does not apply if doing so would vitiate an entire claim limitation—i.e., asserting an infringement theory that would effectively eliminate the claim limitation or render it meaningless. *Asyst Techs., Inc. v. Emtrak, Inc.*, 402 F.3d 1188, 1195 (Fed. Cir. 2005). The doctrine of equivalents is also limited by the disclosure-dedication doctrine, which "bars a patentee from using the doctrine of equivalents to recapture claim scope that it disclosed in the specification but did not literally include in the patent's claims." *CSP Techs., Inc. v. Sud-Chemie AG*, 643 Fed. Appx. 953, 958 (Fed. Cir. 2016).

To establish induced infringement, Qualcomm must prove by a preponderance of evidence that Apple: (1) has intentionally taken action that actually induced direct infringement; (2) was aware of the patent; and (3) knew that the acts it was causing would infringe the patent. If any one of these elements is missing, then there can be no liability for inducement. *See* 35 U.S.C. § 271(b); *Commil USA, LLC v. Cisco Sys., Inc.*, 135 S. Ct. 1920, 1926-28 (2015); *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 760, 766 (2011). To establish contributory infringement, Qualcomm must prove by a preponderance of evidence that: (1) someone other than Apple directly infringes a claim of the patent; (2) Apple supplied an important component of the infringing part of the product; and (3) Apple supplied the component with knowledge of the patent and knowledge that the component was especially made or adopted for us in an infringing manner. *See* 35 U.S.C. § 271(c); *Commil USA*, 135 S. Ct. at 1926. "[T]here can be no contributory infringement in the absence of a direct infringement" by a third party. *Aro Mfg. Co. v. Convertible Top Replacement Co.*, 365 U.S. 336, 341 (1961).

## B. Invalidity

A patent claim is invalid if it is "anticipated" by prior art. For a claim to be invalid because it is anticipated, all its requirements must have been described in a single publication or patent that predates the claimed invention or must have existed in a single device or method that predates the claimed invention. *See ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1327 (Fed. Cir. 2012); *Orion IP, LLC v. Hyundai Motor Am.*, 605 F.3d 967, 974 (Fed. Cir. 2010).

A patent claim is invalid as obvious "if the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art to which the claimed invention pertains." 35 U.S.C. § 103. "The combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 416 (2007). Thus, even if all of the requirements of a claim cannot be found in a single prior art reference that would anticipate the claim, it is still invalid if it would have been obvious to a person of ordinary skill at the time of alleged invention. *See id.* at 418.

A patent is invalid under the doctrine of derivation where the claimed invention was derived from a person who is not named as an inventor. *Gambro Lundia AB v. Baxter Healthcare Corp.*, 110 F.3d 1573, 1576 (Fed. Cir. 1997). "To show derivation, the party asserting invalidity must prove both prior conception of the invention by another and communication of that conception to the patentee." *Id.* The communication to the patentee must disclose every limitation of at least one claim of the patent. *Cumberland Pharms. Inc. v. Mylan Inst. LLC*, 846 F.3d 1213, 1218 (Fed. Cir. 2017); *Ethicon, Inc. v. U.S. Surgical Corp.*, 135 F.3d 1456, 1460 (Fed. Cir. 1998) ("Furthermore, a co-inventor need not make a contribution to every claim of a patent. A contribution to one claim is enough."). Further, the communication to the patentee

must have been sufficient to enable the patentee to practice the claimed invention. *Gambro Lundia AB*, 110 F.3d at 1578.

A patent is also invalid under the doctrine of nonjoinder if it is shown that the patentee did not name a co-inventor on the patent. *Gemstar-TV Guide Int'l, Inc. v. Int'l Trade Comm'n*, 383 F.3d 1352, 1381 (Fed. Cir. 2004); *Pannu v. Iolab Corp.*, 155 F.3d 1344, 1349 (Fed. Cir. 1998). Nonjoinder requires a showing that the omitted coinventor "(1) contribute[d] in some significant manner to the conception or reduction to practice of the invention, (2) ma[de] a contribution to the claimed invention that is not insignificant in quality, when that contribution is measured against the dimension of the full invention, and (3) [did] more than merely explain to the real inventors well-known concepts and/or the current state of the art." *Pannu*, 155 F.3d at 1351.

## III. APPLE DOES NOT INFRINGE ANY VALID CLAIM OF THE '949 PATENT

### A. Overview of the '949 Patent

The '949 patent, titled "Direct Scatter Loading of Executable Software Image from a Primary Processor to One or More Secondary Processor in a Multi-Processor System," was filed on March 21, 2011, and issued on September 16, 2014. The '949 patent is directed to a specific way to transfer and load "executable software images" from a "primary processor" to a "secondary processor."

The core concepts of the '949 patent—multi-processor systems, flashless modems, application processors, inter-chip communication interfaces, multi-segmented images, image headers, data segments, and scatter loading—were already well-known at the time the '949 patent was filed.

### B. Apple Does Not Infringe the '949 Patent

Apple does not infringe the asserted claims of the '949 patent for at least two reasons, which Apple's expert Bill Lin, Ph.D., and Apple engineer Sam Post will explain in greater detail at trial. ***First***, the accused products do not scatter load "***each***

received data segment" as required by claims 1, 2, and 8. ████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████

Qualcomm's argument that the accused products satisfy the requirement "to scatter load each received data segment" under the doctrine of equivalents is barred by prosecution history estoppel. Qualcomm overcame prior art rejections by adding the limitation requiring scatter loading of "*each* received data segment" while arguing this new limitation is "patentably distinguishable." Further, accepting Qualcomm's argument would vitiate the limitation and substantially alter the scope of the claim. Allowing the claims to cover a scenario ████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████

**Second**, the accused products do not meet the agreed construction of an "image header" (i.e., "a header associated with the entire image that specifies where data segments are to be placed in the system memory"), which must be used to scatter load each received data segment, as required by claims 1, 2, and 8. ██████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

[REDACTED]

Qualcomm's argument that the accused products satisfy the "scatter load … based at least in part on the loaded image header" limitation under the doctrine of equivalents is barred by prosecution history estoppel. During prosecution, Qualcomm overcame rejections by adding the "image header" requirements to claim 1 based on arguments concerning an alleged lack of a unitary "image header" in the prior art. Qualcomm's argument also fails on the merits because the use of a [REDACTED]

[REDACTED]

[REDACTED] Under Qualcomm's theory— [REDACTED]

[REDACTED] —this supposed efficiency gained in the claimed invention of the '949 patent would be lost. Therefore, the function-way-result test for equivalents is not met because at least the way is substantially different [REDACTED] and the result is substantially different

[REDACTED]

[REDACTED]

Apple also does not indirectly infringe the asserted claims of the '949 patent for at least the following reasons. **First**, as detailed above, the accused products cannot be used by Apple or others in a way that directly infringes the '949 patent. Without an act of direct infringement, there can be no liability for induced infringement. **Second**, Apple also lacks the specific affirmative intent required to show indirect infringement, including because it reasonably believes that it does not

infringe the '949 patent. **Third**, the accused products are capable of substantial "non-infringing" use. ████████████████████

████████████████████████████████████████

████████████████████████

### C. The '949 Patent Is Invalid Under the Derivation and Non-Joinder Doctrines

The '949 patent is invalid pursuant to the derivation and non-joinder doctrines. The claimed invention of the '949 patent was derived from a person who is not a named inventor. Specifically, Apple will show that Arjuna Sivasithambaresan ("Siva"), a former Apple employee, conceived of the inventive concepts of the '949 patent—separate receipt of the image header and data segments, and direct scatter loading. Apple will also show that Mr. Siva communicated his inventive ideas regarding separate receipt and direct scatter loading to Qualcomm.

The '949 patent is invalid under the doctrine of non-joinder because Qualcomm failed to name Mr. Siva as a co-inventor on the '949 patent, despite the fact that: (1) Mr. Siva significantly contributed to the conception of the '949 patent by conceiving of separate receipt and direct scatter loading; (2) the quality of Mr. Siva's contribution is significant when measured against the '949 patent; and (3) Mr. Siva did more than merely explain well-known concepts or the current state of the art to Qualcomm's engineers.

### D. The '949 Patent Is Unenforceable Due to Inequitable Conduct

The '949 patent is unenforceable due to inequitable conduct. Three of the named inventors—Messrs. Haehnichen, Malamant, and Kim—received communications describing Mr. Siva's idea before any alleged conception date. By swearing to the Patent Office that they were the "original and first inventor(s) of the subject matter which is claimed and for which the patent is sought" without naming Mr. Siva (or anyone from Apple), Messrs. Haehnichen, Malamant and Kim knowingly and intentionally misled the Patent Office regarding the proper identity of

the named inventors. Because omission of Mr. Siva as an inventor was a material misrepresentation, the '949 patent is unenforceable.

### E. The Asserted Claims of the '949 Patent Are Invalid as Anticipated and Obvious

The asserted claims of the '949 patent are invalid as anticipated and obvious. *First*, the IBM Cell Programming Handbook ("Cell Handbook") anticipates claims 1, 2, and 8 of the '949 patent. The Cell Handbook describes a multi-step process for transferring and direct scatter loading executable software images (including images based on the ELF format) from the non-volatile memory coupled to the primary processor into system memory coupled to the secondary processor. In particular, the Cell Handbook describes first transmitting to the secondary processor a set of per-loader/per-binary parameters ("SPE parameters") and/or a segment list (which collectively meet the "image header" limitation under Qualcomm's interpretation of the claims for purposes of its infringement allegations). It then describes separately transmitting to the secondary processor one or more data segments of the image. Because the SPE parameters (where one segment is present) or the segment list (where multiple segments are present) include the destination address in system memory where the data segments should be loaded, the data segment(s) are scatter loaded into the system memory directly from a "hardware buffer" (in the secondary processor) into their final location in local-store system memory. For these reasons, the Cell Handbook anticipates the asserted claims.

*Second*, the combination of Qualcomm's "Gobi1000" Computers and Korean Patent Application Pub. No. 2002/0036354 ("Kim") renders obvious claims 1, 2, and 8 of the '949 patent. █████████████████████████████████████████

However, Kim discloses a multiprocessor system that transmits executable software images stored in a host processor's non-volatile memory to a secondary processor. The executable software images include a header and block that are separately transmitted to the secondary processor. Based on Kim's disclosure of the "separate receipt" feature, it would have been obvious to modify the Gobi1000 Computers

Accordingly, the Gobi 1000 Computers in combination with Kim renders obvious claims 1, 2, and 8 of the '949 patent.

*Finally*, the combination of the Blackfin Hardware Reference Manual ("Blackfin Manual) and the Cell Handbook renders obvious claims 1, 2, and 8 of the '949 patent. The Blackfin Manual discloses a multi-step process to load an executable

software images (called an "INIT block") from the host Blackfin processor to the slave Blackfin Processor. First, the slave Blackfin Processor receives the 10-byte header of the INIT block from the host Blackfin Processor over an inter-processor interface. Second, the slave Blackfin Processor parses the received header to extract the destination address in system memory for the INIT block (which, at that time, has not yet been received). Third, when the host Blackfin Processor transmits the INIT block over the interface, the slave Blackfin Processor loads it directly from a "hardware buffer" into system memory based on the destination address specified in the previously received header. The INIT block is then executed. A person of ordinary skill in the art would have been motivated to combine the Blackfin Manual and Cell Handbook at least because they describe multiprocessor systems and methods of loading an image from one processor to another. Specifically, a person of ordinary skill would have considered combining these different features to achieve greater efficiency in the loading of an image from a host processor to a slave processor, and then scatter loading the image into different locations in the slave processor's system memory as taught by the references. The Blackfin Manual in combination with the Cell Processor (discussed above) renders obvious claims 1, 2 and 8 of the '949 patent.

## IV. APPLE DOES NOT INFRINGE ANY VALID CLAIM OF THE '936 PATENT

### A. Overview of the '936 Patent

The '936 patent, titled "Programmable Streaming Processor with Mixed Precision Instruction Execution," was filed on April 21, 2008, and issued on January 21, 2014. The '936 patent relates to a graphics processor with multiple execution units for executing graphics instructions on graphics data at different precisions. In particular, the '936 patent claims the use of separate conversion instructions that are different from the graphics instructions to convert the precision of graphics data if the data does not match the indicated precision for execution. The '936 patent also claims

a specific type of compiler—a single compiler that both takes as input graphics application instructions and generates executable instructions (including graphics and conversion instructions).

The core concepts of the '936 patent—graphics processors executing graphics instructions, programmable streaming processors, processors with both full- and half-precision execution units, graphics instructions containing an indication of precision, selecting an execution unit based on indicated precision, separate conversion instructions, and compilers, including compilers that generate both graphics instructions and separate conversion instructions—were already well-known at the time the '936 patent was filed.

### B. Apple Does Not Infringe the '936 Patent

Apple does not literally infringe the asserted claims of the '936 patent for at least three reasons, which Apple's expert Henry Fuchs, Ph.D., and Apple engineer Jean-Luc Duprat will explain in greater detail at trial. *First*, the accused products use three separate compilers—none of which takes as input graphics application instructions and generates executable instructions, as is required of the single "compiler" recited in claims 19, 25, and 27. Qualcomm's arguments that the accused products satisfy the "compiler" limitations of the '936 patent under the doctrine of equivalents are barred by prosecution history estoppel. Qualcomm has not overcome the presumption of estoppel at least because Qualcomm cannot show that the rationale for amendments to the "compiler" limitations was no more than tangentially related to the equivalent. Even if Qualcomm is not barred by prosecution history estoppel, the accused products do not satisfy the "compiler" limitations of the '936 patent under the doctrine of equivalents because the claimed invention is substantially different from the accused products. Apple's three separate compilers are ███████████ ████████████████████████████ operate at different times on different computing platforms and at different physical locations, and the use of those three separate compilers creates a more flexible development process for application developers and

a better experience for its customers. **Second**, the accused products are not "configured to" receive or execute the accused conversion instructions, as required by claims 19, 25, and 27. Instead, Apple uses multiple, other techniques that are more efficient than the '936 patent's claimed separate conversion instructions. **Third**, the accused products do not "shut down power" to a "full-precision execution unit," as required by claim 25. At most, the accused products ███████████████████████ █████████████████████████████████████; this technique does not shut down power to an execution unit.

Apple also does not indirectly infringe the asserted claims of the '936 patent for at least the following reasons. **First**, as detailed above, the accused products cannot be used by Apple or others in a way that directly infringes the '936 patent. **Second**, Apple also lacks the specific affirmative intent required to show indirect infringement, including because it reasonably believes that it does not infringe the '936 patent. **Third**, the accused products are capable of substantial "non-infringing" use. The accused products may be used █████████████████████████ ███████████████████████████████ Qualcomm's infringement allegations. At most, the mixed-precision graphics processing Qualcomm contends infringes would only constitute a minor portion of the overall functionality in the graphics processing unit of the accused products, let alone each entire product.

###### C. The Asserted Claims of the '936 Patent Are Invalid as Anticipated and Obvious.

The NV35 graphics processing unit, GeForce FX 5900 graphics card, and accompanying driver software (collectively, the "NV35 Products"), which were developed by NVIDIA and sold in the United States beginning in 2003, disclose each limitation of claim 19. The NV35 Products anticipate the '936 patent because (1) the NV35 Products are used for rendering graphics; ██████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████

The CELL Accelerator Boards and CELL-Based Blade Servers, and their associated documentation and software (collectively, the "CELL Products") developed by Mercury Systems and sold prior to May 2007, also disclose each limitation of claim 19 and, at least under Qualcomm's infringement theory, claim 25. The CELL Products anticipate the '936 patent because: (1) the CELL Processor in the CELL Products is used for high-quality 3D graphics applications and for implementing standard graphics languages like OpenGL; (2) they perform ████ ████████████████████████ in a manner disclosed in the '936 patent; (3) they include both full- and half-precision execution units (i.e., DPfpu units and SPfpu units); (4) they use multi-precision graphics instructions that include an indication of data precision (e.g., DFA / FA instructions (double-precision and single-precision floating-point add), DFMA / FMA instructions (double-precision and single-precision floating-point multiple and add)); (5) they use conversion instructions to convert between full and half precision (i.e., FRDS instruction (double to single precision), FESD instruction (single to double precision)); and (6) all of these instructions ██ ████████████████████████████ In addition, under Qualcomm's (incorrect) infringement theory, the CELL Products disclose the "shut down power" limitation because ████████████████████ when the DPfpu unit is not in use.

The asserted claims of the '936 patent are obvious in light of the combination of the NV35 Products and the article "Programmable Stream Processors" by Kapasi

et al. ("Kapasi") and/or U.S. Patent Application Publication No. 2005/0066205 ("Holmer") because Kapasi discloses a programmable streaming processor and Holmer discloses shutting down power to a full-precision execution unit when not in use and a wireless communication device handset. A person of ordinary skill in the art would have been motivated to combine the NV35 Products, Kapasi, and Holmer at least because they are directed to the same field of endeavor; modifying the NV35 Products would require little, if any work; the references presented similar concerns; and the processor industry was moving toward providing more power and functionality in a smaller form-factor, such as a mobile device.

The asserted claims of the '936 patent are also obvious in light of the combination of the CELL Products and Kapasi and/or Holmer because Kapasi discloses a programmable streaming processor and graphics instructions and Holmer discloses shutting down power to a full-precision execution unit when not in use and a wireless communication device handset. A person of ordinary skill in the art would have been motivated to combine the CELL Products, Kapasi, and Holmer including at least for substantially the same reasons described above. No secondary considerations of non-obviousness apply at least because Qualcomm has not demonstrated the required nexus between its asserted secondary considerations—commercial success, long-felt but unmet need, industry praise, and licensing.

## V. APPLE DOES NOT INFRINGE ANY VALID CLAIM OF THE '490 PATENT

### A. Overview of the '490 Patent

The '490 patent, titled "Power Saving Techniques in Computing Devices," was filed on December 12, 2014, and issued on January 3, 2017. Notwithstanding its broad title, the '490 patent is specifically directed to a "modem processor" and an "application processor" coupled via a communication "bus," where each processor "holds" data intended for the other processor. The '490 patent claims to conserve power merely by providing a specific way to reduce the number of times a bus

connecting a modem processor to an application processor transitions between active and low power states.

The core concepts of the '490 patent—modem processors, application processors, buses, low power and active power bus states, PCIe buses, interprocessor communication over a bus between two processors, using a PCIe bus to couple an application processor to a modem processor, holding data for later transmission, reducing bus power state transitions by holding data for later transmission, modem timers, and transmitting uplink and/or downlink data between an application process and a modem processor over a bus—were already well-known at the time the '490 patent was filed.

### B. Apple Does Not Infringe the '490 Patent

The accused products do not infringe claim 31 of the '490 patent—the sole asserted claim—for at least three reasons, which Dr. Lin and Intel engineer Ulrich Leucht-Roth will explain in greater detail at trial. *First*, the accused products do not have "an application processor configured to hold [uplink] data" but rather ███. *Second*, the accused products do not have a "modem processor configured to hold [downlink] data" but rather ███. Moreover, Qualcomm's arguments that the accused products satisfy, under the doctrine of equivalents, the "[application/modem] processor configured to hold" limitations of claim 31 of the '490 patent are barred by the "all elements rule" because applying claim 31 to allow uplink and downlink data to be held anywhere in the accused products would render the "[application/modem] processor configured to hold" language of claim 31 meaningless and would replace that language with just "hold." Qualcomm's doctrine of equivalents arguments for these limitations are also barred by the disclosure-dedication doctrine because the specification of the '490 patent discloses two embodiments describing where data can be stored—i.e., storing data in external memory "coupled to the processor" and a "storage medium . . . integral to

the processor"—but Qualcomm drafted claim 31 to cover only the latter embodiment. Even if Qualcomm is not barred by the "all elements rule" or by the disclosure-dedication doctrine, the accused products do not satisfy the "[application/modem] processor configured to hold" limitation of claim 31 of the '490 patent under the doctrine of equivalents because the claimed invention is substantially different from the accused products.  Storing data in internal memory (as required by the claimed invention) is substantially different from ███████████████████████████ ████████████████ because, for example, storing data in internal memory allows for faster data access and transmission, and consumes less power.

*Third*, the accused products do not transmit uplink data "after transmission" of the held downlink data.  Instead, uplink and downlink data transfers overlap in the accused products.  Qualcomm's arguments that the accused products satisfy, under the doctrine of equivalents, the "after transmission" limitation of the '490 patent are barred by prosecution history estoppel.  Qualcomm has not overcome the presumption of estoppel because Qualcomm's amendments and arguments during prosecution narrowed the "after transmission" limitation to exclude overlapping uplink and downlink transmissions.  Qualcomm's argument is also barred by the "all elements rule" because applying claim 31 to allow the transmission of uplink data to occur before the transmission of all downlink data would vitiate the uplink "after transmission" of downlink limitation.  Even if Qualcomm is not barred by prosecution history estoppel or by the "all elements rule," the accused products do not satisfy the "after transmission" limitation of claim 31 of the '490 patent under the doctrine of equivalents because the claimed invention is substantially different from the accused products.  Transmission of uplink data after transmission of held downlink data (as required by the claimed invention) is substantially different from overlapping uplink and downlink data transmissions (as in the accused products) because sequential data transfers are suitable for half-duplex buses while overlapping data transfers are not.

Apple also does not indirectly infringe claim 31 of the '490 patent for at least the following reasons. *First*, as detailed above, the accused products cannot be used by Apple or others in a way that directly infringes the '490 patent. *Second*, Apple also lacks the specific affirmative intent required to show indirect infringement, including because it reasonably believes that it does not infringe the '490 patent. *Third*, the accused products are capable of substantial "non-infringing" use.

### C. The Asserted Claim of the '490 Patent Is Invalid as Anticipated and Obvious

Claim 31 of the '490 patent is invalid as anticipated and obvious. The Centrino Notebook Computers, sold before December 16, 2013, disclose each limitation of claim 31 under Qualcomm's apparent reading of the claim for infringement purposes. Alternatively, claim 31 is invalid as obvious in view of the Centrino Notebook Computers. Specifically,

Alternatively, claim 31 is invalid as obvious in view of the Centrino Notebook Computers. The Centrino Notebook Computers render obvious "the application processor configured to hold [uplink] data" under a proper reading of this limitation, which requires the application processor to hold uplink data in memory internal to the processor. Given two well-known ways to hold data—"on-chip" or "off-chip"—a person of ordinary skill would have been motivated to modify the Centrino Notebook Computers

The Centrino Notebook Computers also render obvious the "after transmission" limitations under a proper reading of these limitations. A person of ordinary skill in the art would have found it obvious to modify the Centrino WiFi Card to transmit all held downlink data before pulling uplink data ████ ████████████████████████████████████████████████████ ████████████████████████████████████████ Further, claim 31 would still have been obvious even under Qualcomm's contention that the Centrino WiFi Cards pulled uplink data before transmitting downlink data. A person of ordinary skill would have considered ████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████

The combination of U.S. Patent No. 9,329,671 ("Heinrich") and U.S. Patent No. 8,160,000 ("Balasubramanian") also renders claim 31 obvious because it would have been obvious to a person of ordinary skill to (1) incorporate Balasubramanian's pulling after transmission scheduling techniques—involving a first processing node pulling held data from a second processing node after transmission of the first processing node's held data to the second processing node (2) into Heinrich's inter-processor communication system, which uses a modem processor and an application processor and scheduling techniques that include holding data on each side of the bus and using the expiration of a lazy timer to determine when to transmit the held data. Together, Heinrich and Balasubramanian disclose all the elements of claim 31. A person of ordinary skill in the art would have been motivated to combine Heinrich and Balasubramanian at least because both are directed to the same field; both address the same concern; both solve this concern in the same way; Heinrich's scheme is open to modification; Balasubramanian's scheduling techniques would naturally fit into Heinrich's scheduler, which controls data transfer in both directions; and the same

advantages Balasubramanian teaches would be gained by applying the same approach to Heinrich.

## VI. QUALCOMM'S INFLATED DAMAGES CLAIM IS CONTRARY TO THE LAW AND FACTS

Even if Qualcomm could establish liability—and it cannot for the reasons set forth above—Qualcomm's damages claims are untethered to the law or to facts of this case. Qualcomm is not entitled to damages, as its damages model is based on faulty assumptions and unreliable data. *See Wordtech Sys., Inc. v. Integrated Networks Sols., Inc.*, 609 F.3d 1308, 1318-22 (Fed. Cir. 2010).

For the '936 and '490 patents, (1) Qualcomm's technical experts exaggerate the power savings due to the asserted patents' technologies, (2) Qualcomm's survey expert, Jeffrey Prince, Ph.D., overstates the value of 15 extra minutes of battery life, and (3) Qualcomm's damages expert, Patrick Kennedy, Ph.D., proposes calculations based on the flawed technical and survey analyses, resulting in grossly inflated damages numbers.

For the '936 patent, Qualcomm's technical expert Murali Annavaram, Ph.D., claims the device-level power savings due to the patented technology is ███, but this is based on a ███████████████████████████████████████████████ ███████████████████████████████████████████. In reality, the '936 patent would increase power consumption because the patent requires two processing steps instead of one, or, at best, decrease consumption by no more than ███. Further, Dr. Prince's survey is unreliable because it (1) sought to quantify the value of two extra hours of "heavy use" of a smartphone, which is unrelated to the claims in this case, (2) did not directly test for the value of the battery savings allegedly provided by the patents-in-suit, and (3) did not apportion the results from the other many unpatented features in the accused products. *See NetAirus Techs., LLC v. Apple, Inc.*, No. LACV1003257, 2013 WL 12322092, at *3-4 (C.D. Cal. Oct. 23, 2013); *see also Oracle Am., v. Google Inc.*, No. C 10-3561, 2012 WL850705, at

*10 (N.D. Cal. Mar. 13, 2012).  Finally, Dr. Kennedy's reliance on Dr. Annavaram's and Dr. Prince's faulty analysis, as well as his own 50-50 profit split analysis, creates an improper and inflated damages number for the '936 patent.  *See Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1332-33 (Fed. Cir. 2014).

For the '490 patent, Qualcomm's technical expert—Jacob Baker, Ph.D.—claims the device-level power savings due to the patented technology is ████, but this is based on ████████████████████████████████████.  The claimed functionality of the '490 patent would actually decrease power consumption by no more than ██████.  The same issues described above for the '936 patent for Dr. Prince's survey apply to the '490 patent.  Similarly, Dr. Kennedy's reliance on Dr. Baker and Dr. Prince's faulty analysis, as well as his own 50-50 profit split analysis, creates an unreliable and exaggerated damages number for the '490 patent.

For the '949 patent, many of the assumptions Dr. Kennedy makes in his calculation of the cost of a 32 MB NAND flash component—on which he bases his '949 patent damages opinion—are flawed.  Dr. Kennedy relies on a single 2018 online retailer price for the component that he unreliably attempts to translate into a 2016 price, ignoring Apple's ability to buy in bulk at a lower cost.

Further, if the jury finds Qualcomm is due any damages, a freedom to operate lump sum royalty would be appropriate.  *See Studiengesellschaft Kohle, M.B.H. v. Hercules, Inc.*, 105 F.3d 629, 631 (Fed. Cir. 1997); *see also Personal Audio, LLC v. Apple, Inc.*, 2011 WL 3269330 (E.D.Tex., July 29, 2011).  Based on Apple's policy of pursuing one-time, lump sum licensing terms, a hypothetical negotiation between Qualcomm and Apple would not have resulted in an ongoing royalty, but instead a freedom to operate lump sum payment.

Finally, even if the accused products are found to infringe the ██████ patents (and thus, found to substantially embody the patents), Qualcomm cannot recover damages on any products manufactured by Pegatron, as it is undisputed that

1  Pegatron is licensed by Qualcomm.[1]  The ████████ patents fall within the
2  Qualcomm-Pegatron license, Pegatron's sales of licensed accused products to Apple
3  are authorized by the license, and therefore Qualcomm's patent rights related to the
4  Pegatron-manufactured accused products are exhausted.  If the jury finds that the
5  accused products manufactured by Pegatron infringe the asserted patents, they
6  necessarily are exhausted.  *See Apple, Inc. v. Samsung Elecs. Co.*, 920 F.Supp.2d
7  1079, 1113 (N.D. Cal. 2013) ("Without infringement or evidence of infringing use,
8  there can be no exhaustion.").  "[M]aking a product that substantially embodies a
9  patent is, for exhaustion purposes, no different from making the patented article
10 itself."  *Quanta Computer, Inc. v. LG Elecs., Inc.*, 553 U.S. 617, 637 (2008).  Much
11 like the patent law axiom "[t]hat which infringes if later, anticipates if earlier" (*Peters*
12 *v. Active Manufacturing Co.*, 129 U.S. 530 (1889)), a patentee's license exhausts a
13 patent if that same action would infringe if performed by another.

14 **VII.  FORESEEABLE EVIDENTIARY AND PROCEDURAL ISSUES**

15      Apple has included below its understanding of foreseeable evidentiary and
16 procedural issues based on the parties' briefing, correspondence, and pretrial
17 disclosures.

18      **A.    Qualcomm Has Waived Any Willful Infringement Argument**

19      Qualcomm has failed to preserve any argument that Apple willfully infringes
20 any claim of the asserted patents, or any argument that Qualcomm is entitled to
21 enhanced damages due to willful infringement.  Federal Rule of Civil Procedure 8
22 requires a short and plain statement of a claim showing that the pleader is entitled to
23 relief, and a demand for judgment.  *See* Fed. R. Civ. P. 8(a); *see also DaimlerChrysler*
24 *Corp. v. United States*, 442 F.3d 1313, 1320 (Fed. Cir. 2006) ("A complaint must give
25 the defendant fair notice of what the plaintiff's claim is and the grounds upon which

26  ───────────────
27  [1]    Given Qualcomm's representations at February 22, 2019's hearing on
    Qualcomm's and Apple's Motions *in Limine*, Apple expects this exhaustion issue to
28  be resolved by stipulation.  However, out of an abundance of caution, Apple includes
    the issue here.

it rests[.]"); *Revolution Eyeware, Inc. v. Aspex Eyewear, Inc.*, No. CV 02-01087, 2007 WL 9723350 (C.D. Cal. July 20, 2007). A claim of patent infringement is not the same as a claim of willful infringement. *See Orthokinetics, Inc. v. Safety Travel Chairs, Inc.*, 806 F.2d 1565, 1579 (Fed. Cir. 1986) (holding that infringement and willful infringement are "not the same thing"). Accordingly, courts require parties to plead and prove willful infringement as a predicate to recovering enhanced damages. *See, e.g.*, *Nichia Corp. v. Seoul Semiconductor Ltd.*, No. C-06-0162, 2006 WL 1233148, at *2 (N.D. Cal. May 9, 2006).

Neither Qualcomm's complaint nor its amended complaint contains any claim of willful infringement. *See* Dkt. 001 [Complaint]; Dkt. 014 [Amended Complaint]. Moreover, neither Qualcomm's complaint nor its amended complaint contains any demand for enhanced damages. *See id.* Qualcomm first raised a claim of willful infringement in the Disclosure of Asserted Claims and Infringement Contentions it served on February 9, 2018—six months after it filed its amended complaint. *See* Ex. A [Infringement Contentions]. In its Infringement Contentions, Qualcomm makes only the following conclusory assertions:

> Based on information presently and reasonably available to Qualcomm, Apple has had knowledge of the '936, '558, '949, '490, and '675 patents, and its infringement of these patents, since at least July 6, 2017, when Qualcomm filed this action. Accordingly, since at latest [sic] July 6, 2017, Apple has willfully infringed these patents. Qualcomm reserves the right to supplement this disclosure after discovery of more information.

*Id.* at 17. Because Qualcomm did not amend its complaint to include any claim of willful infringement or enhanced damages, its pleading as to those issues is insufficient under Rule 8.

Qualcomm also failed to include in its Memorandum of Contentions a statement of material facts supporting its willfulness allegation. *See* Civ. L.R. 16.1.f.2. Instead, Qualcomm merely repeated the same conclusory assertions from its Infringement Contentions. *See* Dkt. 528 [Qualcomm Memo.] ¶ 153. Additionally,

Qualcomm did not include enhanced damages among the remedies it sought in the Proposed Pretrial Order jointly filed by the parties in accordance with the Court's schedule. *See* Dkt. 553 [Initial Proposed PTO]; *see also Hunt v. Cnty. of Orange*, 672 F.3d 606, 617 (9th Cir. 2012) (observing that the Ninth Circuit has "consistently held that issues not preserved in the pretrial order have been eliminated from the action"). Accordingly, Qualcomm's argument that Qualcomm is entitled to enhanced damages due to Apple's purported willful infringement is waived. *See* Civ. L.R. 16.1.f.6.c.2 ("A cause of action in the Complaint . . . which is not listed [in the pretrial order] will be dismissed with prejudice.").[2]

---

[2]      Qualcomm successfully moved *in limine* to exclude evidence relating to the outcomes of the companion ITC Investigation No. 1065. At least two of the outcomes from that Investigation are relevant to rebut Qualcomm's willfulness arguments, should the Court determine that those arguments are not waived. First, Qualcomm asserted the same claims of the '936 patent in that Investigation as it does in this case. The Administrative Law Judge determined that Apple does not infringe the asserted claims of the '936 patent, a determination that the ITC has decided not to review, making it a final determination. *Cf. Sleep Number Corp. v. Sizewise Rentals, LLC*, No. ED CV 18-00356, 2018 WL 5263065, at *7 (C.D. Cal. June 26, 2018) (holding that a prior ITC investigation finding infringement permitted an inference of willful infringement in the subsequent district court case). Second, Qualcomm also asserted the '949 patent in the ITC Investigation, but withdrew the patent prior to the hearing. In sum, there are two outcomes that strongly undercut any claim of willfulness against Apple with respect to the '936 and '949 patents.

Separately, although the Administrative Law Judge determined that Apple infringes claim 31 of the '490 patent, the ITC has undertaken review of that determination and that initial determination is, therefore, not final.

Qualcomm should not be permitted to exclude evidence of the outcomes of the 1065 Investigation while simultaneously pressing a willfulness theory that could be rebutted by evidence about those very same outcomes. But as Apple has explained above, the Court need not reach the substantive willfulness issues, because Qualcomm has waived willfulness.

Dated: March 1, 2019        Respectfully submitted,

By: /s/ *Nina S. Tallon*
Nina S. Tallon, DC Bar No. 479481
*pro hac vice*, nina.tallon@wilmerhale.com
WILMER CUTLER PICKERING HALE AND DORR LLP
1875 Pennsylvania Avenue NW
Washington, DC 20006
Phone: 202-663-6000 / Fax: 202-663-6363

Mark D. Selwyn, SBN 244180,
mark.selwyn@wilmerhale.com
WILMER CUTLER PICKERING HALE AND DORR LLP
950 Page Mill Road
Palo Alto, CA 94304
Phone: 650-858-6000 / Fax: 650-858-6100

William F. Lee, MA Bar No. 291960
*pro hac vice*, william.lee@wilmerhale.com
Joseph J. Mueller, MA Bar No. 647567
*pro hac vice*, joseph.mueller@wilmerhale.com
Timothy Syrett, MA Bar No. 663676
*pro hac vice*, timothy.syrett@wilmerhale.com
Richard W. O'Neill, pro hac vice,
richard.o'neill@wilmerhale.com
Bradley M. Baglien, pro hac vice,
bradley.baglien@wilmerhale.com
WILMER CUTLER PICKERING HALE AND DORR LLP
60 State Street
Boston, MA 02109
Phone: 617-526-6000 / Fax: 617-526-5000

Juanita R. Brooks, SBN 75934, brooks@fr.com
Seth M. Sproul, SBN 217711, sproul@fr.com
Frank Albert, SBN 247741, albert@fr.com
Joanna M. Fuller, SBN 266406, jfuller@fr.com
Katherine D. Prescott, SBN 215496
prescott@fr.com
Betty H. Chen, SBN 24056720
betty.chen@fr.com
FISH & RICHARDSON P.C.
500 Arguello Street, Suite 500
Redwood City, CA 94063
Phone: 650-839-5070 / Fax: 650-839-5071

Ruffin B. Cordell, DC Bar No. 445801
*pro hac vice*, cordell@fr.com
Lauren A. Degnan, DC Bar No. 452421

*pro hac vice*, degnan@fr.com
FISH & RICHARDSON P.C.
1000 Maine Avenue, S.W. Suite 1000
Washington, D.C. 20024
Phone: 202-783-5070 / Fax: 202-783-2331

William A. Isaacson, DC Bar No. 414788
*pro hac vice*, wisaacson@bsfllp.com
Karen L. Dunn, DC Bar No. 1002520
*pro hac vice*, kdunn@bsfllp.com
BOIES, SCHILLER & FLEXNER LLP
1401 New York Avenue, N.W.
Washington, DC 20005
Phone: 202-237-2727 / Fax: 202-237-6131

Benjamin C. Elacqua, TX SBN 24055443
*pro hac vice*, elacqua@fr.com
John P. Brinkmann, TX SBN 24068091
*pro hac vice*, brinkmann@fr.com
FISH & RICHARDSON P.C.
One Houston Center, 28th Floor
1221 McKinney
Houston, TX 77010
Phone: 713-654-5300 / Fax: 713-652-0109

Brian P. Boyd, GA SBN 553190
*pro hac vice*, bboyd@fr.com
FISH & RICHARDSON P.C.
1180 Peachtree St., NE, 21ST Floor
Atlanta, GA 30309
Phone: 404-892-5005 / Fax: 404-892-5002

*Attorneys for Apple Inc.*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been served on March 1, 2019 to all counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system per Civil Local Rule 5.4.  Any other counsel of record will be served by electronic mail, facsimile and/or overnight delivery.

Executed on March 1, 2019 at Washington D.C.


*/s/ Nina S. Tallon*